**Case No. 26-60240**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

AMERICAN ENERGY ASSOCIATION; NATURAL RESOURCES DEFENSE COUNCIL, INCORPORATED; DEFENDERS OF WILDLIFE; NATIONAL WILDLIFE FEDERATION; NATIONAL PARKS CONSERVATION ASSOCIATION; FLORIDA WILDLIFE FEDERATION; LOUISIANA WILDLIFE FEDERATION; TEXAS CONSERVATION ALLIANCE,

*Petitioners*,

v.

DOUG BURGUM, Secretary of the Interior, in his official capacities as Chair and Member of the Endangered Species Committee; BROOKE ROLLINS, Secretary of Agriculture, in her official capacity as a Member of the Endangered Species Committee; DANIEL DRISCOLL, Secretary of the Army, in his official capacity as a Member of the Endangered Species Committee; PIERRE YARED, Acting Chair of the Council of Economic Advisors, in his official capacity as a Member of the Endangered Species Committee; LEE ZELDIN, Administrator of the Environmental Protection Agency, in his official capacity as a Member of the Endangered Species Committee; NEIL JACOBS, Administrator of the National Oceanic and Atmospheric Administration, in his official capacity as a Member of the Endangered Species Committee; PETE HEGSETH, Secretary, U.S. Department of Defense,

*Respondents*.

On Petitions for Review of an Order of the Endangered Species Committee

# CENTER FOR BIOLOGICAL DIVERSITY'S
# MOTION TO INTERVENE IN
# AMERICAN ENERGY ASSOCIATION'S PETITION FOR REVIEW

Brian Segee
Center for Biological Diversity
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
(805) 750-8852
bsegee@biologicaldiversity.org

Kristen Monsell
Center for Biological Diversity
2100 Frankin Street, Suite 375
Oakland, CA 94612
(510) 844-7137
kmonsell@biologicaldiversity.org

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel certifies that the following listing persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2 have an interest in the outcome of the case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  Petitioner

    American Energy Association

2.  Attorney for Petitioner

    James Conde, Boyden Gray, P.L.L.C.

3.  Respondents

    Doug Burgum, Secretary of the Interior, in his official capacities as Chair and Member of the Endangered Species Committee

    Brooke Rollins, Secretary of Agriculture, in her official capacity as a Member of the Endangered Species Committee

    Daniel Driscoll, Secretary of the Army, in his official capacity as a Member of the Endangered Species Committee

    Pierre Yared, Acting Chair of the Council of Economic Advisors, in his official capacity as a Member of the Endangered Species Committee

    Lee Zeldin, Administrator of the Environmental Protection Agency, in his official capacity as a Member of the Endangered Species Committee

    Neil Jacobs, Administrator of the National Oceanic and Atmospheric Administration, in his official capacity as a Member of the Endangered Species Committee

    Pete Hegseth, Secretary, U.S. Department of Defense

4. <u>Attorneys for Respondents</u>

Christopher Anderson

Dimple Chaudhary

Robert Nolan Stander

5. <u>Intervenor-Respondent</u>

American Petroleum Institute

6. <u>Attorneys for Intervenor-Respondent</u>

Jason T. Morgan, Stoel Rives LLP

Tiffany Wang, Stoel Rives LLP

**Federal Rule of Appellate Procedure 26.1:**

Center for Biological Diversity discloses as follows:

The Center for Biological Diversity is a 501(c)(3) organization that has no parent corporation, and there is no publicly held corporation that owns ten percent (10%) or more of Center for Biological Diversity.

*s/ Brian Segee*

*Counsel for Proposed Intervenor-Respondent Center for Biological Diversity*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

LEGAL BACKGROUND ......................................................................................4

I.  The Endangered Species Act Section 7 Consultation Process ............4

II.  The Endangered Species Committee Section 7 Exemption Process ...6

III.  Secretary of Defense Section 7(j) Authority .......................................8

IV.  Judicial Review of any Committee Decision Under Section 7(h) .......9

FACTUAL BACKGROUND ..................................................................................9

I.  The March 31, 2026, Section 7(j) Exemption and Pending
Challenges in the District Court ..........................................................9

II.  Procedural History of AEA's Petition for Review Before
the Fifth Circuit Court of Appeals and Judicial Panel on
Multidistrict Litigation .....................................................................11

ARGUMENT ........................................................................................................14

I.  Center for Biological Diversity Is Entitled to Intervene as
of Right in AEA's Petition...............................................................14

A.  The Motion Is Timely ............................................................15

B.  Center for Biological Diversity Possesses a Cognizable
Interest Relating to the Subject Matter of this Action ............16

C.  Disposition of This Action May Impair or Impede Center
for Biological Diversity's Interests ........................................19

D.  Center for Biological Diversity's Interests Are Not
Adequately Represented by Federal Respondents or
American Petroleum Institute ................................................20

III.  In the Alternative, Center for Biological Diversity Should Be Granted
Permissive Intervention ................................................................22

CERTIFICATE OF COMPLIANCE ...................................................................24

# TABLE OF AUTHORITIES

## CASES

*Bldg. & Constr. Trades Dep't v. Reich*,
40 F.3d 1275 (D.C. Cir. 1994) ........................................................................15

*Brumfield v. Dodd*,
749 F.3d 339 (5th Cir. 2014) ..............................................................15, 19, 20

*Ctr. for Biological Diversity v. United States Fish & Wildlife Serv.*,
146 F.4th 1144 (D.C. Cir. 2025) .....................................................................18

*Defs. of Wildlife v. Lujan*,
504 U.S. 555 (1991) .........................................................................................18

*Doe No. 1 v. Glickman*,
256 F.3d 371 (5th Cir. 2001) ......................................................................16, 17

*Edwards v. City of Hous.*,
78 F.3d 983 (5th Cir. 1996) ................................................................ 20, 21-22

*Entergy Gulf States La. v. U.S. E.P.A.*,
817 F.3d 198 (5th Cir. 2016) ...........................................................................15

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., AFL-CIO, Loc. 283 v. Scofield*,
382 U.S. 205 (1965) .........................................................................................14

*La Union del Pueblo Entero v. Abbott*,
29 F.4th 299 (5th Cir. 2022) .......................................................................15, 19

*Sierra Club v. Espy*,
18 F.3d 1202 (5th Cir. 1994) .......................................................................16, 20

*Texas v. United States*,
805 F.3d 653 (5th Cir. 2015) ...........................................................................16

*Texas v. United States EPA*,
No. 23-60069, 2023 U.S. LEXIS App. 15305 (5th Cir. April 19, 2023) ............14

*Tenn. Valley Auth. v. Hill*,
  437 U.S. 153 (1978) ............................................................................4, 5

*Trbovich v. United Mine Workers*,
  404 U.S. 528 (1972) ..............................................................................20

**STATUTES**

16 U.S.C. § 1531(a)(1) .............................................................................4

16 U.S.C. § 1531(a)(2) .............................................................................4

16 U.S.C. § 1531(a)(3) .............................................................................4

16 U.S.C. § 1531(b) ..................................................................................4

16 U.S.C. § 1536(a)(2) ...........................................................................4, 5

16 U.S.C. § 1536(b)(3)(A) .........................................................................6

16 U.S.C. § 1536(e)(3)(G) .........................................................................7

16 U.S.C. § 1536(f)(1)-(2) .........................................................................7

16 U.S.C. § 1536(g)(1) ..............................................................................6

16 U.S.C. § 1536(g)(2)(B) .........................................................................7

16 U.S.C. § 1536(h) ........................................................................ 6, 10-11

16 U.S.C. § 1536(h)(1) ..............................................................................8

16 U.S.C. § 1536(j) ....................................................................... 8-9, 10, 11

16 U.S.C. § 1536(n) ...................................................................... 9, 11, 19

16 U.S.C.§ 1540(g)(1) .............................................................................16

**REGULATIONS**

50 C.F.R. §§ 402.13 ..................................................................................5

50 C.F.R. § 402.14(b)(1) ............................................................................5

50 C.F.R. § 402.14(c) .................................................................................6

50 C.F.R. § 402.14(d) .................................................................................5

50 C.F.R. § 402.14(g) .................................................................................6

50 C.F.R. § 402.14(g)(5) .............................................................................6

50 C.F.R. § 402.14(g)(8) .............................................................................5

50 C.F.R. § 402.14(h) ...................................................................................6

50 C.F.R. § 402.14(h)(2) .............................................................................6

50 C.F.R. § 451.02(c) ..................................................................................6

50 C.F.R. § 451.02(e)(2)(viii) ......................................................................7

50 C.F.R. § 451.02(e)(3)(x) .........................................................................7

50 C.F.R. § 451.02(e)(4)(viii) ......................................................................7

50 C.F.R. § 451.03(b)(2) ..............................................................................7

50 C.F.R. § 452.05(d) ............................................................................. 7-8

50 C.F.R. § 452.05(g) ............................................................................. 7-8

50 C.F.R. § 453.03(a)...................................................................................8

**INTRODUCTION**

Pursuant to Federal Rules of Appellate Procedure 15(d) and 27(a), Center for Biological Diversity (the Center) respectfully requests leave to intervene as of right as a respondent in American Energy Association's (AEA) petition for review in this consolidated action. AEA's petition challenges the March 31, 2026, decision by the "Endangered Species Committee" (Committee) to ratify an exemption of Gulf of Mexico (Gulf) oil and gas activities from the ordinary safeguards afforded endangered and threatened species in section 7(a)(2) of the Endangered Species Act (ESA or Act). *See* Notice of Decision, 91 Fed. Reg. 16,966 (Apr. 4, 2026); Endangered Species Committee Administrative Record (ESC) 5-7 (Exemption Decision). According to AEA, the exemption decision is too protective of endangered and threatened species. Judicial Panel on Multidistrict Litigation (JPML) MCP No. 202, Dkt. No. 24, at 3-4.

Intervention as of right is warranted because the Center's motion is timely; the Center has a cognizable interest in the subject of the litigation; this interest may be impaired by AEA's petition; and the Center's interests are not adequately represented by any existing party.

The Center's motion is being timely filed within 30 days of the date of AEA's petition as required by Federal Rules of Appellate Procedure. The Center's motion is also timely under Fifth Circuit rules, as it being filed well in advance of

Federal Respondents' briefing deadline, and only days after the Center learned that AEA intends to argue that the Exemption Decision did not go as far as AEA would prefer in its removal of ESA protections.

The Center's long history of advocacy for the protection of endangered species and other wildlife impacted by Gulf oil and gas activities is a protectable interest justifying intervention as of right. The Exemption Decision impairs this protectable interest by removing ESA protections for numerous ESA-listed species and could result in the extinction of the endangered Rice's whale.

The unprecedented Exemption Decision was, however, apparently not enough for petitioner AEA or its members. Although its initial petition gave no indication as to the legal or factual basis for its challenge to a decision that it presumably supports and advocated for, AEA represented in filings before the JPML on May 9, 2026, that the Decision includes "some" "avoidance or minimization measures" that its members "believe objectionable." JPML No. 202, Dkt. No. 24, at 3-4. AEA's effort to remove residual recommendations that may protect ESA-listed species thus further threatens to impair the Center's interests.

In addition, AEA's petition raises a threshold question as to whether this Court has original jurisdiction to consider the Exemption Decision on the merits or, alternatively, if review of the Decision instead lies with the district courts under the Administrative Procedure Act (APA). The Center maintains that initial review is

proper only in the district courts and has accordingly filed a challenge to the Committee's Exemption Decision, the Secretary of Defense's national security determination that prompted the Decision, and related issues in the U.S. District Court for the District of Columbia. *Ctr. for Biological Diversity v. Burgum*, No. 1:26-cv-940-RC. That challenge was filed prior to the filing of AEA's petition or any other of the consolidated petitions now before this Court. The impact of AEA's petition on the Center's manner of proceeding as well as the substantive outcome of its pending district court lawsuit provides an additional basis for the Center's motion to intervene as respondent in this action.

Finally, the Center's interests are not adequately represented by Federal Respondents, as the Center and Federal Respondents do not share the same goals in relation to AEA's petition. The Center is not seeking to defend the Exemption Decision but instead opposes AEA's specific effort to argue that the Committee erred by maintaining any "avoidance or mitigation measures." Moreover, the Center asserts that jurisdiction is not proper in appellate courts in the first instance. In contrast, Federal Respondents expressly stated their position in the Exemption Decision that not only is jurisdiction proper in the appellate courts, but that such jurisdiction is limited to the Fifth or Eleventh Circuit Court of Appeals. *See* 91 Fed. Reg. at 16967; ESC 1.

Pursuant to Fifth Circuit Rule 27.4, counsel for the Center contacted counsel for AEA, Federal Respondents, and Intervenor-Respondents American Petroleum Institute ("API") regarding their positions on this motion. AEA takes no position but reserves the right to file a response. Federal Respondents have not responded. Intervenor-Respondent API takes no position.

## LEGAL BACKGROUND

### I.    The Endangered Species Act Section 7 Consultation Process.

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Finding that "fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people," Congress directed that all federal agencies shall "seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes" of the Act. 16 U.S.C. § 1531(a)(1)-(3), (b). To that end, the ESA establishes substantive and procedural safeguards for species that are listed as endangered or threatened, as well as for the formally designated "critical habitats" of such species.

Section 7 of the ESA substantively prohibits federal agencies from taking any action that may jeopardize the continued existence of listed species or destroy or adversely modify a species' critical habitat. *Id.* § 1536(a)(2). To meet this

substantive mandate, section 7 requires agencies to consult with either the National Marine Fisheries Service (NMFS) or the U.S. Fish and Wildlife Service (FWS), or both, depending on the species at issue, before engaging in any discretionary action that may affect a listed species or critical habitat. *Id*. The agency taking the action is known as the action agency, and NMFS and FWS are known as the expert consulting agencies or "Services."

During the consultation process, both the action agency and the Services must "use the best scientific and commercial data available." § 1536(a)(2); 50 C.F.R. § 402.14(d), (g)(8). The section 7 consultation requirement reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Tenn. Valley Auth.*, 437 U.S. at 185.

Once an action agency determines that its action "may affect" a listed species or critical habitat, consultation, either formal or informal, is required. The process ends informally if the action agency determines an action "is not likely to adversely affect any listed species or critical habitat" and the Service issues a written concurrence. 50 C.F.R. §§ 402.13, 402.14(b)(1).

For those relatively infrequent actions where the action agency or Services instead determine that an action is likely to adversely affect a listed species or destroy or adversely modify a species' critical habitat, "formal consultation" is conducted. Formal consultation culminates in the Services issuing a "biological

opinion" advising the action agency as to whether the proposed action, alone or taken together with cumulative effects, "is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(c), (g), (h). If a Service determines that jeopardy is likely, it must provide the action agency with "reasonable and prudent alternatives" to the proposed action that would avoid that result, if such alternatives exist. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)(5), (h)(2).

## II.     The Endangered Species Committee Section 7 Exemption Process.

In 1978 amendments to the Act, Congress created an "escape valve" for circumstances in which a Service determines that the agency action will jeopardize a listed species or adversely modify or destroy a species' critical habitat *and* there are no reasonable and prudent alternatives that would avoid this result. 16 U.S.C. § 1536(g)(1).

In such a circumstance, the action agency, the Governor of the State in which an agency action will occur, or a permit or license applicant may submit an exemption application to the Endangered Species Committee (Committee). 16 U.S.C. § 1536(g)(1); 50 C.F.R. § 451.02(c). The Committee is chaired by the Interior Secretary and composed of five other senior officials: the Secretaries of Agriculture and the Army, the Chairman of the Council of Economic Advisers, and the Administrators of the Environmental Protection Agency and the National

Oceanic and Atmospheric Administration. Once an exemption application is received, the President appoints one individual from each affected State to be a member of the Committee in relation to the specific application. 16 U.S.C. § 1536(e)(3)(G), (g)(2)(B); 50 C.F.R. § 451.03(b)(1). If there is no affected State, the President (following advice from the Interior Secretary) appoints an individual "with expertise relevant to the application" to the Committee. 50 C.F.R § 451.03(b)(2).

An exemption application must be submitted to the Interior Secretary within 90 days following the termination of the consultation process, and must include, *inter alia*, a description of the consultation process and the alternatives considered, and "a statement describing why such action cannot be altered or modified to conform with the requirements of" section 7(a)(2). 16 U.S.C. § 1536(f)(1)-(2); 50 C.F.R. § 451.02(e)(2)(viii), (e)(3)(ix), (e)(4)(viii).

ESA section 7(g) prescribes detailed requirements pertaining to the Interior Secretary's review of an exemption application. If the Secretary determines that threshold requirements are satisfied, he must prepare a report on the application within 140 days. To develop the record for the report, the Secretary must designate an Administrative Law Judge, who must hold at least one hearing and is empowered to conduct prehearing conferences; hear motions, objections, rebuttal,

and cross-examination; may issue subpoenas; and shall provide an opportunity for intervention in the hearing. 50 C.F.R. § 452.05(d), (g).

Under ESA section 7(h), the Committee "shall make a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary." 16 U.S.C. § 1536(h)(1); 50 C.F.R. § 453.03(a). Section 7(h) further prescribes that the Committee "shall grant an exemption" if, "by a vote of not less than five of its members," it determines "on the record" and "based on the report of the Secretary" that "there are no reasonable and prudent alternatives to the agency action" and the "benefits of such action clearly outweigh" alternative courses of action "consistent with conserving the species or its critical habitat," among other required findings. 16 U.S.C. § 1536(h)(1)(i)-(ii).

In more than four decades since the Committee exemption process was enacted, there have been (prior to the action challenged in the consolidated petitions) only six instances in which an exemption application has been submitted to the Committee, and only two in which one was granted. Cong. Rsch. Serv., R4078, Endangered Species Act: The Exemption Process 1 (Updated Jan. 17, 2017).

## III. Secretary of Defense Section 7(j) Authority.

Section 7(j) of the ESA provides that "[n]otwithstanding any other provision" of the ESA, the Committee "shall grant an exemption for any agency

action if the Secretary of Defense finds that such exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j). The Department of Defense was not an applicant in any of the six prior exemption applications, nor did the Secretary of Defense invoke the section 7(j) provision in relation to any of the previous applications.

**IV.    Judicial Review of Any Committee Decision Under Section 7(h).**

Section 7(n) of the ESA provides that "any person ... may obtain judicial review ... of any decision of the Endangered Species Committee under subsection(h) in the United States Court of Appeals for" the circuit where the exempted agency action will occur, or if the agency action will occur "outside of any circuit, the District of Columbia." 16 U.S.C. § 1536(n).

FACTUAL BACKGROUND

**I.    The March 31, 2026, Section 7(j) Exemption and Pending Challenges in District Court.**

On March 16, 2026, Secretary of the Interior Doug Burgum published a Federal Register notice announcing that the "Endangered Species Committee" would meet on March 31, 2026, "regarding an exemption under the Endangered Species Act with respect to oil and gas exploration, development, and production activities in the Gulf of America associated with the Bureau of Ocean Energy Management [BOEM] and the Bureau of Safety and Environmental Enforcement

[BSEE] Outer Continental Shelf Oil and Gas Program." 91 Fed. Reg. 12,672 (Mar. 16, 2026); ESC 1.

The Interior Secretary convened the Committee in response to a March 13, 2026, letter from Defense Secretary Pete Hegseth to the Interior Secretary announcing the Defense Secretary had "found it necessary for reasons of national security to exempt Gulf oil and gas activities from the ESA's requirements," under the purported authority of ESA section 7(j). ESC 31-32. Specifically, Secretary Hegseth's letter assets that "ongoing [ESA] litigation ... threatens to halt oil and gas production" in the Gulf, and "threatens national security by preventing the agencies that regulate oil and gas activities from realizing the Gulf's full development potential." ESC 31.

On March 31, 2026, the Secretaries of Interior, Agriculture, and Army; the Administrators of the Environmental Protection Agency and the National Oceanic and Atmospheric Administration; and the Chair of the Council on Economic Advisors convened. ESC 8. The Defense Secretary also attended the meeting. ESA 9-10. The meeting attendees unanimously voted to grant an exemption for reasons of national security under ESA section 7(j). ESC 22.

The written decision memorializing that vote asserts "the application and other related requirements" in ESA section 7(h) "do not apply" and the Committee was required to grant the exemption because the Defense Secretary had invoked

section 7(j). ESC 5. Despite this express acknowledgment that the Committee's decision was not made in conformance with section 7(h), the decision asserts that "any person may obtain judicial review of this decision, which is made under [section 7(h)], 'in the United States Court of Appeals for … any circuit wherein the agency action concerned will be, or is being, carried out,'" citing ESA section 7(n), and that such review should proceed "exclusively in the U.S. Courts of Appeals for the Fifth or Eleventh Circuits." 91 Fed. Reg. at 16967; ESC 6.

The Center has challenged the exemption decision, along with Secretary Hegseth's national security determination, in the U.S. District Court for the District of Columbia. *Ctr. for Biological Diversity v. Burgum*, No. 1:26-cv-940-RC. The Center maintains that original jurisdiction belongs in the district court because the Committee did not follow any of the procedures or requirements for approving an exception under section 7(h) and because the provision conferring jurisdiction to the courts of appeals does not include the Secretary of Defense's national security determinations under section 7(j).

## II. Procedural History of AEA's Petition for Review Before the Fifth Circuit Court of Appeals and Judicial Panel on Multidistrict Litigation.

On April 13, 2026, AEA filed its petition challenging the Exemption Decision before this Court. Dkt. No. 1. On April 17, 2026, Federal Respondents advised the Court that it had filed a Notice of Multi-Circuit Petitions with the JPML. Dkt. No. 8.

11

On April 21, 2026, the JPML issued a Consolidation Order with respect to AEA's petition, and a petition filed by the Natural Resources Defense Council (NRDC) in the D.C. Circuit Court of Appeals. Dkt. No. 9; see also *In Re*: Endangered Species Committee, Order Regarding Gulf of America Oil and Gas Activities, 91 Fed. Reg. 16966, Issued on April 3, 2026, MCP No. 202, JPML Dkt. No. 3. By random selection, the Order designated the Fifth Circuit Court of Appeals to conduct judicial review of the consolidated petitions. *Id*. On April 21, 2026, this Court issued an updated case caption reflecting the further consolidation of two additional subsequent petitions (by Defenders of Wildlife (Defenders) and National Wildlife Federation, *et al.* (NWF)) which were originally filed in the D.C. Circuit Court of Appeals. Dkt. No. 10; JPML Dkt. No. 10-4.[1]

In response to motions for reconsideration filed on April 23 and April 24 by NRDC and Defenders, JPML Dkt. Nos. 7, 15, the JPML stayed its April 17 Consolidation Order until it decides the motions, which it will consider at its May 28, 2026, hearing session, JPML Dkt. Nos. 11, 17. On May 8, 2026, AEA and Federal Respondents each filed responses to the motions for reconsideration. JPML Dkt. Nos. 24, 25.

---

[1] A fifth petition, filed by W & T Offshore, Inc., was filed in the Eleventh Circuit Court of Appeals on April 13, 2026, Case No. 26-11211, and has not yet been consolidated with the other petitions in the Fifth Circuit.

In the meantime, the proceedings before this Court initiated by AEA's April 13 petition are not stayed. On April 30, 2026, Federal Respondents filed notice that the administrative record was available, including a certified index to that record. Dkt. No. 20. On May 4, 2026, API filed a motion to intervene as of right in all the consolidated petitions, which the Court granted on May 6, 2026. Dkt. Nos. 24, 34. On May 5, 2026, the Court issued a notice establishing the briefing schedule. Dkt. No. 26.

In addition, on May 6, 2026, petitioners Defenders and NWF filed an opposed motion to stay further proceedings in this Court pending resolution of the JPML motions for reconsideration. Dkt. No. 32.

Although AEA's petition did not specify on what grounds it was objecting to the Exemption Decision, its response in opposition to the reconsideration motions pending before the JPML stated that "[t]he order as published includes 'the avoidance or minimization measures described in [National Marine Fisheries Service's] 2025 biological opinion' and other prior consultation decisions … including some that AEA's members believe objectionable." JPML Dkt. No. 24, at 3-4.

Due to the pending reconsideration motions before the JPML, it remains to be determined whether the Fifth Circuit Court of Appeals or D.C. Circuit Court of Appeals will ultimately review the consolidated petitions. Currently, however, the

Consolidation Order is stayed but not vacated and although there is a pending motion, proceedings before this Court are not stayed. Since Rule 15(d) requires that intervention motions be filed within 30 days of a petition's filing, the Center is filing this motion to intervene in AEA's petition to ensure there are no questions regarding the timeliness of its motion.

**ARGUMENT**

Federal Rule of Appellate Procedure 15(d) provides for intervention in petitions that seek review of an agency order, such as AEA's petition. Because "Rule 15(d) articulates no standard for resolving intervention questions," the courts of appeals generally apply one "akin to that of a district court's considering a motion under Federal Rule of Civil Procedure 24." *Texas v. U.S. EPA*, No. 23-60069, 2023 U.S. LEXIS App. 15305, *3 (5th Cir. Apr. 19, 2023); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., AFL-CIO, Loc. 283 v. Scofield*, 382 U.S. 205, 216-17 n.10 (1965) ( "policies underlying intervention" in district courts under Civil Rule 24 are "applicable in appellate courts").

## I.     The Center Is Entitled to Intervene as of Right in AEA's Petition

Civil Rule 24 provides for intervention as of right if: (1) the motion is timely; (2) the movant has an interest in the action's subject matter; (3) the movant shows that "disposition of the action may impair or impede" its ability to protect its interest; and (4) the movant's interest is not adequately represented by existing

parties. Fed. R. Civ. P. 24(a)(2); *see also Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014); *Bldg. & Constr. Trades Dep't v. Reich*, 40 F.3d 1275, 1282 (D.C. Cir. 1994).

Rule 24 is to be liberally construed. *La Union del Pueblo Entero v. Abbott*, 29 F.4th 299, 305 (5th Cir. 2022). Federal courts "should allow intervention" where "no one would be hurt and the greater justice could be attained." *Id*. (citation modified); *Entergy Gulf States La. v. U.S. EPA*, 817 F.3d 198, 203 (5th Cir. 2016) ("The rule is to be liberally construed, with doubts resolved in favor of the proposed intervenor.") (citation modified).

## A.    The Motion Is Timely.

The Center's motion is timely. Federal Rule 15(d) provides that a motion to intervene in a proceeding seeking review of an agency order must be filed within 30 days after the petition is filed. Fifth Circuit Rule 15.5 further directs that a motion to intervene filed under Rule 15(d) should be filed "promptly," but "not later than 14 days prior to the due date of the brief of the party supported by intervenor." The Center is filing this motion within thirty days after AEA's April 13, 2026, petition for review and more than 14 days before Respondents' current briefing deadline of July 15, 2026. Dkt. No. 26.

**B. Center for Biological Diversity Possesses a Cognizable Interest Relating to the Subject Matter of this Action.**

To intervene under Rule 24(a), a movant must show a "direct, substantial, [and] legally protectable" interest in the proceeding. *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015) (citations omitted). The "'interest' test is primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Sierra Club v. Espy*, 18 F.3d 1202, 1207 (5th Cir. 1994).

The Center satisfies this "interest" requirement because it has engaged in prolonged, diligent advocacy for the Gulf and its imperiled species, and has a direct stake in the continued protection of those species. Hartl Decl. ¶¶ 7, 9-12. At the direction of the Defense Secretary, the Committee removed these protections pursuant to the Exemption Decision, which is "the basis of the controversy in the case." *Doe No. 1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001).

The Center's advocacy frequently involves litigation brought pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1), APA, and other duly enacted laws. Hartl Decl. ¶ 12. This litigation includes *Sierra Club v. NMFS*, No. 25-cv-01627 (D. Md.), in which the Center and other plaintiffs are challenging NMFS's 2025 biological opinion as inadequately protective of the Rice's whale and other ESA-listed species. ESC 206-611 (docket entries from the D. Md. litigation).

Federal Respondents invoked the mere existence of this litigation as the primary rationale for their Exemption Decision. ESC 31 ("On January 26, 2026, the Department of the Interior notified the Department of War of ongoing [ESA] litigation that threatens to halt oil and gas production in the Gulf of America."); ESC 11 ("Considering this litigation, it is essential to our national security to exempt all Gulf oil and gas activities from the [ESA's] requirements."). On April 23, 2026, Federal Defendants moved to dismiss *Sierra Club v. NMFS*, arguing that by virtue of the Committee's Exemption Decision, plaintiffs' claims are now moot. No. 25-cv-01627 (D. Md.), Dkt. No. 99.

The Center's interests and activities to protect those interests—which are not only directly and unquestionably impacted by the Exemption Decision but also form the very basis for that decision—are thus more than sufficiently related to the "transaction that forms the basis of the controversy in the case" to support intervention as of right. *Glickman*, 256 F.3d at 375. The Center and its members have a substantial interest in the general subject matter of this litigation—the Committee's Exemption Decision—as well as the specific goal of the AEA's petition to challenge any remaining recommendations that its members undertake avoidance or minimization measures for listed species.

The Center can also demonstrate Article III standing. Center members have recreational, scientific, educational, aesthetic, and professional interests in specific

17

ESA-listed species, and particular areas within the Gulf and its shores those species inhabit that are harmed by the Exemption Decision. These interests would be further harmed if AEA's attempt to further broaden the scope of that decision succeeds. *See e.g.*, *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 115 (D.C. Cir. 2025) (the "desire to … observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing") (quoting *Defs. of Wildlife v. Lujan*, 504 U.S. 555, 562-63 (1991)).

The Exemption Decision removes procedural and substantive ESA section 7 protections for numerous ESA-listed species that Center members have a demonstrated interest in. Hartl Decl. ¶¶ 20-24; Reeves Decl. ¶¶ 10-13, 16-19, 23-25. These exempted protections, including the removal of "reasonable and prudent alternatives" that NMFS determined were necessary to avoid Gulf oil and gas activities from jeopardizing the continued existence of Rice's whale, reduced to only 51 individuals remaining in the wild, directly harm these interests. Reeves Decl. ¶ 17.

The decision casts a far broader net than the Rice's whale, however. The risks from oil spills as well as the multitude of other drilling impacts on ESA-listed species—such as harmful noise from geological and geophysical surveys, collisions with vessels, and habitat destruction from platforms and pipelines—will no longer be subject to the standard, species-protective consultation process, also

18

directly harming Center's members' interests. Hartl Decl. ¶¶ 20-23; Reeves Decl. ¶¶ 22-23. AEA's petition seeks to challenge the "avoidance or minimization measures" incorporated into the exemption, the removal of which would further and additionally harm Center's members' interests. Hartl Decl. ¶ 24; Reeves Decl. ¶ 25.

### C. Disposition of This Action May Impair or Impede Center's Interests.

To prove a sufficient impairment, a movant need only demonstrate that "there is a possibility that [its] interest could be impaired or impeded" if intervention was prohibited. *La Union del Pueblo Entero*, 29 F.4th at 307 (citing *Brumfield*, 749 F.3d at 344-45.). This standard is also readily satisfied. In its response in opposition to the motions for reconsideration before the JPML, AEA expressly stated its intention to argue that any protections left in the wake of the Committee's action should be further reduced or eliminated. These arguments, if accepted by the Court, will impair or impede the Center's interests in Gulf species.

In addition, the Center seeks to intervene here to challenge appellate court jurisdiction to entertain AEA's petition for review under ESA section 7(n). As explained, it is the Center's position that jurisdiction over the exemption decision, as well as Secretary Hegseth's national security determination, is proper in the first instance in district court. Intervention ensures the Center will have an opportunity

19

to protect its interest in expeditiously pursuing litigation in what the Center believes is the appropriate forum for resolving its claims.

**D.  Center for Biological Diversity's Interests Are Not Adequately Represented by Federal Respondents or American Petroleum Institute.**

An intervention applicant satisfies the final prong by showing that its interest "may be" inadequately represented. *Espy*, 18 F.3d at 1207 (*citing Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972)). "The applicant has the burden of demonstrating inadequate representation, but this burden is 'minimal.'" *Brumfield*, 749 F.3d at 345 (citation omitted).

Finding that the requirement must still have some "teeth," the Fifth Circuit recognizes two presumptions of adequate representation. *Id.* (citing *Edwards v. City of Hou.*, 78 F.3d 983, 1005 (5th Cir. 1996)). The second of these presumptions arises where the applicant "shares the same ultimate objective as a party to the suit." *Id*. In that circumstance, "the existing party is presumed to adequately represent the party seeking to intervene unless that party demonstrates adversity of interest, collusion, or nonfeasance." *Id*.[2]

Here, it is indisputable that the Center and Federal Respondents do not "share the same ultimate objective." Federal Respondents' ultimate objective is to

---

[2] The first of these presumptions, which arises where one party is a representative of the absentee by law, is plainly irrelevant here.

defend the Committee's and Secretary's Hegseth's action to exempt, on national security grounds, oil and gas operations in the Gulf from the ESA's ordinary requirements. In contrast, the Center's ultimate objective is to ensure that the endangered and threatened species, in which its members have concrete interests, receive the most protection to which they are legally entitled. These are obviously divergent interests.

The Center's interests will also not be represented by Federal Respondents with respect to threshold jurisdictional issues. As noted *supra*, the government has already made clear that it believes that exclusive review belongs in the appellate courts—the opposite of the Center's position. ESC 6 (advising that judicial review of the Exemption Decision lies "exclusively in the U.S. Court of Appeals for the Fifth or Eleventh Circuits").

Nor, obviously, will the Center's interests be protected by AEA, which will present arguments diametrically counter to the Center's interests.[3]

The Center is accordingly entitled to intervene as a matter of right. *Edwards*, 78 F.3d at 1006 ("Having dispelled both possible aides to a finding of adequate representation, we revert to the *de minimis* standard of proof required by the Court to establish inadequate representation. [The applicants] have satisfactorily shown

---

[3] Similarly, Intervenor Respondent API's interests are counter to, not representative of, the Center's interests.

that their interests in this litigation 'may be' insufficiently represented, enough so to satisfy this final requirement for intervention under Rule 24(a)(2).").

## II. In the Alternative, the Center Should be Granted Permissive Intervention.

If the Court denies its motion to intervene as of right, the Center alternatively requests that it be granted permission to intervene pursuant to Rule 24(b)(2). Rule 24(b)(2) states that a court may grant intervention upon a "timely motion" involving a "claim or defense that shares with the main action a common question of law or fact," and will not "unduly delay or prejudice the adjudication of the original parties' rights."

As detailed *supra*, the Center's motion is timely. Moreover, as also previously addressed, the Center's defenses and the main action share common questions of law and fact. The Center denies that Petitioner AEA is entitled to the relief it seeks in relation to "some" of the avoidance or minimization measures described in NMFS' 2025 biological opinion and other prior consultation decisions that AEA's members "believe objectionable." JPML Dkt. No. 24, at 3-4. The Center further contests the underlying jurisdiction of this Court to hear AEA's petition in the first instance. Finally, this timely filed motion will not unduly delay or prejudice the adjudication of AEA's petition. Indeed, it is the Center's rights that are at risk of being unduly delayed or prejudiced by this proceeding, as its district court challenge was filed prior to AEA's and all other petitions.

Respectfully Submitted this 13th day of May, 2026.

*s/ Brian Segee*
Brian Segee
Center for Biological Diversity
226 W. Ojai Ave., Ste. 101-442
Ojai, CA 93023-3278
(805) 750-8852
bsegee@biologicaldiversity.org

*s/ Kristen Monsell*
Kristen Monsell
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
Phone: (510) 844-7137
Email: kmonsell@biologicaldiversity.org

*Counsel for Proposed Intervenor-
Respondent Center for Biological Diversity*

**CERTIFICATE OF COMPLIANCE**

The undersigned counsel certifies that this motion:

(i)      complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2, this document contains 4,913 words; and

(ii)      complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in proportionally spaced typeface using Microsoft 365 Word in 14-point Times New Roman.

Dated: May 13, 2026 _s/ Brian Segee_
Brian Segee

**Case No. 26-60240**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

AMERICAN ENERGY ASSOCIATION; NATURAL RESOURCES DEFENSE
COUNCIL, INCORPORATED; DEFENDERS OF WILDLIFE; NATIONAL
WILDLIFE FEDERATION; NATIONAL PARKS CONSERVATION
ASSOCIATION; FLORIDA WILDLIFE FEDERATION; LOUISIANA
WILDLIFE FEDERATION; TEXAS CONSERVATION ALLIANCE,

*Petitioners*,

v.

DOUG BURGUM, Secretary of the Interior, in his official capacities as Chair
and Member of the Endangered Species Committee; BROOKE ROLLINS,
Secretary of Agriculture, in her official capacity as a Member of the
Endangered Species Committee; DANIEL DRISCOLL, Secretary of the Army, in
his official capacity as a Member of the Endangered Species Committee;
PIERRE YARED, Acting Chair of the Council of Economic Advisors, in his
official capacity as a Member of the Endangered Species Committee; LEE
ZELDIN, Administrator of the Environmental Protection Agency, in his
official capacity as a Member of the Endangered Species Committee; NEIL
JACOBS, Administrator of the National Oceanic and Atmospheric
Administration, in his official capacity as a Member of the Endangered
Species Committee; PETE HEGSETH, Secretary, U.S. Department of Defense,

*Respondents*.

On Petitions for Review of an Order of the Endangered Species Committee

# DECLARATION OF BRETT HARTL IN SUPPORT OF CENTER FOR
# BIOLOGICAL DIVERSITY'S MOTION TO INTERVENE IN IN
# AMERICAN ENERGY ASSOCIATION'S PETITION FOR REVIEW

I, Brett Hartl, declare as follows:

1. I am competent to make this declaration. I provide this declaration based upon my personal knowledge. I would testify to the facts in this declaration under oath if called upon to do so.

2. I am the Government Affairs Director at the Center for Biological Diversity (Center), and I work out of both the Center's Washington, D.C., and Arizona offices. I have been with the Center since 2013.

3. I am also a member of the Center and have been a member of the Center since 2013. As a member, I rely on the Center to represent my interests in conserving native species and their habitats.

4. I earned a Bachelor of Arts in Conservation Biology from Prescott College. I earned a J.D. from Lewis and Clark Law School. Prior to attending law school, I spent four years working as a field biologist with endangered species, including marine mammals and seabirds. I also previously worked in the House of Representatives' Natural Resources Committee for the Democratic staff, and I was a senior policy fellow at the Society for Conservation Biology.

5. The Center is a member organization incorporated under the laws of the State of California. It is recognized as a not-for-profit corporation under Section 501(c)(3) of the United States Internal Revenue Code. The Center has 106,970 active members across the country, including more than 5,281 members in

1

Florida, 478 in Alabama, 363 in Louisiana, 162 in Mississippi, and 3,966 in Texas. The Center is based in Tucson, Arizona, and works throughout the entire United States. Our other major offices are in Washington, D.C., Oakland, California, and Portland, Oregon.

6. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems, public lands and water, and public health through science, policy, and environmental law. Based on an understanding that the health and welfare of human societies are closely linked to the condition of the natural environment, the Center works to protect natural resources like air, water, and land and to secure a future for animals and plants hovering on the brink of extinction. We work to protect the ecosystems they need to survive, for the species and for the people that interact with, depend on, and cherish these natural resources.

7. Protection of endangered and threatened species is the core organizational focus of the Center. Whether large or small, we believe all species have an intrinsic right to live. The United States and the world at large are currently in the midst of a biodiversity crisis: the diversity of life that sustains ecological systems and human cultures around the world are collapsing. As a result, the Center works tirelessly to protect endangered and threatened species through advocacy, litigation, education campaigns, conservation of critical habitats

for species, and holding federal agencies accountable to their duties to protect threatened and endangered species as directed by Congress.

8. In my professional capacity as the Government Affairs Director at the Center, I monitor national policy issues that impact endangered species, wildlife, oceans, and environmental protection broadly. This includes agency rulemakings, policy decisions, and their consequences throughout the country. I coordinate the Center's national-level responses and engagement, meet with agency officials, and work with outside stakeholders. I oversee and am personally involved with Freedom of Information Act requests, formal commenting, advocacy, lobbying, and litigation.

9. The Center and its Oceans Program and Endangered Species Program have worked towards better environmental protections and better protections for wildlife in the Gulf of Mexico (Gulf) for over 20 years. For example, in 2003, the Center filed a lawsuit to expand critical habitat for the Perdido Key Beach Mouse, Alabama Beach Mouse, and Choctawhatchee Beach Mouse found in Alabama and Florida that are threatened by the risks of oil spills from fossil fuel activities in the Gulf, and in 2008 the Center worked to secure critical habitat designation for the smalltooth sawfish found off Florida's southwestern coast. In 2010, the Center brought lawsuits under the Clean Water Act following the Deepwater Horizon

catastrophe that spilled nearly 5 million barrels of oil into the Gulf, and we challenged the unprecedented use of oil dispersants following that catastrophe.

10. The Center has actively advocated against oil and gas activities that are harmful to wildlife in the Gulf ever since. For example, the Center has submitted extensive comments on the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program; the draft Environmental Impact Statements (EIS) for Lease Sales in the Gulf, including Lease Sales 247, 250, and 251; the 2024–2029 Outer Continental Shelf Oil and Gas Leasing Program; and the Draft Proposed Program Outer Continental Shelf Oil and Gas Leasing Program for 2026–2029. In addition, in 2021, the Center filed an administrative petition to require vessel speed restrictions to protect Rice's whales from deadly ship strike collisions.

11. The Center has worked to secure Endangered Species Act protections for many marine species found in the Gulf, including the dwarf seahorse, sperm whale, bluefin tuna, goliath grouper, elkhorn coral, staghorn coral, black-capped petrel, eastern black rail, and red knot shorebird. The Center has also worked extensively to protect the loggerhead sea turtle, leatherback sea turtle, and Kemp's ridley sea turtle, including, for example, bringing a 2021 lawsuit challenging a decision to exempt shrimp trawlers from using turtle-excluder devices.

12. To protect its organizational and members' interests, the Center has filed numerous lawsuits against the U.S. Department of the Interior challenging

4

approvals of oil and gas drilling in the Gulf for failing to properly comply with the nation's environmental laws, including challenges to oil and gas lease sales from 2018 to 2025. The Center has also filed numerous lawsuits against the U.S. Department of Commerce and its National Marine Fisheries Service challenging failures of that agency to properly assess threats to and properly protect endangered species in its jurisdiction during Section 7 consultations under the Endangered Species Act.

13. Endangered Species Act consultations under Section 7 provide the Center with critical information on the status of endangered species that cannot be obtained elsewhere. Under the law and the Section 7 regulations, every biological opinion provides a comprehensive snapshot of the threatened and endangered species that might be harmed by a proposed action, including a current assessment of a species' conservation status, the state of the current environmental baseline, and an evaluation of all threats a species currently faces. The Center routinely analyzes biological opinions to determine where and how stronger conservation advocacy efforts should be focused to better protect the environment.

14. Due to the nature of any exemption granted by the Endangered Species Committee, Section 7 of the Act sets forth a detailed, complex, and multistep process that the Endangered Species Committee must undertake when reviewing a possible exemption under the Act. The core components of each

Endangered Species Committee process include (1) an application seeking an exemption must meet particular criteria at the outset to qualify as a valid exemption; (2) the Secretary of the Interior must prepare a report to the Committee assessing the good faith compliance of the federal agencies and/or private applicants throughout the consultation process at issue for a possible exemption; (3) a formal adjudication conducted by an Administrative Law Judge to assess facts and witnesses; and (4) a final review and assessment by the Committee prior to granting an exemption. Each of these components must occur with the public having full access to all underlying public records and the ability for the public to participate in and monitor all meetings in person.

15.     When the Endangered Species Committee last met in October 1991 to consider an application for an exemption related to logging and its impacts to the northern spotted owl, an entire month of evidentiary hearings were conducted in Portland, Oregon, in January 1992, during which 97 witnesses provided testimony before an Administrative Law Judge. This trial-like adversarial proceeding allowed all sides to assess the complex scientific determinations of the Interagency Scientific Committee, which had carefully studied the threats to the northern spotted owl from logging of old growth forests.[1] In addition to the formal

---

[1] *See generally*, Marcot, Bruce G.; Thomas, Jack Ward. 1997. *Of spotted owls, old growth, and new policies: a history since the Interagency Scientific Committee*

adjudicatory process, the Committee provided two full days of public testimony to allow the public to include its voice and opinions in this process.[2]

16. On March 16, 2026, the Secretary of the Interior announced that the Endangered Species Committee would meet on March 31, 2026, to consider an exemption relating to "oil and gas exploration, development, and production activities" in the Gulf. This notice failed to provide any further details, including which biological opinion or opinions the exemption would relate to, who the applicant for the exemption was, or even what stage of the process the Endangered Species Committee believed it was initiating.

17. The Center filed a lawsuit in the U.S. District Court for the District of Columbia two days later, challenging the Interior Secretary's unlawful convening of the Endangered Species Committee and unlawful withholding of statutorily required information. The Center subsequently sought emergency relief to enjoin the meeting of the Committee. During briefing on the Center's emergency motion, the Center learned that on March 13, 2026, the Secretary of Defense (also known as the Secretary of War) had notified the Interior Secretary that the Defense Secretary found it necessary for reasons of national security to exempt federally

---

report. U.S. Department of Agriculture, Forest Service, Pacific Northwest Research Station. 34 p., https://www.fs.usda.gov/pnw/pubs/pnw_gtr408.pdf.
[2] Fischman, Robert L. 1992. *Clear the Air*. 22 Envtl. L. 1097, https://www.repository.law.indiana.edu/facpub/597.

authorized Gulf oil and gas exploration and development activities from the requirements of Section 7(a)(2) of the Endangered Species Act.

18. On March 31, 2026, members of the Endangered Species Committee, including the Secretaries of Interior, Agriculture, and Army; the Administrators of the Environmental Protection Agency and the National Oceanic and Atmospheric Administration; and the Chair of the Council on Economic Advisors, convened in Washington, D.C. The Defense Secretary was also present. The meeting attendees unanimously voted to grant an exemption for purported reasons of national security under Section 7(j) of the Endangered Species Act. The decision applies to "the oil and gas exploration, development, and production activities, as well as the avoidance or minimization measures that are described in the agency action analyzed in [the National Marine Fisheries Service's] 2025 biological opinion and in [the Fish and Wildlife Service's] 2018 and 2025 consultation decisions" on federally-authorized oil and gas activities in the Gulf. These "avoidance and minimization measures" include, among other things, a requirement that oil and gas vessels slow to 10 knots or less in certain areas in the eastern Gulf off Florida to reduce the risk of fatal vessel strikes of Rice's whales; other measures to reduce the risk of vessel strikes of other protected species such as sperm whales; measures to reduce marine debris that can choke sea turtles, seabirds, whales, and other

marine life; and measures to reduce the harm from noise pollution caused by certain oil and gas drilling activities.

19. The exemption decision strips imperiled species of important protections otherwise required under the Endangered Species Act and therefore harms the Center's and its members' interests in protecting endangered and threatened species and their habitats, as well as in the federal government's faithful execution of the Endangered Species Act. Accordingly, following the meeting, the Center then amended its lawsuit in the U.S. District Court for the District of Columbia to challenge the Committee's unlawful exemption decision, the Committee's unlawful withholding of information, and the Defense Secretary's arbitrary national security determination.

20. I also have an interest in this case because I am personally harmed by the Committee's exemption decision as well as AEA's effort to even further reduce protections for affected species. The conservation of both marine and terrestrial wildlife in and around the Gulf is of deep personal importance to me. As a result of both my education and field experiences working in conservation, I have developed a deep passion for observing wildlife, specifically mammals and birds. I travel extensively around the United States and the world to look for wildlife, thus far observing 755 species of mammals and 4,850 species of birds. I have a deep love for marine mammals. I have personally observed 37 of the world's 102

species of cetaceans and even swum with nine different species of marine mammals. In 2024, I traveled to the island of Dominica to snorkel with sperm whales, one of the deepest diving cetaceans on the planet. Sperm whales remain an endangered species throughout the world, and the populations in the Gulf and the Caribbean continue to decline primarily due to ship strikes, ocean noise pollution from industrial activities including oil and gas development, and the ingestion of marine debris. Seeing these magnificent animals in the water and feeling their sonar pulses coarse through my body is truly one of the most amazing experiences of my life, and I am distressed and injured when these whales are killed by the impacts of the oil and gas industry in the Gulf. Below is a photo of a sperm whale that I took and that hangs on my wall at home:



21.    I have traveled to the Gulf and will continue to do so in the future to view and attempt to view wildlife affected by the Endangered Species Committee's exemption. For example, I have travelled numerous times to view whooping cranes on their wintering grounds in and around Aransas National Wildlife Refuge on the Texas coast as far back as 2003, with my most recent trip to view them in March of 2024. Whooping cranes remain one of the rarest birds in North America and the entire wild migratory population only numbers 700 or so individuals, meaning an oil spill in the Gulf could potentially put their entire wintering habitat at severe risk and decimate the blue crab, their primary food source. I have also traveled to parts

of Texas, Louisiana, and Mississippi as far back as 2011 and as recently as March 2024 to attempt to view the eastern black rail, a small and very endangered wetland species found on Gulf coast that could easily have entire populations wiped out by a catastrophic oil spill.

22. Another species that could easily be wiped away to extinction from a catastrophic oil spill is the black-capped petrel. This rare seabird only nests in the Dominican Republic and Haiti, but importantly, forages in deep waters in the Gulf and along the Gulf Stream current in the Atlantic. I have gone on several pelagic seabird trips off the coast of North Carolina, in 2009 and 2013, and will be returning to North Carolina on May 23, 2026, to view and photograph these elusive seabirds. I have also traveled to the Sierra de Bahoruco mountains in the southwest portion of the Dominican Republic to search for black-capped petrels on their breeding grounds, where I heard one petrel fly overhead. With a population of fewer than 500 pairs, any major impact to these seabirds in the Gulf could easily drive the species extinct everywhere.

23. Every threatened and endangered terrestrial and marine species found in or along the Gulf is now at grave risk that their conservation will be set back, or that such species could be condemned to extinction. My personal aesthetic, recreational, and spiritual interests in the wildlife that I love and repeatedly try to observe is greatly harmed by the Endangered Species Committee's exemption that

sets back the conservation and recovery of these species. It pains me even more that an exemption was granted in such a cursory and thoughtless way compared to previous meetings of the Committee that were fully open to the public, and where the voices of scientists and conservationists were meaningfully considered in a thoughtful and deliberative process.

24. And while the exemption significantly harms my interests, the avoidance and minimizations measures within the exemption and that are challenged by AEA provide at least some safeguards for Endangered Species Act-listed species that in turn help protect my interests in these species. For example, one of these measures instructs oil and gas vessels to stay a certain distance from sperm whales when any of these animals are seen in the water, to reduce the risk of vessel strikes that can injure and kill these animals. Another of these measures seeks to reduce the amount of marine debris and trash from oil and gas operations, which helps protect sperm whales, seabirds (including black-capped petrels), and other marine animals from accidentally ingesting and chocking on this pollution. Petitioner American Energy Association is seeking to eliminate even these small protective measures that remain, thus increasing the extent of injury and harm to sperm whales, black-capped petrels, and other protected species from oil and gas activities, and harming my interests in sperm whales and other species these measures are intended to benefit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed May 12, 2026, in Prescott, Arizona.

Brett Hartl

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

AMERICAN ENERGY ASSOCIATION; NATURAL RESOURCES DEFENSE
COUNCIL, INCORPORATED; DEFENDERS OF WILDLIFE; NATIONAL
WILDLIFE FEDERATION; NATIONAL PARKS CONSERVATION
ASSOCIATION; FLORIDA WILDLIFE FEDERATION; LOUISIANA
WILDLIFE FEDERATION; TEXAS CONSERVATION ALLIANCE,

*Petitioners*,

v.

DOUG BURGUM, Secretary of the Interior, in his official capacities as Chair and
Member of the Endangered Species Committee; BROOKE ROLLINS, Secretary
of Agriculture, in her official capacity as a Member of the Endangered Species
Committee; DANIEL DRISCOLL, Secretary of the Army, in his official capacity
as a Member of the Endangered Species Committee; PIERRE YARED, Acting
Chair of the Council of Economic Advisors, in his official capacity as a Member of
the Endangered Species Committee; LEE ZELDIN, Administrator of the
Environmental Protection Agency, in his official capacity as a Member of the
Endangered Species Committee; NEIL JACOBS, Administrator of the National
Oceanic and Atmospheric Administration, in his official capacity as a Member of
the Endangered Species Committee; PETE HEGSETH, Secretary, U.S.
Department of Defense,

*Respondents*.

On Petitions for Review of an Order of the Endangered Species Committee

## DECLARATION OF JAMES REEVES IN SUPPORT OF
## CENTER FOR BIOLOGICAL DIVERSITY'S
## MOTION TO INTERVENE IN
## AMERICAN ENERGY ASSOCIATION'S PETITION FOR REVIEW

I, James Reeves, declare as follows:

1. I have personal knowledge of the statements in this declaration, and I could and would competently testify to these matters if called as a witness.

2. I currently live in Pensacola Beach, Florida, which is also where I grew up, and New Orleans, Louisiana, splitting my time between the two. I work as an attorney and specialize in contractual litigation, handling insurance claims, corporate defense, and other matters in Louisiana, Mississippi, Alabama, and Florida.

3. I have been a member of the Center for Biological Diversity since 2018. I support the Center because I share its mission in protecting wildlife and wild places and because I trust the organization to represent my interests. I often read their action alerts to inform my communications with decisionmakers about the issues I care about.

4. I love getting outdoors and do so just about every day—whether it is for boating, paddleboarding, hiking, swimming, birdwatching, nature photography, or beachcombing. In fact, it is not an understatement to say that I live for these activities. My wife and I enjoy doing them together, exploring beaches, bays, and coastal waterways in Louisiana, Mississippi, Alabama, and Florida.

5. I take walks on Pensacola Beach with my wife or my mother every day that I am at my home in Florida, regardless of the season. I make a point to collect trash on the beach every time I go.

6. My wife and I visit the Gulf Islands National Seashore several times a week when we're in Florida, between Navarre and Fort Pickens. This year, we have hiked part of the Florida Scenic Trail at Fort Pickens many times for the purpose of seeing birds and wildlife. In March of 2026, we observed two great horned owlets that hatched at Fort Pickens, and we are excited to return throughout the year to look for them as well as the seashore's resident bald eagle population and the numerous osprey that call the Fort Pickens area home. I plan to visit these areas of the Gulf Islands National Seashore on a monthly basis throughout 2026 and 2027.

7. A few times each year, we take a boat or car across the pass for a hike or beach stroll around Fort McRee, Johnson Beach, and Perdido Key. We plan to make this trip in summer 2026. Some of our other favorite places to explore include Jean Lafitte National Preserve, tributaries of Lake Pontchartrain, and Dauphin Island, to name a few, and we plan to return to them throughout 2026.

8. Boating is a major part of my life—something I have enjoyed since I was a child. I love all kinds—sailing, canoeing, kayaking, and motorboating—and I've owned various boats over the last two decades, including a Boston Whaler that

my wife and I now have. We use the Whaler frequently every season, launching from Pensacola Bay. We also have two kayaks and love to paddle around nearby bays, tributaries, and waterways throughout the year, and we often rent kayaks or paddleboards during our travels and excursions along the Gulf Coast. Whether it is kayaking around Lake Pontchartrain or taking our Whaler up the intercoastal waterway all the way to the Alabama-Florida line, we live on the water and spend as much time as our schedules allow on the boat or the beach, at least once or twice each month from the beginning of spring until the end of summer. I expect to continue using my boat in these waters regularly throughout 2026, including multiple trips in the upcoming summer and fall months.

9.     Any time that I boat or kayak, I look for marine life like dolphins, sharks, rays, and sea turtles. I frequently see dolphins and rays, which is always a captivating experience. If I'm on the water, I will stop paddling my kayak or turn off my boat engine to observe them.

10.     I feel fortunate to have seen rare marine animals like sea turtles and manatees many times (including in the Gulf Islands National Seashore and Fort Pickens area, which is an uncommon sighting). These form special, life-long memories. As an example, my wife and I were swimming at the point near Fort Pickens pass about six years ago when we saw a massive shadow moving quickly towards us in the water. At first, we thought it was a shark and began running

through waist-high water to make it to shore, but then my wife turned and saw it was actually a huge manatee when it came up for air, and then it swiftly swam away. I have seen manatees many times when kayaking or paddleboarding in places like Key West, Fleming Key, Stock Island, and rivers in Florida, but seeing one in the Gulf surf was truly unique, and I have never seen one swimming at full speed. It was an incredible experience to share with my wife—a special memory we will always laugh about.

11. In the warmer months, I enjoy seeing sea turtle nests when I walk along the beach and like to monitor their progress to see when they hatch. I also have a great affinity for seabirds. In the cooler months, I enjoy seeing the birds that overwinter on the beaches and often carry binoculars with me in hopes of viewing them. In addition to the enjoyment I get from viewing these special animals, just knowing that our home is also a shared habitat that is instrumental for the survival of sea turtles and seabirds brings me joy and a sense of calm.

12. Indeed, my wife and I regularly jog from our condo in the direction of Fort Pickens, and occasionally, we'll be accosted by least terns who will swoop close to our heads to run us off. While this is an aggressive demonstration, it's endearing to see these tiny, brave birds run off the potential threats to their nesting sites.

13. Having these kinds of encounters with manatees, birds, sea turtles, dolphins, and other wildlife is the main reason I get outdoors, and I would not see much of a point of continuing these activities if this chance was diminished or destroyed. Being out in nature is satisfying and enjoyable in itself, but, for me, the whole point is to look for and hopefully see a native animal in its habitat.

14. I am also an avid wildlife photographer, and marine and shore species are my favorite subjects. I have traveled throughout the United States and the world to view and photograph marine life and seabirds. For example, in November 2025, I traveled throughout the Galapagos Islands by boat and took nearly 10,000 photographs of birds and wildlife like frigate birds, hammerhead sharks, petrels, green sea turtles, and hawksbill sea turtles.

15. I enjoy whale watching and have traveled around the world to view whales for more than a decade, including to places like Big Sur and San Diego, California; Magdalena Bay, Mexico; Kenai Fjords National Park, Alaska; the Galapagos Islands, Ecuador; and the Beagle Channel and Cape Horn, Chile.

16. I was excited to learn that the Gulf of Mexico was home to a resident whale, the Rice's Whale, especially when I learned it lived off the Florida and Louisiana coasts.

17. On March 7, 2026, I attended the Gulf Coast Whale Festival on Pensacola Beach, Florida. This event celebrated the Rice's Whale. The Center for

Biological Diversity had a booth at the festival, which I helped set up and attend. I was shocked to learn that there are only fifty Rice's Whales left on the planet, especially because the threats to them like noise, oil spills, and ship strikes are completely avoidable. The Gulf Coast Whale Festival motivated me to go see and photograph the Rice's Whale, which I am planning to do on a deep-sea charter to DeSoto Canyon or nearby waters in June or July of 2026.

18. The health and biodiversity of the Gulf is an integral part of who I am: it is where I grew up, it is where I live, it is where I work, and it is where I play.

19. The experiences and activities associated the Gulf's wildlife add immense value to my quality of life, benefitting me in ways that are difficult to quantify or explain. They maintain and improve my physical health for one, but they also sustain and support my mental health in important and irreplaceable ways. I am a partner at a law firm—a demanding, stressful job—and getting out in nature provides a sense of peace and solitude that allows me to relax, unwind, and forget the troubles of the day.

20. I specialize in contractual litigation and have handled numerous disputes involving the oil and gas industry, including cases concerning blowouts, oil spills, and gas leaks. This has given me firsthand knowledge of the risks and damage that can result from offshore oil drilling in the Gulf—and I know the environment, my property, and my personal health are all at stake.

21. For example, I litigated some of the insurance claims associated with the 2010 Deepwater Horizon oil spill, which gave me a significant understanding of both the damage caused and how badly things were mishandled. I saw tar balls on the beach and could smell the stench of oil near the shore, and the things I knew through my work about the carcinogens and other toxic chemicals that couldn't been seen or smelled kept me out of and off of the water for an extended time, preventing me from doing the activities I enjoy. It was strange and sad to not be able to enjoy the beach in the way I have for my entire life, and, beyond those primary impacts, it also caused me a lot of distress and sorrow to know that both people and wildlife were suffering and dying. The spill killed thousands and thousands of animals, including sea turtles, seabirds, whales, dolphins, fish, and others I enjoy seeing.

22. For the last sixteen years, I had believed that the Deepwater Horizon incident was an extreme oil spill that would never be repeated, but that belief has been shaken by the announcement of Secretary Burgum on March 13, 2026, that the administration approved an ultradeep drilling project to 5,600 feet 250 miles off the Louisiana coast. I am deeply concerned that this project, coupled with other current proposals to open vast new areas of the eastern Gulf to oil and gas drilling, including areas of the southwest Florida coast that has long been under a drilling moratorium, will cause me to go through a devastating experience like the

Deepwater Horizon spill again. And aside from increasing the odds for another massive spill, more oil drilling will definitely cause small spills, seeps, and other pollution that can have lethal, long-lasting impacts on wildlife, which also harms my interests in seeing sea turtles, seabirds, dolphins, whales, manatees, and other animals. Increased vessel traffic and noise pollution will add to these impacts. These impacts will occur in or affect the same areas I personally use, including the Gulf Islands National Seashore, Fort Pickens, and waters accessible from Pensacola Bay.

23.     I expect the government to follow the law, including the Endangered Species Act, to ensure the worst harms of offshore oil drilling are avoided. In my opinion, the Endangered Species Act is an important guard rail that protects the Gulf's biodiversity and the species there, like the critically endangered Rice's Whale, from the worst effects of oil and gas drilling. I was shocked and upset when I learned that on March 31, 2026, Secretary Burgum of the U.S. Department of the Interior convened the Endangered Species Committee and granted an exemption to the Endangered Species Act for oil and gas activities in the Gulf. The fact that Secretary Burgum convened this Committee and granted such a broad exemption without following the procedures required by the Endangered Species Act and without providing the public with the records supporting its decision is even more dismaying.

24. Every day, I worry that there will be news of another oil and gas disaster in the Gulf. Risking the health of the Gulf and its beaches to oil and gas development puts my personal interests, lifestyle, health, and values at great risk too. Even if it does not cause another massive oil spill like Deepwater Horizon, such unchecked development will necessarily increase the possibility of small oil spills and leaks, air and water pollution, vessel traffic, and other impacts that negatively affect my ability to enjoy my property, wildlife, and the coastal environment.

25. My personal aesthetic, recreational, and spiritual interests in the wildlife that I love and repeatedly try to observe are harmed by the exemption granted by the Endangered Species Committee, which removes the guardrails that protects them from the impacts of drilling and sets back the conservation and recovery of these species. The loss of avoidance and mitigation measures that were put in place to minimize the impacts of oil and gas development further harms my interests. As I experienced during the Deepwater Horizon spill, these types of impacts can force me to avoid the water and coastal areas altogether. A court order restoring Endangered Species Act protections and requiring compliance with avoidance and mitigation measures would reduce the risk of spills, pollution, vessel traffic, and disruption to wildlife, and would help preserve my ability to continue using and enjoying these areas.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed May 12, 2026, at Pensacola Beach, Florida.

James Reeves