Case No. 26-60240

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

---

AMERICAN ENERGY ASSOCIATION, et al.,

*Petitioners*,

v.

DOUG BURGUM, Secretary of the Interior, in his official capacities as Chair and Member of the Endangered Species Committee, et al.,

*Respondents*,

AMERICAN PETROLEUM INSTITUTE,

*Intervenor-Respondent*.

---

On Petitions for Review of an Order of the Endangered Species Committee

---

## AMERICAN PETROLEUM INSTITUTE'S
## OPPOSITION TO MOTION TO STAY OR DISMISS

---

Jason T. Morgan
Ryan P. Steen
Tiffany Wang
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, Washington 98101
T: (206) 624-0900
F: (206) 386-7500
jason.morgan@stoel.com
ryan.steen@stoel.com
tiffany.wang@stoel.com

*Counsel for Intervenor-Respondent American Petroleum Institute*

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of the case. These representations are made in order so that the judges of this Court may evaluate possible disqualification or recusal.

1.  <u>Petitioners</u>

    American Energy Association

    Natural Resources Defense Council, Incorporated

    Defenders of Wildlife

    National Wildlife Federation

    National Parks Conservation Association

    Florida Wildlife Federation

    Louisiana Wildlife Federation

    Texas Conservation Alliance

2.  <u>Attorneys for Petitioners</u>

    James Conde, Boyden Gray, P.L.L.C.

    Kate Desormeau, Natural Resources Defense Council

    Jane P. Davenport, Defenders of Wildlife

    Catherine Wannamaker, Southern Environmental Law Center

3.  <u>Respondents</u>

    Doug Burgum, Secretary of the Interior, in his official capacities as Chair and Member of the Endangered Species Committee

Brooke Rollins, Secretary of Agriculture, in her official capacity as a Member of the Endangered Species Committee

Daniel Driscoll, Secretary of the Army, in his official capacity as a Member of the Endangered Species Committee

Pierre Yared, Acting Chair of the Council of Economic Advisors, in his official capacity as a Member of the Endangered Species Committee

Lee Zeldin, Administrator of the Environmental Protection Agency, in his official capacity as a Member of the Endangered Species Committee

Neil Jacobs, Administrator of the National Oceanic and Atmospheric Administration, in his official capacity as a Member of the Endangered Species Committee

Pete Hegseth, Secretary, U.S. Department of Defense

4. <u>Attorneys for Respondents</u>

Christopher Anderson

Dimple Chaudhary

Robert Nolan Stander

5. <u>Intervenor-Respondent</u>

American Petroleum Institute ("API")

6. <u>Attorneys for Intervenor-Respondent</u>

Ryan P. Steen, Stoel Rives LLP

Jason T. Morgan, Stoel Rives LLP

Tiffany Wang, Stoel Rives LLP

7. <u>Proposed Intervenor-Respondent</u>

Center for Biological Diversity ("CBD")

8. <u>Attorneys for Proposed Intervenor Respondents</u>

Brian Segee, Center for Biological Diversity

**Federal Rule of Appellate Procedure 26.1:**

API discloses as follows:

API is a 501(c)(6) organization that has no parent corporation, and there is

no publicly held corporation that owns ten percent (10%) or more of API.

*/s/ Jason T. Morgan*
Jason T. Morgan

*Counsel for Intervenor-Respondent*
*American Petroleum Institute*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................................1

TABLE OF AUTHORITIES .............................................................................V

I. INTRODUCTION ........................................................................................1

II. BACKGROUND .........................................................................................4

      A.    Section 7 of the ESA and the Exemption Process. ..............................4

      B.    The Gulf Oil and Gas Program. ............................................................6

      C.    Gulf Oil and Gas Program Biological Opinions. ..................................7

      D.    The Committee's Exemption. ................................................................8

III. ARGUMENT ...........................................................................................11

      A.    The Requested Stay Should Be Denied. ..............................................11

      B.    NRDC's Alternative Request for Dismissal Under Rule 42.4 Should Be Denied. ..............................................................................16

IV. CONCLUSION ........................................................................................17

CERTIFICATE OF COMPLIANCE .................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Benton Twp. v. Berrien Cnty.*,
570 F.2d 114 (6th Cir. 1978) ...............................................................16

*Ctr. for Biological Diversity v. Burgum*,
No. 1:24-cv-00990 (D.D.C.) ..............................................................8, 10

*Ctr. for Biological Diversity v. Burgum*,
No. 1:26-cv-00940 (D.D.C. Mar. 27, 2026) ......................................3, 14

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) ..............................................................14

*In re Desoto Cnty.*,
No. 26-60020, 2026 WL 147775 (5th Cir. Jan. 20, 2026) .....................13

*Landis v. N. Am. Co.*,
299 U.S. 248 (1936)...............................................................................11

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
538 U.S. 803 (2003)...............................................................................13

*Ramsey v. Kantor*,
96 F.3d 434 (9th Cir. 1996) .....................................................................5

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
No. 8:25-cv-1627 (D. Md.).............................................................8, 10, 12

*Vasquez-De Martinez v. Garland*,
34 F.4th 412 (5th Cir. 2022) ..................................................................16

*Wedgeworth v. Fibreboard Corp.*,
706 F.2d 541 (5th Cir. 1983) .............................................................11, 13

**Statutes**

16 U.S.C. § 1536(a)(2)......................................................................4, 5, 6

16 U.S.C. § 1536(b) .................................................................................4

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

16 U.S.C. § 1536(b)(3)(A) ....................................................................5

16 U.S.C. § 1536(b)(4) .........................................................................5

16 U.S.C. § 1536(e) ..............................................................................5

16 U.S.C. § 1536(h) ..............................................................................5

16 U.S.C. § 1536(j) .......................................................................1, 5, 10

16 U.S.C. § 1536(n) .......................................................................passim

16 U.S.C. § 1536(o)(2) ..........................................................................6

28 U.S.C. § 2112 ...................................................................................3

**Rules**

Fifth Circuit Rule 42.4 ................................................................3, 16, 17

**Regulations**

50 C.F.R. § 402.14(i) .............................................................................5

50 C.F.R. § 402.14(a) .............................................................................4

50 C.F.R. § 402.14(h) .............................................................................4

50 C.F.R. § 402.14(h)(2) .........................................................................5

91 Fed. Reg. 16,966 (Apr. 3, 2026) ..................................................1, 10, 15

## I. INTRODUCTION

On March 13, 2026, the Secretary of War ("Secretary") found it was necessary to exempt the federal oil and gas program in the Gulf of America ("Gulf") from the Endangered Species Act's ("ESA") Section 7 consultation requirement in order to protect national security. Dkt. 24-2 at 16-17 (letter from the Secretary). This finding is based on the Secretary's detailed determinations that continued operation of the Gulf oil and gas program is essential to national security and that perpetual ESA litigation by activist groups intended to halt all oil and gas operations in the Gulf threatens national security by, among other things, injecting "uncertainty and instability into Gulf development." Dkt. 24-2 at 19-31 ("National Security Findings"). The Secretary therefore requested the exemption, as provided by the ESA, and the Endangered Species Committee reviewed and approved the exemption (the "Exemption Decision"), as required by the ESA. *See* 91 Fed. Reg. 16,966-01 (Apr. 3, 2026); 16 U.S.C. § 1536(j). The ESA vests exclusive review of Committee exemptions in the "Court of Appeals," 16 U.S.C. § 1536(n), as stated on the face of the Exemption Decision. *See* 91 Fed. Reg. at 16,967.

Petitioner Natural Resources Defense Council, Inc. ("NRDC") challenges the Exemption Decision, calling it "a warrant for the extinction of endangered

species in the Gulf" and vowing to "use every tool at our disposal to fight this."[1] Apparently, "every tool" includes first filing a lawsuit in the wrong court (the D.C. district court, which has no jurisdiction to review the Exemption Decision) and then seeking to stay proceedings in the correct court (the Fifth Circuit Court of Appeals where jurisdiction is plainly vested).

This is the second time NRDC has tried to use the stay "tool" to delay its own litigation. The first time was a request to stay proceedings in this Court while the U.S. Judicial Panel on Multidistrict Litigation ("JPML") evaluated NRDC's motion to reconsider the JPML's decision to consolidate petitions in this Circuit. Dkt. 32. This Court denied that request and the JPML denied NRDC's reconsideration motion. Dkts. 56, 67. After denying the stay request, the Court granted NRDC and its aligned petitioners a 30-day extension on the briefing deadline, in response to claims that they needed "further time for adequate briefing." Dkt. 61 at 1.

NRDC comes back now asking for *more* delay, claiming that the case should be stayed so that the D.C. district court can first decide if it has jurisdiction. But NRDC's second stay request is as baseless as its first one. The D.C. district court

---

[1] NRDC, *Trump Administration Uses "God Squad" to Allow Gulf Oil and Gas Industry to Bypass Endangered Species Protections* (Mar. 31, 2026) (statement of Andrew Wetzler, senior vice president for Nature at NRDC ), https://www.nrdc.org/press-releases/trump-administration-uses-god-squad-allow-gulf-oil-and-gas-industry-bypass.

already opined in a related proceeding that it "likely lacks subject matter jurisdiction" under "16 U.S.C. § 1536(n)." *See* Order Denying Plaintiff's Motion for Temporary Restraining Order, *Ctr. for Biological Diversity v. Burgum*, No. 1:26-cv-00940, Dkt. 17 at 1 (D.D.C. Mar. 27, 2026).

The delays sought by NRDC are not harmless. The Exemption Decision was intended to remove national security threats associated with litigation and provide regulatory certainty for the oil and gas industry. NRDC's challenge to the Exemption Decision prolongs the very litigation risk and regulatory uncertainty that the Secretary's requested exemption was intended to address. And now, NRDC seeks to further prolong the national security threat it helped create by staying its own challenge to the exemption while it tries to fend off dismissal of another improperly filed lawsuit. The Court should therefore deny NRDC's stay request.

NRDC's alternative request for voluntary dismissal under Fifth Circuit Rule 42.4 is also baseless. Allowing NRDC the option to restart its litigation in this Court anytime in the next 180 days would frustrate orderly briefing of the other petitions in this case, create an end-run around the ESA's strict 90-day limitations period (16 U.S.C. § 1536(n)), and undermine the purpose of consolidating petitions for a single review (28 U.S.C. § 2112). NRDC is just using Rule 42.4 as another

- 3 -

"tool" to try to prolong resolution of this case. The Court should deny NRDC's alternative request as well.

## II.  BACKGROUND

### A.    Section 7 of the ESA and the Exemption Process.

ESA Section 7 requires federal agencies to ensure that their actions are "not likely to jeopardize the continued existence" of ESA-listed species or "result in the destruction or adverse modification of [the critical] habitat of such species." 16 U.S.C. § 1536(a)(2). To comply with this mandate, a federal "action" agency is required to consult with the applicable federal "consult[ing]" agency regarding actions that may adversely affect ESA-listed species. *See id.*; 50 C.F.R. § 402.14(a). The consulting agency evaluates those effects and completes the Section 7 consultation by issuing a biological opinion regarding whether the action is likely to jeopardize ESA-listed species or adversely modify critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(h).

There are two different consulting agencies: the National Marine Fisheries Service ("NMFS") for marine species, and the Fish and Wildlife Service ("FWS" and collectively with NMFS, the "Services") for most terrestrial species. There are a few species (*e.g.*, sea turtles) for which the Services share consulting responsibilities.

If the consulting agency finds that an action *is* likely to jeopardize an ESA-listed species or adversely modify or destroy designated critical habitat, it will propose "reasonable and prudent alternatives" to modify or place certain conditions on the proposed action. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2). For proposed actions (or reasonable and prudent alternatives) that are *not* likely to jeopardize listed species or adversely modify critical habitat, the consulting agency will issue a statement exempting any "incidental take" from the ESA's take prohibition and identifying "reasonable and prudent measures" to minimize the impacts of the incidental take. 50 C.F.R. § 402.14(i); 16 U.S.C. § 1536(b)(4). The incidental take statement is "functionally equivalent to a permit because the activity in question would, for all practical purposes, be prohibited but for the incidental take statement." *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996).

The Section 7 consultation obligation applies "unless" the Endangered Species Committee (the "Committee") grants an exemption. 16 U.S.C. § 1536(a)(2). The Committee is a Cabinet-level body that has exclusive authority to grant exemptions from the requirements of Section 7, even if the exemption would jeopardize ESA-listed species. *See* 16 U.S.C. § 1536(e), (h). Pursuant to 16 U.S.C. § 1536(j), "the Committee *shall grant* an exemption for any agency action if the Secretary of [War] finds that such exemption is necessary for reasons

- 5 -

of national security" (emphasis added). The resulting exemption order releases an agency action from any Section 7 requirements. *See, e.g.*, 16 U.S.C. § 1536(a)(2), (o)(2).

**B.      The Gulf Oil and Gas Program.**

The Bureau of Ocean Energy Management ("BOEM") and the Bureau of Safety and Environmental Enforcement ("BSEE") (jointly, the "Bureaus") administer offshore oil and gas leasing and activities requiring permits and approvals under the Outer Continental Shelf Lands Act. The Gulf's outer continental shelf is one of the world's major oil and gas producing regions. *See* National Security Findings ¶ 1. The Gulf produces 15% of the U.S. crude oil (roughly two million barrels per day) and about 1.7% of U.S. dry natural gas, making it essential to domestic energy operations. *Id.*

To manage this program, the Bureaus approve thousands of plans and permits each year. As of January 1, 2026, there are 1,919 active oil and gas leases in the Gulf. Dkt. 24-2 (Declaration of Holly Hopkins ("Hopkins Decl.")) ¶ 6. In fiscal year 2024, operations on the outer continental shelf in the Gulf produced 668 million barrels of oil and 700 billion cubic feet of natural gas. *Id*. These resources are produced by an extensive network of approximately 1,330 active platforms, 7,570 wells, and 18,390 miles of active pipelines. *Id*. All these activities are supported by a robust and ongoing planning and permitting process, including

hundreds of approvals issued each year by BOEM and an average of 5,829 approvals per year issued by BSEE. *Id*. API's members are the primary recipients of these approvals. *Id*.

## C.     Gulf Oil and Gas Program Biological Opinions.

To comply with ESA Section 7 for the Gulf oil and gas program, BOEM and BSEE engaged in comprehensive consultations with FWS and NMFS over many years. National Security Findings ¶¶ 4, 25-28. Because of the number of approvals needed each year, BOEM, BSEE, and the Services took a comprehensive approach and developed multi-year biological opinions that governed all activities in the Gulf. *See id.* ¶¶ 25-30. In 2018, FWS produced a 10-year biological opinion (the "2018 BiOp") and revisited that decision in 2025, and, in 2020, NMFS produced a 10-year biological opinion. *Id*. ¶¶ 27-28. Each biological opinion includes an incidental take statement, as required by Section 7. Both biological opinions were intended to satisfy the Bureaus' obligations under the ESA and allow for timely issuance of the permits necessary for continued operation of the Gulf oil and gas program. National Security Findings ¶¶ 26, 29.

Environmental activist groups challenged both biological opinions and sought to vacate the opinions and halt oil and gas operations in the Gulf. *See* National Security Findings ¶¶ 31, 33-34, 40. The Maryland federal district court did vacate NMFS's biological opinion, but not before NMFS produced a revised

biological opinion on May 20, 2025 (the "2025 BiOp"). *Id.* ¶¶ 36-37. The same activist groups also challenged NMFS's 2025 BiOp, seeking to vacate it. *Id.* ¶ 38; *see also* Amended Complaint, *Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 8:25-cv-1627, Dkt. 32 (D. Md. Aug. 1, 2025). Litigation over FWS's 2018 BiOp and subsequent consultation action in 2025 remains pending. National Security Findings ¶ 40; *see generally* Docket, *Ctr. for Biological Diversity v. Burgum*, No. 1:24-cv-00990 (D.D.C.).

Vacatur of either biological opinion would have disastrous consequences for the Gulf oil and gas program. National Security Findings ¶¶ 8-9, 41-52; *see also* Hopkins Decl. ¶¶ 6, 11, 13. These opinions and their incidental take statements are a linchpin for Gulf oil and gas operations. National Security Findings ¶ 29. They allow federal agencies to issue permits, approve plans, and take other similar actions necessary for Gulf oil and gas development in compliance with the ESA. *Id.* They likewise protect agencies and operators from civil and criminal liability when acting in compliance with the opinions. *Id.* All oil and gas operators in the Gulf, including API's members, rely on these ESA consultation decisions and actions. *Id.* ¶ 30.

D. **The Committee's Exemption.**

On March 13, 2026, Secretary Hegseth determined that an exemption from the ESA was necessary "to remove a substantial threat to national security."

Dkt. 24-2 at 19-20. He based his decision on several factors, including the devastating effects that judicial vacatur of NMFS's 2025 BiOp and FWS's 2018 and 2025 consultation decisions would have on domestic oil and gas production. National Security Findings ¶¶ 6-17, 41-52. The Secretary concluded that vacating these ESA consultation decisions would "effectively halt all oil and gas activities in the Gulf" because the Bureaus would have to—but could not—perform the "case-by-case ESA review" of thousands of permitting decisions. *Id*. ¶¶ 42, 43. Operators would also face "a no-win decision" from the immediate loss of take coverage: (a) shut down operations and risk "massive financial losses, breach of contract claims, and other negative consequences" including "significant worker and public health and safety issues and industrial damage" or (b) continue to operate and "risk violating the ESA." *Id*. ¶ 46.

The Secretary found that cessation of oil and gas production in the Gulf would "significantly jeopardize American energy independence and, as a result, the national security," in part by driving up prices and boosting oil export revenues for geopolitical adversaries like Russia and Iran. *Id.* ¶¶ 56-57; *see also id.* ¶ 60. That concern is particularly acute, the Secretary explained, "given the global volatility in oil and gas production and supply" and "the current conflict with Iran." *Id.* ¶ 84. The Secretary further determined that halting oil production in the Gulf would increase prices for American consumers, cause the loss of American

- 9 -

jobs, drive up inflation, hamstring the nation's ability to respond to emergencies, and disrupt the military's critical fuel supply chain. *Id.* ¶¶ 61, 64, 70, 71, 75. In sum, the consequences of vacating the ESA consultation decisions would be catastrophic. *Id.* ¶ 76. Even judicial interference short of vacatur posed "an unacceptable risk to the national security." *Id.* ¶ 83.

Once the Secretary made his National Security Findings, the ESA mandated that the Committee meet to grant the exemption. *See* 16 U.S.C. § 1536(j). The Committee met on March 31, 2026, and published its required order granting the exemption on April 3, 2026. *See* 91 Fed. Reg. 16,966-01. The exemption "applies to the full scope of" "the oil and gas exploration, development, and production activities" that were analyzed in the Services' biological opinions and consultation decisions, while maintaining "robust avoidance or minimization measures" established by the Bureaus. *Id.* at 16,966. Despite the issuance of the Exemption Decision, the activist groups challenging NMFS's 2025 BiOp and FWS's 2018 and 2025 consultation decisions continued to press their (moot) lawsuits. *See* Status Report and Request for Briefing Schedule, *Sierra Club*, No. 8:25-cv-1627, Dkt. 96 at 2 (D. Md. Apr. 15, 2026). ("Plaintiffs do not believe that dismissal is warranted or appropriate."); Joint Status Report and Request for Briefing Schedule, *Ctr. for Biological Diversity v. Burgum*, No. 1:24-cv-00990, Dkt. 45 at 2 (D.D.C. Apr. 20, 2026) (same).

## III. ARGUMENT

### A. The Requested Stay Should Be Denied.

A stay of litigation is an equitable request, and "the suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to some one else." *Wedgeworth v. Fibreboard Corp.*, 706 F.2d 541, 545 (5th Cir. 1983) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)). NRDC does not meet this standard.

At a very minimum, there is a "fair possibility that the stay" NRDC requests "will work damage to some one else." *Id.* (citation omitted). API sought to intervene in this case to protect its members' interests in oil and gas operations in the Gulf. API's members conduct many of the activities directly addressed by NMFS's 2025 BiOp and FWS's 2018 and 2025 consultation decisions and they are, therefore, directly regulated and affected by the Exemption Decision. National Security Findings ¶¶ 5-10.

The Secretary's determination that the exemption is necessary to protect national security was based on his finding that ESA lawsuits "threaten to effectively halt all oil and gas operations in the Gulf" and place operators in a "'no-win situation.'" *Id.* ¶¶ 41-46. The cycle of unending litigation perpetuated by NRDC (and others aligned with it) is intended to, and does, threaten oil and gas

- 11 -

production by "inject[ing] uncertainty and instability into Gulf development and sow[ing] confusion among both the regulated entities and the agencies that regulate those activities" and "disrupt[ing] oil operations that require advanced planning, which, in turn, curtail oil and gas development." *Id*. ¶¶ 49-51. Indeed, the plaintiffs in both the Maryland and District of Columbia cases challenging, and seeking vacatur of, NMFS's and FWS's biological opinions refused to concede that their challenges are moot. On June 24, 2026, the Maryland district court disagreed, granting the defendants' motion to dismiss plaintiffs' claims as moot. *Sierra Club*, No. 8:25-cv-1627, Dkt. 112 (D. Md. June 24, 2026). A similar motion is pending in the District of Columbia case.

API's members "need regulatory certainty" to invest in development of Gulf oil and gas resources that are indisputably essential to national security. *Id*. ¶¶ 51, 80-81. Without the exemption, the federal permitting agencies are left "perpetually defending their decisions in litigation," which "generates uncertainty and instability for both the oil and gas industry, which relies on governmental approvals, and the agencies that issue those approvals." *Id*. ¶ 52. "[T]his kind of regulatory instability undermines the certainty that companies need to commit billions of dollars to offshore energy production." *Id*. ¶ 100.

NRDC disregards these impacts, selectively quoting *National Park Hospital Association* to claim that the Supreme Court has made "clear" that "'[m]ere

uncertainty as to the validity of a legal rule'" does not "'constitute[] a hardship.'" Dkt. 68 at 7 (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003)). Left out of that claim is the Supreme Court's qualifier that this was "for purposes of the ripeness analysis." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 811. They also overlook that there is no challenge to a "legal rule" here; rather, they have challenged a *statutory national security exemption* granted *specifically* to eliminate "[r]egulatory uncertainty and instability" that will "disrupt oil operations" in the Gulf. National Security Findings ¶ 51.

Under these circumstances, there is more than "a fair possibility that the stay" requested by NRDC "will work damage to some one else." *Wedgeworth*, 706 F.2d at 545 (citation omitted). Delay in resolution of this litigation impacts national security interests, as explained and determined by the Secretary, and the directly related interests of API's members in the ongoing production of Gulf petroleum to meet national energy needs.

NRDC also fails to "make out a clear case of hardship or inequity in being required to go forward" with its own case. *Id.* (citation omitted). In fact, NRDC identifies no hardship at all. *In re Desoto Cnty.*, No. 26-60020, 2026 WL 147775, at *2 (5th Cir. Jan. 20, 2026) ("While it is true that denial of a stay will require the County to proceed to trial, the costs of trial are not extraordinary—rather, they are a basic incident of litigation."). And, certainly, any hardship associated with

- 13 -

litigating NRDC's own case does not outweigh the Secretary's National Security Findings regarding the harm of regulatory uncertainty.

NRDC suggests that there is efficiency in allowing the D.C. district court to decide jurisdiction first because "the district court is familiar with the issues concerning the Exemption from having previously denied a motion for a temporary restraining order in a related case." Dkt. 68 at 8. But the D.C. district court denied a motion for a temporary restraining order in that related case *because* it "likely lacks subject matter jurisdiction" under "16 U.S.C. § 1536(n)." *See Ctr. for Biological Diversity v. Burgum*, No. 1:26-cv-00940, Dkt. 17 at 1 (D.D.C. Mar. 27, 2026). There is no efficiency in waiting for the district court to confirm that it lacks subject matter jurisdiction. And even if the district court changes its mind, any ruling by that court would be both subject to appeal and not binding on this Court.

NRDC glosses over the stay standard, arguing that when "jurisdiction or venue is disputed and a party files a petition solely as a protective matter, courts of appeal commonly stay the appellate proceeding pending resolution of the parallel district court action 'to prevent duplicative litigation' and conserve judicial resources." Dkt. 68 at 5-6 (quoting *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 180-81 (D.C. Cir. 2017)). This is wrong for multiple reasons.

- 14 -

*First*, although NRDC claims to have filed its petition "protectively," the other petitioners in this case do not.[2] *Second*, a stay will not "conserve judicial resources" because this Court will be required to make an independent assessment of its own jurisdiction regardless of the D.C. district court's decision and any decision by that court will be subject to appeal, pushing resolution of this issue out indefinitely. *Third*, to the extent there is "duplicative litigation," that is because NRDC erroneously filed its case in the D.C. district court—*after* that district court said it "likely lacks subject matter jurisdiction" in a related case, *despite* a clear statutory mandate to file in the Court of Appeals (16 U.S.C. § 1536(n)), and *despite* the fact that the Exemption Decision itself states "that a person may obtain judicial review exclusively in the U.S. Courts of Appeals for the Fifth or Eleventh Circuits." 91 Fed. Reg. at 16,967. NRDC's current stay request is just the next iteration of its gamesmanship.

Accordingly, NRDC fails (again) to show that a stay is warranted in this case, and its motion should be denied.

---

[2] NRDC suggests that the court could just stay its briefing obligations, and not that of the other petitioners. Dkt. 68 at 5-7. But that is just an invitation to duplicative litigation.

**B.      NRDC's Alternative Request for Dismissal Under Rule 42.4 Should Be Denied.**

Without a credible basis for a stay, NRDC pursues a procedural maneuver under Rule 42.4 that would allow it to be temporarily dismissed from the case (while the remaining parties proceed to brief the merits of the case) and then reappear at any time of its choosing in the next 180 days if it does not like the result in the D.C. district court. This request should also be denied.

The Court has broad discretion to deny a voluntary motion to dismiss "when it's in the interest of justice or fairness" to do so. *Vasquez-De Martinez v. Garland*, 34 F.4th 412, 414 (5th Cir. 2022) (internal quotation marks and citation omitted). "One good reason to exercise discretion against dismissal is to curtail strategic behavior." *Albers v. Eli Lilly & Co.*, 354 F.3d 644, 646 (7th Cir. 2004). Another good reason for denying voluntary dismissal is where "only one of two appellants have moved to dismiss" and it is apparent that the court "must reach the merits of this action" anyway. *Benton Twp. v. Berrien Cnty.,* 570 F.2d 114, 119 (6th Cir. 1978).

Here, there are ample reasons why temporary dismissal is not in the interests of justice or fairness. Principally, dismissal under Rule 42.4 is inconsistent with the 90-day limitations period in 16 U.S.C. § 1536(n). Congress plainly wanted challenges to ESA exemption decisions fast-tracked to the Court of Appeals within 90 days. Allowing NRDC to dismiss a timely filed appeal and then reinstate it 180

days later thwarts that time-limited grant of jurisdiction. It is not in the interest of justice to allow NRDC to manipulate the ESA's limitation period or to facilitate NRDC's shenanigans by allowing it to pick and choose which courts it wants to decide which issues, in which order, and then participating in this case if, and only if, it does not like the result in the D.C. district court. Lastly, dismissal of NRDC's petition is also unwarranted because the requested dismissal would not extend to the other similarly aligned petitioners. The Court will therefore have to reach the merits of this case regardless of any dismissal of NRDC.

For all these reasons, the request for voluntary dismissal without prejudice should be denied.

## IV.  CONCLUSION

For the foregoing reasons, and those stated in the opposition filed by Federal Respondents, NRDC's motion for stay and alternative request for dismissal under Rule 42.4 should be denied.

Dated: June 25, 2026.

/s/ Jason T. Morgan
JASON T. MORGAN, WA. Bar No. 38346
jason.morgan@stoel.com
RYAN P. STEEN, WA Bar No. 39922
ryan.steen@stoel.com
TIFFANY WANG, WA. Bar No. 57367
tiffany.wang@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3400
Seattle, Washington 98101
T: (206) 624-0900
F: (206) 386-7500

*Counsel for Intervenor-Respondent
American Petroleum Institute*

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2026, an electronic copy of the foregoing AMERICAN PETROLEUM INSTITUTE'S OPPOSITION TO MOTION TO STAY OR DISMISS was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service on all parties will be accomplished by the appellate CM/ECF system.

/s/ Jason T. Morgan
Jason T. Morgan
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, Washington 98101
T: (206) 624-0900
F: (206) 386-7500
jason.morgan@stoel.com

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this motion:

(i)    complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2, this document contains 3,824 words; and

(ii)    complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

Dated: June 25, 2026.

*/s/ Jason T. Morgan*
Jason T. Morgan