No. 26-60240

# In the United States Court of Appeals For the Fifth Circuit

**AMERICAN ENERGY ASSOCIATION,**
*Petitioner*,

**v.**

**DOUG BURGUM, Secretary of the Interior, in his official capacities as Chair and Member of the Endangered Species Committee; BROOKE ROLLINS, Secretary of Agriculture, in her official capacity as a Member of the Endangered Species Committee; DANIEL DRISCOLL, Secretary of the Army, in his official capacity as a Member of the Endangered Species Committee; PIERRE YARED, Acting Chair of the Council of Economic Advisers, in his official capacity as a Member of the Endangered Species Committee; LEE ZELDIN, Administrator of the Environmental Protection Agency, in his official capacity as a Member of the Endangered Species Committee; NEIL JACOBS, Administrator of the National Oceanic and Atmospheric Administration, in his official capacity as a Member of the Endangered Species Committee; PETE HEGSETH, Secretary, U.S. Department of Defense,**
*Respondents.*

On Petition for Review of an Order of the Endangered Species Committee

## OPENING BRIEF FOR PETITIONER AMERICAN ENERGY ASSOCIATION

Michael Buschbacher
James R. Conde
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
 Suite 900
Washington, DC 20006
(202) 955-0620

# CERTIFICATE OF INTERESTED PERSONS

*American Energy Association v. Doug Burgum, et al.*
No. 26-60240

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### Petitioners[1]

American Energy Association

Natural Resources Defense Council, Incorporated

Defenders of Wildlife

National Wildlife Federation

National Parks Conservation Association

Florida Wildlife Federation

Louisiana Wildlife Federation

Texas Conservation Alliance

---

[1] American Energy Association is the sole petitioner remaining in this case. On June 30, 2026, the Court granted the other Petitioners' voluntary motions to dismiss with prejudice. Dkts. 90, 92.

**Respondents and Respondent-Intervenors**

American Petroleum Institute

Doug Burgum, Secretary of the Interior, in his official capacities as Chair and Member of the Endangered Species Committee

Brooke Rollins, Secretary of Agriculture, in her official capacity as a Member of the Endangered Species Committee

Daniel Driscoll, Secretary of the Army, in his official capacity as a Member of the Endangered Species Committee

Pierre Yared, Acting Chair of the Council of Economic Advisers, in his official capacity as a Member of the Endangered Species Committee

Lee Zeldin, Administrator of the Environmental Protection Agency, in his official capacity as a Member of the Endangered Species Committee

Neil Jacobs, Administrator of the National Oceanic and Atmospheric Administration, in his official capacity as a Member of the Endangered Species Committee

Pete Hegseth, Secretary, U.S. Department of War

**Attorneys**

James R. Conde, Boyden Gray PLLC

Jason T. Morgan, Stoel Rives LLP

Tiffany Wang, Stoel Rives LLP

Ryan P. Steen, Stoel Rives LLP

Katherine Desormeau, Natural Resources Defense Council

Jane P. Davenport, Defenders of Wildlife

Joseph M. Manning, Defenders of Wildlife

Catherine Wannamaker, Southern Environmental Law Center

Brian Segee, Center for Biological Diversity

Christopher Anderson, U.S. Department of Justice

Dimple Chaudhary, Environmental Protection Agency

Robert Nolan Stander, U.S. Department of Justice

In accordance with Federal Rule of Appellate Procedure 26.1, Petitioner American Energy Association discloses that it is a 501(c)(6) organization that has no parent corporation, and there is no publicly held corporation that owns ten percent (10%) or more of American Energy Association.

Dated: July 15, 2026

Respectfully submitted,

/s/ James R. Conde
James R. Conde

*Counsel for Petitioner*
*American Energy Association*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and (f) and Fifth Circuit Rule 28.2.3, Petitioner respectfully requests oral argument. This case involves the first ever national security exemption under section 7(j) of the Endangered Species Act. Oral argument would therefore substantially aid the Court in its resolution of the case.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................................i

STATEMENT REGARDING ORAL ARGUMENT .............................................iv

TABLE OF AUTHORITIES ....................................................................vii

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES...................................................................2

INTRODUCTION ...........................................................................3

STATEMENT OF THE CASE................................................................5

    I.      The Endangered Species Act ...............................................5

        A.     Section 7 Consultations............................................5

        B.     Section 7 Exemptions............................................. 9

    II.     The Gulf of America Program Consultations ................................. 11

        A.     The 2020 Gulf of America Biological Opinion ........................14

        B.     The 2025 Gulf of America Biological Opinion ....................... 17

        C.     Legal Challenges to the 2025 Biological Opinion.....................21

    III.    The Committee's Exemption .........................................22

    IV.   Procedural History..................................................24

SUMMARY OF THE ARGUMENT .................................................26

LEGAL STANDARD ...........................................................28

ARGUMENT ..................................................................29

    I.      This Court Has Subject-Matter Jurisdiction ...................................29

II.   Petitioner Has Standing ................................................................ 35

III.  The Committee's Order Is Arbitrary ............................................40

IV.   The Committee's Error Is Prejudicial ...........................................46

V.    The Proper Remedy Is to Sever the Order or Remand Without
      Vacatur ....................................................................................48

CONCLUSION .............................................................................................52

# TABLE OF AUTHORITIES

<b>Page(s)</b>

**Cases**

*Arbaugh v. Y&H Corp.*,
   546 U.S. 500 (2006)..................................................................29

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023)..................................................................30

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................8

*Bowen v. Massachusetts*,
   487 U.S. 879 (1988) .................................................................30

*Carswell v. Camp*,
   54 F.4th 307 (5th Cir. 2022).....................................................29

*Cent. & S. W. Servs., Inc. v. EPA*,
   220 F.3d 683 (5th Cir. 2000)................................................ 50, 51

*Cisneros v. Alpine Ridge Grp.*,
   508 U.S. 10 (1993)....................................................................32

*Ctr. for Biological Diversity v. DOT*,
   2026 WL 1959172 (5th Cir. July 7, 2026)............................... 12

*Ctr. for Biological Diversity v. EPA*,
   937 F.3d 533 (5th Cir. 2019) ................................................... 13

*Dep't of Educ. v. Brown*,
   600 U.S. 551 (2023) .................................................................38

*DHS v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020) ..........................................................41, 42, 43

*Diamond Alt. Energy, LLC v. EPA*,
   606 U.S. 100 (2025) ............................................................ 36, 37

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ............................................................ 41

*Entergy Corp. v. Riverkeeper, Inc.,*
  556 U.S. 208 (2009) ............................................................ 41

*EPA v. Calumet Shreveport Ref., LLC,*
  605 U.S. 627 (2025) ............................................................ 31

*FCC v. Prometheus Radio Project,*
  592 U.S. 414 (2021) ............................................................28

*FDA v. Wages & White Lion Invs., LLC,*
  604 U.S. 542 (2025) ...................................................... 46, 48

*Fla. Power & Light Co. v. Costle,*
  650 F.2d 579 (5th Cir. 1981) ...............................................52

*Healthy Gulf v. U.S. Dep't of the Interior,*
  152 F.4th 180 (D.C. Cir. 2025)............................................ 12

*Hunt v. Wash. State Apple Advert. Comm'n,*
  432 U.S. 333 (1977) ............................................................40

*Judulang v. Holder,*
  565 U.S. 42 (2011)...............................................................40

*Keene v. International Union of Operating Engineers, Local 624,*
  569 F.2d 1375 (5th Cir. 1978) ............................................... 1

*King v. Burwell,*
  576 U.S. 473 (2015) ............................................................ 35

*Louisiana v. Haaland,*
  86 F.4th 663 (5th Cir. 2023)...........................................13, 47

*Louisiana v. Haaland,*
  No. 2:23-CV-01157, 2023 WL 6450134 (W.D. La. Sept. 21, 2023) ............. 14, 20

*Louisiana v. NMFS,*
  817 F. Supp. 3d 390 (W.D. La. 2026) ......................13, 19, 21, 22, 39, 45, 47

*Massachusetts v. EPA*,
549 U.S. 497 (2007) ...................................................................38

*Me. Lobstermen's Ass'n v. NMFS*,
70 F.4th 582 (D.C. Cir. 2023) ..............................6, 7, 8, 9, 37, 38, 46, 48, 50, 51

*Michigan v. EPA*,
576 U.S. 743 (2015) ........................................................... 41, 44

*Mullin v. Doe*,
2026 WL 1825840 (U.S. June 25, 2026)......................................... 33

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007) ......................................................... 41

*Nat'l Ass'n of Mfrs. v. DOD*,
583 U.S. 109 (2018)...................................................30, 34, 35

*Nat'l Religious Broads. v. FCC*,
138 F.4th 282 (5th Cir. 2025) ...................................... 35, 37, 39

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) ...................................................................42

*NRDC v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ......................................................49

*Patel v. Garland*,
596 U.S. 328 (2022) ....................................................................32

*Sierra Club v. NMFS*,
797 F. Supp. 3d 440 (D. Md. 2024)...................................... 12, 15, 16

*Sierra Club v. NMFS*,
No. CV DLB-25-1627, 2025 WL 3706503 (D. Md. Dec. 22, 2025).....................1

*Sierra Club v. Peterson*,
185 F.3d 349 (5th Cir. 1999) ........................................................38

*Sierra Club v. Peterson*,
228 F.3d 559 (5th Cir. 2000) .......................................................38

*Tex. Ass'n of Mfrs. v. CPSC*,
989 F.3d 368 (5th Cir. 2021) ....................................................52

*Tex. Corn Producers v. EPA*,
141 F.4th 687 (5th Cir. 2025) ...................................................44

*Texas v. United States*,
126 F.4th 392 (5th Cir. 2025) ..................................... 48, 49, 50, 51

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ..................................................................36

*TVA v. Hill*,
437 U.S. 153 (1978) ............................................................ 6, 45

*United Food & Commercial Workers Union Local 751 v. Brown Grp., Inc.*,
517 U.S. 544 (1996) ..................................................................36

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954)..................................................................44

*Weyerhaeuser Co. v. FWS*,
586 U.S. 9 (2018) .....................................................................43

*Winter v. NRDC*,
555 U.S. 7 (2008) .............................................................. 42, 51

**Statutes**

5 U.S.C. § 703....................................................................30

5 U.S.C. § 704 ...................................................................34

5 U.S.C. § 706....................................................................46

5 U.S.C. § 706(2)(A) ..........................................................28

5 U.S.C. § 706(2)(C) ..........................................................28

5 U.S.C. § 706(2)(D) ..........................................................28

16 U.S.C. § 1531(b) ..............................................................5

16 U.S.C. § 1532(6) ............................................................5

16 U.S.C. § 1532(13) ...........................................................9

16 U.S.C. § 1532(16) ..........................................................12

16 U.S.C. § 1532(20) ...........................................................5

16 U.S.C. § 1533(c) .............................................................5

16 U.S.C. § 1536(a)(2) ...........................................6, 9, 32, 34

16 U.S.C. § 1536(b)(3)(A) .....................................................7

16 U.S.C. § 1536(b)(4) .........................................................8

16 U.S.C. § 1536(e)(1) .........................................................9

16 U.S.C. § 1536(e)(3) .........................................................9

16 U.S.C. § 1536(g) .............................................................9

16 U.S.C. § 1536(h) .................................9, 10, 30, 31, 34

16 U.S.C. § 1536(h)(1)(A)(i) ...............................................33

16 U.S.C. § 1536(h)(1)(A)(ii) ..............................................33

16 U.S.C. § 1536(h)(1)(B) .............10, 26, 33, 39, 40, 42, 43, 45, 50

16 U.S.C. § 1536(h)(2)(A) ...................................................11

16 U.S.C. § 1536(j) ............................... 4, 10, 31, 32, 33, 41

16 U.S.C. § 1536(*l*)(1) ..................................................... 10, 49

16 U.S.C. § 1536(n) ...............................1, 26, 28, 29, 32

16 U.S.C. § 1538(a)(1)(B) .....................................................5

16 U.S.C. § 1538(a)(1)(C) .....................................................5

16 U.S.C. § 1538(g) .............................................................8

16 U.S.C. § 1540 ....................................................................9

28 U.S.C. § 2112(a)(1) ..........................................................25

28 U.S.C. § 2112(a)(3) ..........................................................25

28 U.S.C. § 2112(a)(5) ..........................................................25

43 U.S.C. § 1331................................................................... 11

Pub. L. No. 93-205, 87 Stat. 884 (1973) .................................6

Pub. L. No. 95-632, 92 Stat. 3751 (1978) ...............................6

Pub. L. No. 96-159, 93 Stat. 1225 (1979) ...............................6

**Regulations**

50 C.F.R. § 17.11 ..................................................................5

50 C.F.R. § 17.12 ..................................................................5

50 C.F.R. § 402.01(b) ...........................................................5

50 C.F.R. § 402.02.............................................................7, 8

50 C.F.R. § 402.14 ................................................................8

50 C.F.R. § 402.14(h) ...........................................................7

50 C.F.R. § 402.14(i)(1) ........................................................8

50 C.F.R. § 402.14(i)(2) ........................................................8

50 C.F.R. § 402.14(i)(6) ........................................................9

50 C.F.R. § 402.17(b)............................................................8

50 C.F.R. § 453.03(b).....................................................10, 50

84 Fed. Reg. 15,446 (Apr. 15, 2019) ...................................12

86 Fed. Reg. 47,022 (Aug. 23, 2021) ..................................12

88 Fed. Reg. 47,453 (July 24, 2023) ....................................................................20

**Other Authorities**

Focused Biological Assessment to Support Endangered Species Act
Reinitiated Consultation on the Gulf of Mexico Oil and Gas
Program, https://perma.cc/M3VS-FQNT ...............................................17, 18

H.R. Rep. No. 95-1625 (1978) ...............................................................................6

Memorandum of Understanding Regarding Jurisdictional
Responsibilities and Listing Procedures Under the Endangered
Species Act of 1973 (Aug. 28, 1974), https://perma.cc/PKR6-
2ZGY ...................................................................................................................5

NMFS, *Biological Opinion on the Federally Regulated Oil and Gas
Program Activities in the Gulf of Mexico* (2020), https://perma.cc/
9ZWW-BFKJ ..............................................................................................14, 15

NMFS, *Rice's Whale Proposed Critical Habitat Map*, https://perma.cc/
ANV9-3APD .....................................................................................................20

NOAA, *Species Directory: Rice's Whale*, https://perma.cc/S4Z7-
H8MU (last visited July 13, 2026)...................................................................12

Robert Bryce, *The Anti-Industry Industry* (Feb. 18, 2023),
https://perma.cc/ 66XJ-2NB4............................................................................3

U.S. Dep't of the Interior, *Endangered Species Act Meeting*, at 34:45
(YouTube, Mar. 31, 2026), https://youtu.be/iC3xyp4GxRE?t=
2085................................................................................................................... 23

# JURISDICTIONAL STATEMENT

The Endangered Species Committee granted the exemption decision at issue here "pursuant to section 7(h)." 91 Fed. Reg. 16,966, 16,966 (Apr. 3, 2026), JA[R.5]. Accordingly, a petition for review must be filed in a "United States Court of Appeals … within 90 days after the date of issuance of the decision." 16 U.S.C. § 1536(n). American Energy Association filed a timely petition for review on April 13, 2026. Dkt. 1. Under 28 U.S.C. § 2112(a)(1), (3), the Judicial Panel on Multidistrict Litigation consolidated petitions for review in this circuit. Dkt. 9. This Court therefore has jurisdiction over challenges to the Committee's exemption, as discussed *infra*.

Venue is also proper in this circuit, as the Committee conceded. 91 Fed. Reg. at 16,967, JA[R.6] ("a person may obtain judicial review exclusively in the U.S. Courts of Appeals for the Fifth or Eleventh Circuits."). "Unlike jurisdiction, venue can be waived." *Keene v. International Union of Operating Engineers, Local 624*, 569 F.2d 1375, 1378 (5th Cir. 1978). The Committee has waived venue objections by agreeing that this circuit is a proper venue. But regardless, venue is proper. Much of the agency action at issue here is carried out within the territorial boundaries of Louisiana. *See Sierra Club v. NMFS*, No. CV DLB-25-1627, 2025 WL 3706503, at *5 (D. Md. Dec. 22, 2025); *see* Dkt. 52, at 3–4. Accordingly, venue is proper in this circuit.

## STATEMENT OF ISSUES

(1)     Whether this Court has jurisdiction under 16 U.S.C. § 1536(n).

(2)     Whether the Committee's order arbitrarily subjects oil and gas activities in the Gulf of America to burdensome mitigation measures without a reasoned explanation.

(3)     Whether the Court should sever the order or remand to the Committee without vacatur to avoid inequitable and disruptive consequences.

# INTRODUCTION

For decades, the "anti-industry industry"[2]—groups opposed to oil and gas—have invoked the Endangered Species Act in district courts across the country to tie up oil and gas leasing and permitting activities in the Gulf of America with litigation uncertainty, delays, and regulatory burdens. To mollify these groups and settle, federal regulators have indulged their demands, burdening offshore businesses such as those represented by Petitioner American Energy Association ("AEA") with precautionary measures to avoid even the faintest possibility of harm to any protected species, from the awesome baleen whale to the humble gastropod, heedless of cost. But despite reams of precautionary regulations, the anti-industry industry always comes back for more. Their goal is to shut down oil and gas activities in the Gulf of America for good.

In 2024, they nearly succeeded. A district court in Maryland threatened to vacate a biological opinion permitting the Department of Interior's oil and gas program in the Gulf of America. That would have shut down oil and gas activities in the Gulf, with disastrous consequences for the American economy, energy security, and our military's supply chains.

---

[2] *See* Robert Bryce, *The Anti-Industry Industry* (Feb. 18, 2023), https://perma.cc/66XJ-2NB4.

The Secretary of War stepped into the breach. Invoking a never-before-used provision of the Endangered Species Act, the Secretary of War found that an exemption for the Gulf of America's oil and gas program was necessary for reasons of national security. 16 U.S.C. § 1536(j). The Endangered Species Committee accordingly granted an exemption.

If the Committee had stopped there, AEA would not be here. AEA supports the exemption. But the Committee did not stop there. Instead, when granting the mandatory exemption, the Committee exercised its discretion to impose an unnecessary order mandating continued compliance with hundreds of pages of burdensome pre-existing mitigation requirements. Although the Committee has statutory authority to impose such a mandate when granting an exemption, the statute and basic principles of administrative law require that when it does so, the Committee explain its decision under the statutory factors and give some attention to cost. But the Committee didn't explain why its order imposing mitigation requirements satisfied the statutory factors, and it gave zero attention to cost. That was arbitrary. On remedy, however, the Court should not vacate the exemption. It should vacate only the order requiring mitigation, or remand without vacatur. Vacating the exemption in its entirety would be unwarranted, disruptive, inequitable, and against the public interest.

**STATEMENT OF THE CASE**

## I. THE ENDANGERED SPECIES ACT

Congress enacted the Endangered Species Act ("ESA") in 1973 to help conserve endangered or threatened species. 16 U.S.C. § 1531(b). To that end, Congress directed the Secretaries of Commerce and the Interior to maintain "a list" of endangered and threatened species. *Id.* § 1533(c); *see also id.* § 1532(6), (20); 50 C.F.R. §§ 17.11, 17.12. The ESA then generally prohibits the "take" of any listed species. 16 U.S.C. § 1538(a)(1)(B)–(C).

The Secretary of Commerce has delegated his responsibility for administering the Act to the National Marine Fisheries Service ("NMFS"), and the Secretary of the Interior has delegated his responsibility to the U.S. Fish and Wildlife Service ("FWS"). *See* 50 C.F.R. § 402.01(b). NMFS protects marine species, while FWS protects freshwater and terrestrial species. *See* Memorandum of Understanding Regarding Jurisdictional Responsibilities and Listing Procedures Under the Endangered Species Act of 1973 (Aug. 28, 1974), https://perma.cc/PKR6-2ZGY.

### A. Section 7 Consultations

Section 7 of the ESA imposes obligations on federal agencies carrying out, funding, or authorizing all manner of activities. In its original form, section 7 required any federal agency "to insure" that its proposed actions "do not jeopardize" a listed

5

species or destroy its habitat, while duly consulting with NMFS or FWS. Pub. L. No. 93-205, § 7, 87 Stat. 884, 892 (1973). After courts interpreted that categorical text to halt several major projects, *see, e.g.*, *TVA v. Hill*, 437 U.S. 153, 172–73 (1978), Congress amended the ESA "to introduce some flexibility into the Act," H.R. Rep. No. 95-1625, at 3 (1978); *see* Pub. L. No. 95-632, § 3, 92 Stat. 3751, 3752 (1978); Pub. L. No. 96-159, § 4, 93 Stat. 1225, 1226 (1979).

Specifically, Congress created a new subsection 7(a)(2), requiring that an agency "insure" only that an agency action "is not *likely* to jeopardize" a listed species or its habitat. 16 U.S.C. § 1536(a)(2) (emphasis added). As courts have recognized, this "requires the action agency to avoid acts that will more likely than not jeopardize a species. No more, and no less." *Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 595 (D.C. Cir. 2023). In doing so, Congress also provided that the agency must "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). "This empirical mandate ensures the law is not 'implemented haphazardly, on the basis of speculation or surmise,' and thus 'avoid[s] needless economic dislocation produced by agency officials zealously but unintelligently pursuing their environmental objectives.'" *Me. Lobstermen's Ass'n*, 70 F.4th at 595 (quoting *Bennett v. Spear*, 520 U.S. 154, 176–77 (1997)).

An agency may consult with NMFS or FWS on case-by-case basis or on a

"[p]rogrammatic" basis by "addressing an agency's multiple actions on a program, region, or other basis." 50 C.F.R. § 402.02. Either way, in a typical 7(a)(2) consultation, NMFS or FWS as the consulting agency play a limited but important role. The consulting agency "must consult with the action agency and provide expert 'assistance.'" *Me. Lobstermen's Ass'n*, 70 F.4th at 595 (quoting 16 U.S.C. § 1536(a)(2)). It "must then write an opinion 'detailing how the agency action affects the species,'" ordinarily called a biological opinion. *Id.* at 595–96 (quoting 16 U.S.C. § 1536(b)(3)(A)); 50 C.F.R. § 402.14(h) (detailing the contents of the biological opinion).

If the consulting agency finds likely jeopardy to a listed species in its biological opinion, then it "shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action." 16 U.S.C. § 1536(b)(3)(A); *see* 50 C.F.R. § 402.02 (defining "reasonable and prudent alternatives"). "Lastly," the consulting agency "must ('shall') issue a license permitting incidental harm to a species if [it] concludes the action or the incidental take 'will not' violate § 7," or if the action agency agrees to the suggested "reasonable and prudent alternative" that avoids jeopardy, *Me. Lobstermen's Ass'n*, 70 F.4th at 596 (quoting 16 U.S.C. § 1536(b)(4)).

The "role" of the consulting agency "is thus a limited one." *Id.* at 596. The consulting agency "must lend expert assistance to the action agency, make a prediction about effects and, if the agency cannot reject the null hypothesis (no jeopardy) as unlikely, then grant a license." *Id.* at 596. In making predictions, the consulting agency must discount effects that are not "reasonably certain to occur," and it must rely upon "clear and substantial information." 50 C.F.R. § 402.17(b). The consulting agency may not find likely jeopardy "by relying upon worst-case scenarios or pessimistic assumptions." *Me. Lobstermen's Ass'n*, 70 F.4th at 586.

The consulting agency's incidental take license must take the form of a "written statement," 16 U.S.C. § 1536(b)(4), commonly referred to as an incidental-take statement, *see* 50 C.F.R. § 402.14(i)(1), and must specify "terms and conditions," including such "reasonable and prudent measures that [NMFS or FWS] considers necessary or appropriate to minimize" incidental harm to a listed species or habitat. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §§ 402.02, 402.14(i)(2) (defining "reasonable and prudent measures" and their limits).

This written statement has legal consequences. *See Spear*, 520 U.S. at 176–77. The ESA threatens persons, including agency officials, with enormous criminal and civil liability for incidental, unauthorized harm to a species. *See id.*; *see also* 16 U.S.C. § 1538(g) (unlawful for a person to "cause to be committed" a "take"); *id.*

§ 1532(13) (person includes agency employees); *id.* § 1540 (penalties). The incidental-take statement acts as a liability shield, permitting an action to go forward without risk of liability. 50 C.F.R. § 402.14(i)(6). In practice, therefore, the consulting agency's biological opinion and accompanying incidental-take statement have "'a powerful coercive effect on the action agency': federal agencies and their employees risk civil and criminal penalties for the incidental 'taking' of a species if they ignore a biological opinion, so they rarely if ever do." *Me. Lobstermen's Ass'n*, 70 F.4th at 593 (quoting *Spear*, 520 U.S. at 169–70).

### B.    Section 7 Exemptions

Second, also following *TVA v. Hill*, Congress amended the ESA to authorize exemptions from subsection 7(a)(2). Congress created an "Endangered Species Committee" and exempted agency actions from subsection 7(a)(2) when the "agency has been granted an exemption … by the Committee pursuant to subsection (h) of this section." 16 U.S.C. § 1536(a)(2), (e)(1). The Endangered Species Committee is composed of six high-ranking politically accountable executive officers (and in some cases, an individual from each affected state). *Id.* § 1536(e)(3). Subsection (g) describes the usual process for applying to the Committee for an exemption, *id.* § 1536(g), and subsection (h) sets out the substantive findings the Committee must make to grant an exemption, *id.* § 1536(h). As relevant here, however, subsection (j)

provides the following command: "Notwithstanding any other provision of [the ESA], the Committee shall grant an exemption for any agency action if the Secretary of [War] finds that such exemption is necessary for reasons of national security." *Id.* § 1536(j).

The Committee may also grant the exemption subject to an order containing "reasonable mitigation and enhancement" restrictions, but only if it makes specific findings. *Id.* § 1536(h)(1)(B). If "reasonable mitigation and enhancement measures … are necessary and appropriate to minimize the adverse effects of the agency action upon" a listed species "or critical habitat," then the Committee may impose such reasonable mitigation measures through an "order" accompanying the decision. *Id.* § 1536(h)(1)(B), (*l*)(1). Ultimately, the Committee's "final determinations" must be documented in a "written decision," the Committee may include an order "specifying required mitigation and enhancement measures," if any, and it must publish both "its decision and order in the Federal Register as soon as practicable." 50 C.F.R. § 453.03(b). Subsection (h), the only subsection dealing with the Committee's exemption, provides that "[a]ny final determination by the Committee under this subsection shall be considered final agency action for purposes of chapter 7 of title 5." 16 U.S.C. § 1536(h).

When the action agency has performed a "biological assessment," *see id.*

§ 1536(h)(2)(A), an exemption "shall constitute a permanent exemption with respect to all endangered or threatened species for the purposes of completing such agency action," *id.*

## II. THE GULF OF AMERICA PROGRAM CONSULTATIONS

The Department of Interior administers the Outer Continental Shelf Lands Act, which governs oil and gas exploration, development, and production in the Gulf of America's outer continental shelf. *See generally* 43 U.S.C. § 1331 *et seq.* "The Gulf of America's outer continental shelf is one of the world's major oil and gas producing regions. It produces 15% of U.S. crude oil." Secretary of War Letter, Attachment, Nat'l Security Findings ¶ 1, JA[R.34]. "[I]n 2023 alone, the Gulf of America oil and gas industry is estimated to have supported over 412,000 jobs, contributed over $34.4 billion to the U.S. gross domestic product, and generated $6.1 billion in federal government revenue." Declaration of Holly Hopkins, JA[R.381–82] ("Hopkins Decl."). "As of January 1, 2026, there are 1,919 active oil and gas leases in the Gulf." *Id.*, JA[R.381]. This requires "an extensive network of" about "1,330 active platforms, 7,570 wells, and 18,390 miles of active pipelines." *Id.* Each year, the Department of Interior issues thousands of individual permits for wells, pipelines, and facilities. *Id.*

Several listed species inhabit the Gulf of America's waters, including "the

Rice's Whale, previously known as the Gulf of Mexico Bryde's whale." *Sierra Club v. NMFS*, 797 F. Supp. 3d 440, 450 (D. Md. 2024); *see* NOAA, *Species Directory: Rice's Whale*, https://perma.cc/S4Z7-H8MU (last visited July 13, 2026). Although the Rice's whale is visually indistinguishable from the Bryde's whale, which is not endangered or threatened, NMFS listed the Gulf of Mexico Bryde's whale in 2019 as a "genetically distinct" "subspecies" of whale in danger of extinction. 84 Fed. Reg. 15,446, 15,471 (Apr. 15, 2019); *see* 16 U.S.C. § 1532(16) (defining "species" to include "subspecies"). It later approved a taxonomic change to list it as the Rice's whale (*Balaenoptera ricei*). *See* 86 Fed. Reg. 47,022 (Aug. 23, 2021).

The Rice's whale "inhabits a narrow corridor along the Northeastern continental slope between the DeSoto and Mississippi Canyons, at depths of 100 to 400 meters, spending nights near the surface and days along the seafloor." *Healthy Gulf v. U.S. Dep't of the Interior*, 152 F.4th 180, 196 (D.C. Cir. 2025); *see also* 84 Fed. Reg. at 15,454–55, 15,472–73. Virtually all confirmed sightings of the Rice's whale are confined to this northeast area of the Gulf. *See* 84 Fed. Reg. at 15,472 ("all the confirmed … whale sightings in the Gulf of Mexico have been within" this area); *Healthy Gulf*, 152 F.4th at 199 ("On frequency of sightings and acoustic detections, Interior concluded that Rice's whales are observed almost exclusively in the Northeastern GOM in the DeSoto Canyon area."); *Ctr. for Biological Diversity v. DOT*, 2026 WL

1959172, at *5 (5th Cir. July 7, 2026) (similar); *Louisiana v. Haaland*, 86 F.4th 663, 667 (5th Cir. 2023) (similar).



"The Gulf is huge. It covers about 600,000 square miles, and it contains more than 640 quadrillion gallons of water." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 539 (5th Cir. 2019). And the vast majority of oil and gas program activity in the Gulf of America happens in the western and central regions of the Gulf, away from the known habitat of the Rice's whale. JA[R.102]. Unsurprisingly, there has *never* been a documented vessel strike of a Rice's whale related to oil and gas program activities, *Louisiana v. NMFS*, 817 F. Supp. 3d 390, 401 (W.D. La. 2026), even though somewhere "between 55,842 and 169,614 vessel trips are made each year in

the Gulf in support of oil and gas operations." Hopkins Decl., JA[R.384]. Nevertheless, the Rice's whale has been at the forefront of "a weaponization of the Endangered Species Act" that aims to shut down or hamper oil and gas activities in the Gulf of America. *Louisiana v. Haaland*, No. 2:23-CV-01157, 2023 WL 6450134, at *9 (W.D. La. Sept. 21, 2023).

## A. The 2020 Gulf of America Biological Opinion

In 2020, NMFS published a programmatic 720-page biological opinion allowing the Department of Interior's oil and gas program activities in the Gulf of America. *See* NMFS, *Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico* (2020), https://perma.cc/9ZWW-BFKJ. NMFS claimed that the Department's oil and gas program would likely jeopardize the Rice's whale, primarily because of supposed "vessel strikes" related to the program. *Id.* at 550–54.

To avoid jeopardy to the Rice's whale, NMFS suggested a "reasonable and prudent alternative." *Id.* at 597–99, 607–14. This suggested "alternative" included restrictions for "any vessel transiting through the Bryde's whale area": (1) mandatory, trained visual observers on board the vessel; (2) a "10-knot, year-round speed restriction" applicable to all vessels, "regardless of size"; (3) a "minimum separation distance" from a whale of "500" meters; (4) all vessels above 65 feet must "have a functioning Automatic Identification System" and all other vessels must re-

port time and speed data and visual marine mammal sightings; (5) no "transit at nighttime or at low visibility conditions," (6) recording non-compliance; and, (7) a catchall requiring that all other measures described by NMFS in the 2020 biological opinion be followed in the Rice's whale area to the extent other measures are "more stringent than the measures specifically identified for the [Rice]'s whale vessel restriction." *Id.* at 597–98.

With this "alternative," NMFS concluded that the oil and gas program "would not likely jeopardize" the Rice's whale. *Id.* at 600. NMFS accordingly issued an incidental-take statement that "covers take that is incidental to implementation of the RPA." *Id.* at 601.

Conservation groups sued in a federal district court in Maryland. *Sierra Club*, 797 F. Supp. 3d at 490. The district court held that NMFS violated the Administrative Procedure Act ("APA") on multiple grounds: the agency (1) purportedly committed several process fouls when failing to make crystal ball predictions about a catastrophic oil spill, *id.* at 456–65, (2) may have overestimated the Rice's whale and Gulf sturgeon populations by using the available data, *id.* at 465–72, (3) failed to adequately explain why the putative harm of vessel strikes and noise on the Rice's whale did not require mitigation measures *outside of the Rice's whale* known habitat even though the agencies explained that such harm is speculative, *id.* at 482–87, (4)

failed to limit incidental take from (already illegal) oil spills, *id.* at 488–90, and (5) adopted an insufficiently precise surrogate method for monitoring how many listed species are struck (taken) by vessels, *id.* at 490–93. The district court then ordered the biological opinion "vacated in full," *id.* at 495, but delayed vacatur by four months, *id.* at 497, because "immediate vacatur appears likely to disrupt oil and gas activity in the Gulf without necessarily mitigating the dangers to listed species," *id.* at 496. The district court later extended the vacatur deadline to May 21, 2025. JA[R.204–05].

Vacatur of the biological opinion would have been utterly disastrous. Vacatur of a programmatic biological opinion would "effectively halt all oil and gas activities in the Gulf." *See* Secretary of War Letter, Attachment, Nat'l Security Findings ¶ 42, JA[R.39]. Specifically, vacatur would (1) "prevent" the Department of Interior "from issuing new approvals for Gulf oil and gas development," *id.* ¶ 43, JA[R.39], (2) "call into question existing authorizations associated with thousands of active leases, facilities, wells, and miles of pipeline," *id.* ¶ 44, JA[R.39], and (3) "strip liability protections from agencies and operators, exposing them to civil and criminal penalties," *id.* ¶ 45, JA[R.39]. It would make the Department's licensing operations impossible and impose enormous losses and uncertainty on private industry. *See* Declaration of Bryan Domangue, JA[R.317–20] ("Domangue Decl.") (explaining in

detail the Department of Interior harms); Hopkins Decl., JA[R.384–88] (explaining industry harms); Declaration of Joe T. Gordon ("Gordon Decl."), JA[R.601–11] (explaining harm to Chevron's activities). To avert a catastrophic shut down of the Gulf of America oil and gas program, NMFS rushed to put together another biological opinion by the district court's drop-dead vacatur deadline.

**B.** **The 2025 Gulf of America Biological Opinion**

Racing against the deadline, NMFS published a new biological opinion in May of 2025. NMFS, *Biological and Conference Opinion on Bureau of Ocean Energy Management and Bureau of Safety and Environmental Enforcement's Oil and Gas Program Activities in the Gulf of America* (2025), https://perma.cc/FAU6-X5UH, JA[R.942] ("2025 BiOp").[3] As relevant here, the programmatic 2025 biological opinion defines the agency action to include "all past leases operating in the Gulf of America … and actions associated with new leases awarded in the Gulf of America … through approximately 2029." *Id.* at 2, JA[R.967]. Because each lease has approximately a "40-year lifespan," the agency action program at issue "covers approximately 45 years of operations." *Id.*, JA[R.967]. This includes "pre-lease activities related to geolog-

---

[3] Consistent with the ESA, the Department of Interior submitted an "amended Biological Assessment" prior to the biological opinion. 2025 BiOp at 3, 5, JA[R.968, 970]; *see* Focused Biological Assessment to Support Endangered Species Act Reinitiated Consultation on the Gulf of Mexico Oil and Gas Program, https://perma.cc/M3VS-FQNT ("Biological Assessment").

ical and geophysical (G&G) surveys" and "decommissioning." *Id.*, JA[R.967]; *see also* Biological Assessment at 11–83 (describing the proposed action and action area in detail).

Notably, this time, the Department of Interior included as part of its proposed action the "reasonable and prudent alternative" suggested by NMFS in 2020 to avoid likely jeopardy to the Rice's whale. *See* 2025 BiOp at 98, JA[R.1063]. The requirements are embodied in a "protocol" attached to the biological opinion ("Attachment 4") that is "non-discretionary" and "part of the action." *Id.* at 96, 98, JA[R.1061, 1063]; 2025 BiOp, Attachment 4, JA[R.1685–88]. The Department also included several other binding mitigation protocols (also included as attachments to the biological opinion) to avoid purported jeopardy to listed species. *See id.* at 96– 100, JA[R.1061–65]; *see generally* 2025 BiOp, Attachments, JA[R.1644–1719]. These include, for example, mitigation protocols regulating (1) geophysical surveys, *id.*, Attachment 1, JA[R.1645–73], (2) vessel strike avoidance measures generally, *id.*, Attachment 3, JA[R.1681–84], and (3) pile driving activities,[4] *id.*, Attachment 7, JA[R.1695–704].

NMFS, however, disagreed with its prior analysis and the Department of In-

---

[4] "[P]ile driving is the primary method by which fixed structures are attached to the sea floor and provide stability for other support structures." 2025 BiOp at 60, JA[R.1025].

terior, concluding that the oil and gas program was "likely to jeopardize the continued existence of the Rice's whale," despite all the mitigation measures incorporated in the action. 2025 BiOp at 548, JA[R.1513]. To find jeopardy justifying further burdens on industry, NMFS engaged in wild speculation to assume that oil and gas program vessels strike Rice's whales nearly once a year, even though such strikes have never been documented and are extremely unlikely to occur. *See* 2025 BiOp at 356–59, JA[R.1321–24] (describing NMFS's chain of speculation to claim phantom oil and gas vessel strikes); *see also Louisiana*, 817 F. Supp. 3d at 401–04 (explaining NMFS's speculation).

To prevent this supposed jeopardy, NMFS required yet another "reasonable and prudent alternative" on top of all the other mitigation restrictions. 2025 BiOp at 576–84, JA[R.1541–49]. The additional reasonable and prudent alternative consists of a phased 45-year long plan that would extend additional mitigation burdens far beyond the Rice's whale core habitat.

First, the Department must establish "a near real-time platform to help oil and gas related vessels avoid strikes of Rice's whale" even "outside the" Rice's whale core area, and "[a]ll oil and gas operators in the specified area must monitor the" platform and "take any necessary action to avoid or reduce the likelihood of vessel strike." *Id.* at 577, JA[R.1542].

Second, "within 18 months" the Department must create a working group of experts to develop an unspecified "vessel strike avoidance technology plan" to mitigate phantom vessel strikes to the Rice's whale. *Id.* at 578, JA[R.1543]. This plan "must" harness available technology to avoid strikes, and "should also consider pairing technology … with … modifications to vessel operations such as speed and trajectory." *Id.* at 579, JA[R.1544]. "Within 24 months," the Department "must begin implementation of the technology plan." *Id.* at 580, JA[R.1545]. The Department must also require additional "monitoring" of the whale and of phantom vessel strikes. *Id.* at 580–81, JA[R.1545–46].

Although this "technology plan" is phrased in vague terms, the pre-ordained outcome would likely be to impose additional vessel restrictions "between the 100- to 400-m-isobaths across the northern Gulf of Mexico," something the agencies have attempted in the past to placate conservation groups. *Louisiana*, 2023 WL 6450134, at *6.[5]

With this reasonable and prudent alternative, NMFS concluded that any risk of jeopardy would be "discountable." 2025 BiOp at 584, JA[R.1549]. NMFS accord-

---

[5] In 2023, at the request of the Natural Resources Defense Council, NMFS proposed to designate this entire area of the northern Gulf as critical habitat for the whale. *See* 88 Fed. Reg. 47,453, 47,471 (July 24, 2023); *see also* NMFS, *Rice's Whale Proposed Critical Habitat Map*, https://perma.cc/ANV9-3APD.

ingly issued an incidental-take statement contingent on NMFS agreeing to this proposed "reasonable and prudent alternative." *Id.* at 585, JA[R.1550]. Without this alternative, however, the incidental-take statement "would not apply and provides no exemption for incidental take resulting from" the actions of the Department. *Id.*, JA[R.1550].

### C.    Legal Challenges to the 2025 Biological Opinion

Hours after the release of the biological opinion, conservation groups sued again in Maryland district court, claiming that it was deficient and must again be vacated because NMFS failed to make adequate crystal ball predictions relating to topics such as the effect of highly uncertain catastrophic oil spills and "climate change" on listed species. *See Sierra Club v. NMFS*, No. 8:25-cv-1627 (D. Md., filed May 20, 2025), Dkt. 1, JA[R.235–39].

This time, the State of Louisiana and oil industry plaintiffs also sued NMFS in Louisiana, arguing that NMFS rested its conclusion of likely jeopardy to the Rice's whale on arbitrary speculation and worst-case scenarios. *Louisiana v. NMFS*, No. 25-cv-00691 (W.D. La., filed May 20, 2025), Dkt. 1, JA[R.89–120]. The Louisiana district court agreed with the *Louisiana* plaintiffs and entered summary judgment against NMFS. *Louisiana*, 817 F. Supp. 3d at 403–04. As the district court concluded, the agency's jeopardy analysis for the Rice's whale unlawfully relied upon

worst-case, pessimistic assumptions and speculation "as means in search of an end: justifying additional restrictions on offshore drilling in order to achieve a settlement with environmental group plaintiffs in the District of Maryland litigation." *Louisiana*, 817 F. Supp. 3d at 404. The district court agreed that a remand without vacatur would be the proper remedy. *Id.* at 405–06.

## III.   THE COMMITTEE'S EXEMPTION

On March 13, 2026, after hostilities with Iran led to global oil price shocks, the Secretary of War notified the Endangered Species Committee that, under Section 1536(j), an ESA exemption for the Gulf is needed for reasons of national security. The Secretary of War found that litigation threatens domestic oil production necessary for national security. *See generally* Secretary of War Letter, Attachment, Nat'l Security Findings ¶¶ 1–103, JA[R.34–46]. Vacatur, he explained, would "effectively halt all oil and gas activities in the Gulf." *See id.* ¶ 42, JA[R.39]. The Secretary of War further explained that shutting down oil and gas activities in the Gulf of America would harm national security by increasing oil prices by 19–24%, thereby boosting oil revenues for foreign adversaries, undermining U.S. economic sanctions, weakening the ability of the United States to withstand global oil price shocks, undermining the Department of War's supply chains for refined petroleum products such as jet fuel and thereby "affecting operational readiness and mission effectiveness," and con-

tributing to oil volatility that breeds global instability. *Id.* ¶¶ 56–85, JA[R.41–44]. Accordingly, the Secretary found an exemption for the Gulf of America program "necessary for reasons of national security." *Id.* ¶¶ 89, 103, JA[R.44, 46]. The Secretary found the exemption necessary for "the full suite of agency actions that" the Department of Interior identified in its amended biological assessment and that NMFS reviewed in the 2025 biological opinion. *Id.* ¶ 90, JA[R.44].

As relevant here, in a single paragraph, the Secretary of War also asserted that despite the exemption, "protected species will continue receiving appropriate protections because the underlying agency action includes those mitigation and protection measures" that the Department of Interior and NMFS "identified as necessary when developing the proposed action that is the subject of this determination," but stressed that "in any event, an exemption is necessary for reasons of national security." *Id.* ¶ 102, JA[R.46].

The Secretary of the Interior, in his capacity as Chairman of the Endangered Species Committee, then convened the Committee for a public meeting on March 31, 2026. 91 Fed. Reg. 12,672 (Mar. 16, 2026), JA[R.1]; *see also* U.S. Dep't of the Interior, *Endangered Species Act Meeting*, at 34:45 (YouTube, Mar. 31, 2026), https://youtu.be/iC3xyp4GxRE?t=2085. The Committee voted unanimously to grant an exemption. Transcript of Meeting at 16 (Mar. 31, 2026), JA[R.22] ("chorus

23

of ayes"); 91 Fed. Reg. at 16,966, JA[R.5] ("By unanimous vote, the Committee exempted under section 7(h) of the Endangered Species Act the Gulf of America Oil and Gas Activities ….").

A few days later, the Committee published a decision granting an exemption. 91 Fed. Reg. 16,966, JA[R.5]. The Committee's decision included an "Order" mandating that "the avoidance or minimization measures described in NMFS's 2025 biological opinion and in [the U.S. Fish and Wildlife Service]'s 2018 and 2025 consultation documents" "shall continue to be implemented under this Order." *Id.* at 16,966–67, JA[R.5–6].

## IV.   PROCEDURAL HISTORY

Within 10 days of publication, AEA petitioned for review in this Court to challenge the decision's Order, Dkt. 1, and the Natural Resources Defense Council ("NRDC") filed a civil action in district court and a "protective petition" in the D.C. Circuit challenging the Committee's exemption decision, Compl., *NRDC, Inc. v. Burgum*, No. 1:26-cv-1116 (D.D.C. Apr. 1, 2026), Doc. 1; Pet. for Review at 2–3 ("NRDC Pet. for Review"), *NRDC, Inc. v. Burgum*, No. 26-1079 (D.C. Cir. Apr. 3, 2026), Doc. 2167070. Other conservation groups later filed petitions for review in the D.C. Circuit. *See* No. 26-1085 (D.C. Cir. Apr. 14, 2026), No. 26-1088 (D.C. Cir. Apr. 15, 2026).

Following the multi-circuit consolidation statute, 28 U.S.C. § 2112(a)(1), (3), the Judicial Panel on Multidistrict Litigation ("JPML") randomly selected this Court and consolidated all petitions for review in this circuit. Dkt. 9. The D.C. Circuit accordingly transferred all petitions for review to this circuit. 28 U.S.C. § 2112(a)(5). Conservation groups asked JPML to reconsider its consolidation order, but JPML rejected their argument and denied reconsideration. Dkt. 67. Following JPML's denial of reconsideration, all of the conservation groups voluntarily dismissed their petitions for review with prejudice. Dkts. 90, 92.[6] That leaves AEA as the sole petitioner before this Court.

---

[6] NRDC initially sought a temporary stay or dismissal without prejudice pending its lawsuit in district court, vaguely asserting that this Court lacks jurisdiction. *See* Dkt. 68. Petitioner AEA, the United States, and Respondent-Intervenor American Petroleum Institute opposed, and this Court denied a stay or dismissal without prejudice. *See* Dkt. 88-2. NRDC voluntarily dismissed its petition with prejudice shortly thereafter.

<h1 style="text-align:center">SUMMARY OF THE ARGUMENT</h1>

First, this Court has subject-matter jurisdiction under the plain terms of the statute because the Committee necessarily granted the exemption "under subsection (h)." 16 U.S.C. § 1536(n). NRDC's suggestion that this Court lacks jurisdiction because the Committee's exemption was preceded by a national security finding under subsection 7(j) is unpersuasive. The Committee must still act under subsection 7(h), as it did here.

Second, AEA has associational standing because its members include the objects of the mitigation requirements, bringing this suit is consistent with AEA's purpose, and relief does not require individual participation.

Third, on the merits, although the Committee was bound to grant an exemption, when the Committee decided to exercise its regulatory discretion to impose mitigation measures by order, it had to explain why those mitigation measures are "reasonable" and "necessary and appropriate," as the statute requires. 16 U.S.C. § 1536(h)(1)(B). The Committee didn't do so. That was arbitrary.

Fourth, taking due account of the rule of prejudicial error in an administrative law case, the failure was not a harmless foot fault. The Court has no way of knowing how the Committee would have exercised its policy discretion if it had considered

cost. Indeed, many of the requirements are very burdensome but have doubtful benefit to any listed species. This requires remand.

Fifth, the order requiring mitigation measures is severable, because it is legally and logically separate from the exemption the Committee was required to grant after the subsection 7(j) finding, and the mandatory exemption can function perfectly without mandatory mitigation. In the alternative, the Court should remand without vacatur and retain jurisdiction. Remand without vacatur is warranted because the Committee could successfully explain why the mitigation measures are appropriate on remand, and vacatur would be highly disruptive and indeed, harm national security. Full vacatur of the exemption would be profoundly inequitable to AEA and create terrible incentives, as it would make AEA worse off for exercising its right to judicial review and prevailing, discouraging meritorious challenges and encouraging arbitrary agency action. AEA does not seek such a disruptive remedy, and the Court should not grant it.

## LEGAL STANDARD

Judicial review of a Committee's final decision proceeds under "chapter 7 of title 5"—the APA. 16 U.S.C. § 1536(n). The APA provides that courts must "hold unlawful and set aside agency action" that is "arbitrary" or "capricious," "not in accordance with law," "in excess of statutory jurisdiction," or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). Under this standard, the reviewing court must ensure that "the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

# ARGUMENT

## I. THIS COURT HAS SUBJECT-MATTER JURISDICTION

"Jurisdiction is always first." *Carswell v. Camp*, 54 F.4th 307, 310 (5th Cir. 2022). Federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Here, no existing party challenges this Court's subject-matter jurisdiction over AEA's petition for review.

Before it dismissed its petition, in a motion to stay later denied by this Court, however, NRDC suggested that this Court lacks direct subject-matter jurisdiction over challenges to the Committee's decision, and that such suits must instead be brought in district court. *See* Dkt. 68, at 4. Petitioner AEA accordingly addresses subject-matter jurisdiction to help this Court discharge its independent obligation.

The relevant statutory review provision provides:

> Any person … may obtain judicial review, under chapter 7 of title 5, of any decision of the Endangered Species Committee under subsection (h) in the United States Court of Appeals for … any circuit wherein the agency action concerned will be, or is being, carried out … by filing in such court within 90 days after the date of issuance of the decision, a written petition for review.

16 U.S.C. § 1536(n).

The referenced "[s]ubsection (h)," titled "Grant of exemption," in turn is the single subsection that deals with the Committee's grant of an exemption from

29

subsection 7(a)(2), and it provides that "[a]ny final determination by the Committee under this subsection shall be considered final agency action for purposes of chapter 7 of title 5." *Id.* § 1536(h).

Subsection 7(n) sets out a classic "special statutory review" scheme for challenging Committee exemption decisions. 5 U.S.C. § 703. Under the APA, a petition for review filed within 90 days is the "form of proceeding" for challenging the Committee's final decision, and a court of appeals with venue is the "court specified by statute"—a court of appeals. *Id.* The Supreme Court has "several times held that the creation of such a review scheme for agency action divests district courts of their ordinary jurisdiction over the covered cases." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023); *see also Nat'l Ass'n of Mfrs. ("NAM") v. DOD*, 583 U.S. 109, 114 (2018). "When Congress enacted the APA to provide a general authorization for review of agency action in the district courts, it did not intend that general grant of jurisdiction to duplicate the previously established special statutory procedures relating to specific agencies." *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988). So too here: subsection 7(n) channels pre-enforcement challenges to Committee exemption decisions to the courts of appeals.

Jurisdiction is easy here. The Committee invoked subsection 7(h) as the basis for the exemption decision and accompanying order:

> Based on the Secretary of War's National Security Findings, the Committee grants pursuant to section 7(h) an exemption from the requirements of the Endangered Species Act for Gulf of America Oil and Gas Activities. 16 U.S.C. 1536(h).

91 Fed. Reg. at 16,966, JA[R.5].

"[T]he face of the agency action" is clear. *EPA v. Calumet Shreveport Ref., LLC*, 605 U.S. 627, 648 (2025). The Committee acted under subsection 7(h).

NRDC, however, claimed that courts of appeals lack jurisdiction under subsection (n) over challenges to the Committee's decision, and that such suits must instead be brought in district court. *See* Dkt. 68, at 4. According to NRDC, because the Secretary of War found that an exemption was necessary for reasons of national security, 16 U.S.C. § 1536(j), the Committee did not *really* grant an exemption under subsection (h), *id.* § 1536(h), but under subsection (j). So, NRDC reasons, the review channeling scheme does not apply because subsection (n) is limited to "any decision of the Endangered Species Committee under subsection (h)," and the Committee here acted under subsection (j). NRDC Pet. for Review, *supra*, at 2–3.

NRDC's attempt to second-guess the Committee's basis for its action fails. The Committee necessarily acts under subsection (h) whenever it grants an exemption from subsection 7(a)(2), for reasons of national security or otherwise. Subsection 7(a)(2), the relevant agency obligation to avoid likely jeopardy, recognizes only one kind of exemption: a Committee exemption "pursuant to subsection (h) of this

section." 16 U.S.C. § 1536(a)(2). There is no standalone exemption "pursuant to subsection (j)." And subsection 7(n) broadly channels "*any* decision of the Endangered Species Committee under subsection (h)." *Id.* § 1536(n) (emphasis added). "The word 'any' has an expansive meaning," *Patel v. Garland*, 596 U.S. 328, 338 (2022), and captures decisions "of whatever kind." *Id.* (quoting Webster's Third New International Dictionary 97 (1993)). That includes a Committee exemption compelled by national security findings under subsection (j).

Subsection 7(j) is best read as a command for the Committee to grant an exemption under subsection 7(h). It reads: "Notwithstanding any other provision of [the ESA], the Committee shall grant an exemption for any agency action if the Secretary of [War] finds that such exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j) (emphasis added). Subsection (j) is written as a notwithstanding provision, not a separate grant of Committee exemption authority. "[T]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993). The point of subsection (j) is to "override" legal hurdles that ordinarily constrain a Committee's subsection (h) exemption: Once the Secretary of War makes the necessary national security finding, the Committee *must* grant an exemption under subsection (h), so

the Committee need not show, for example, that "there are no reasonable and prudent alternatives" that avoid jeopardy or that "the benefits of such action clearly outweigh the benefits of alternative courses of action." 16 U.S.C. § 1536(h)(1)(A)(i)–(ii). But subsection (j) doesn't provide a standalone, separate source of exemption authority for the Committee: it is best read as a command to act under (h).

Confirming this, subsection (j) says nothing about the "avoidance or minimization measures" imposed by the Committee's order. 91 Fed. Reg. at 16,966–67, JA[R.5–6]. Only the Committee may impose such measures, and only under subsection (h), after showing that the measures are "reasonable" and "necessary and appropriate to minimize the adverse effects of the agency action upon" listed species. 16 U.S.C. § 1536(h)(1)(B). Because the Committee imposes such an order here, it necessarily acted under subsection (h).

This conclusion is reinforced by "general administrative-law principles. In APA cases, an agency's subsidiary decisions merge into the final agency action, which is then subject to review." *Mullin v. Doe*, 2026 WL 1825840, at *10 (U.S. June 25, 2026). Subsection (j) is clear that after the Secretary of War makes a finding, *the Committee*, not the Secretary of War, must take the further step of granting an exemption. 16 U.S.C. § 1536(j). The Secretary of War's finding under subsection (j) is

therefore only "preliminary," 5 U.S.C. § 704, not final agency action. Only after the Committee takes the formal step of granting an exemption is there "final agency action." 16 U.S.C. § 1536(h). And the only subsection vesting the Committee with the power to grant an exemption is subsection (h). Again, there is no standalone subsection 7(j) exemption in the statute.

NRDC's invocation of the words "under subsection (h)" in isolation therefore doesn't prove anything. The term "under," as the Supreme Court has noted, "is a chameleon that must draw its meaning from its context." *NAM*, 583 U.S. at 124 (cleaned up). In this statutory context, when the Committee grants an ESA exemption following the Secretary of War's national security finding, it necessarily does so "under subsection (h)."

NRDC's contrary argument makes no sense of the scheme as a whole. Subsection 7(a)(2) requires an agency to "insure" no likely jeopardy "unless such agency has been granted an exemption …. *pursuant to subsection (h) of this section.*" 16 U.S.C. § 1536(a)(2) (emphasis added). Section 7 does not recognize an exemption "pursuant to subsection (j)." "Pursuant to" and "under" are legal synonyms. *NAM*, 583 U.S. at 124. By NRDC's logic, then, an exemption granted after the Secretary of War makes national security findings would be nugatory, since subsection 7(a)(2), just like the statutory review provision in subsection 7(n), does not mention

"subsection (j)." That kind of "surplusage" is too strange to countenance. *NAM*, 583 U.S. at 128.

NRDC's reading also flunks the common-sense test. Under NRDC's reading, direct review, consolidation, and a 90-day statute of repose would apply to all final Committee decisions *except* the most critically important—exemptions that the Secretary of War finds necessary for reasons of national security. Only exemptions necessary to national security could be challenged in district courts throughout the country, subject to no statute of repose, and no mandatory consolidation. "It is implausible that Congress meant the Act to operate in this manner." *King v. Burwell*, 576 U.S. 473, 494 (2015).

This Court should accordingly confirm that it has jurisdiction under subsection 7(n) over challenges to the Committee's decision.

## II.  PETITIONER HAS STANDING

"To establish associational standing, an association must show that '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Nat'l Religious Broads. v. FCC*, 138 F.4th 282, 290 (5th Cir. 2025) (quoting *United Food & Commercial Workers Union Local 751 v. Brown Grp.,*

*Inc.*, 517 U.S. 544, 553 (1996)). AEA satisfies all three requirements for the relief it seeks.

First, AEA has "at least one member with standing to" sue "in his or her own right." *United Food*, 517 U.S. at 545. To establish Article III standing, a member "must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "Importantly, if" an entity "is an object of the action (or forgone action) at issue, then there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 112 (2025) (cleaned up).

AEA member Arena Offshore, LLC (Arena) easily satisfies this test. "Arena is one of the largest independent oil and natural gas producers in the Gulf of America ("Gulf"). Arena currently operates 126 platforms, holds 96 federal offshore oil and natural gas leases, and typically has one or two drilling rigs under contract, all in the Gulf." *See* Ex. A, Declaration of Arena CEO Brent Ozenne ¶ 4 ("Arena Decl."). The mitigation measures required by the order directly regulate Arena's oil and gas activities. *Id.* ¶ 7. As the object of the mitigation measures, Arena's standing is there-

fore "self-evident." *Me. Lobstermen's Ass'n*, 70 F.4th at 592 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)); *see also Nat'l Religious Broads.*, 138 F.4th at 290 (same).

The mitigation measures impose monetary costs and operational burdens on Arena. Arena Decl. ¶ 7. "Those monetary costs are of course an injury." *Diamond Alt. Energy*, 606 U.S. at 114 (quotation marks omitted). For example, the mitigation measures incorporated in the 2025 biological opinion and required by the Committee's order require Arena to hire or train species observers to comply with vessel strike avoidance protocols throughout the Gulf, impose reporting burdens on Arena, and impose numerous other, detailed, costly, and burdensome requirements on Arena's pile driving, platform decommissioning, and site clearance activities, all of which impose substantial burdens on Arena. *See* Arena Decl. ¶¶ 7–36. There is no question that Arena is injured.

Arena's harms are also "fairly traceable" to the Committee's order. *Me. Lobstermen's Ass'n*, 70 F.4th at 593. Under the Committee's order, all of the mitigation measures imposed by the Department of Interior and NMFS "shall continue to be implemented." 91 Fed. Reg. at 16,966–67, JA[R.5–6]. By mandating that the Department shall continue applying all of the current mitigation measures, the Committee's order effectively freezes into place the mitigation measures for the duration of the

permanent exemption (the next 45 years), even if they are unnecessary to prevent likely jeopardy to a listed species. "A ruling for [Arena] could remove this barrier to lifting the [mitigation measures], which is enough for standing to challenge it." *Me. Lobstermen's Ass'n*, 70 F.4th at 593.

Redressability is also straightforward. When, as here, a regulated entity asserts a procedural injury, redressability requires a minimal showing. *Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023). "[T]he fact that the defendant might well come to the same decision after abiding by the contested procedural requirement does not deprive a plaintiff of standing." *Id.* at 561–62. Petitioners need show only "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007); *Sierra Club v. Peterson*, 185 F.3d 349, 360 (5th Cir. 1999), *on reh'g*, 228 F.3d 559 (5th Cir. 2000).

Some possibility exists here. The mitigation measures required by the Committee's order are highly precautionary, reflecting the Department of Interior's attempts to placate litigious conservation groups and surmount a veto by NMFS, which has long applied section 7 by following a presumption in favor of the species and assuming jeopardy even when it is unlikely—a practice that the D.C. Circuit, in a pathbreaking decision, recently held violates the ESA. *Me. Lobstermen's Ass'n*, 70

F.4th at 599. Although following *Maine Lobstermen's Association* NMFS no longer invokes the presumption in favor of the species, NMFS continues to apply the precautionary principle in practice by premising jeopardy findings on far-fetched worst-case scenarios and flimsy evidence, not clear and substantial evidence of *likely* jeopardy. *See Louisiana*, 817 F. Supp. 3d at 404. Given this, there is some possibility that on remand, the Committee will find that at least some of the mitigation measures imposed by the Committee's order are not "necessary and appropriate to minimize the adverse effects of the agency action upon" listed species. 16 U.S.C. § 1536(h)(1)(B).

Second, "the interests" AEA "seeks to protect are germane to [its] purpose." *Nat'l Religious Broads.*, 138 F.4th at 290. AEA is a "trade organization representing American energy producers, suppliers, and affiliated businesses that support free markets." Ex. B, Declaration of AEA Founder and President Jason Isaac ¶ 3. "A key part of" AEA's "mission is using advocacy and litigation to oppose policies that unduly hinder domestic energy production out of misplaced environmental concern." *Id.* ¶ 5. AEA has several "members that produce oil and gas in the Gulf of America or provide support services to those that do." *Id.* ¶ 6. AEA's purpose is therefore germane to the "interests sought to be protected here." *Nat'l Religious Broads.*, 138 F.4th at 290.

Last, "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.* at 290 (citation omitted). Individual participation is necessary if proving the claim on the merits or administering relief calls for "individualized proof." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). That is not the case here.

For these reasons, AEA has established associational standing to bring this suit.

## III.  THE COMMITTEE'S ORDER IS ARBITRARY

On the merits, the Committee's order is arbitrary. "When an administrative agency sets policy, it must provide a reasoned explanation for its action." *Judulang v. Holder*, 565 U.S. 42, 45 (2011). If it does not, the action is "'arbitrary [or] capricious' under the … APA." *Id.* at 52. Here, the Committee failed to satisfy this requirement.

The Committee ordered that the mitigation measures imposed by the Department of Interior and NMFS "shall continue to be implemented." 91 Fed. Reg. at 16,966–67, JA[R.5–6]. But the Committee never explained why any of these mitigation measures were "reasonable" and "necessary and appropriate to minimize the adverse effects of the agency action upon" the species, as the law requires. 16 U.S.C. § 1536(h)(1)(B). "Read naturally in the present context, the phrase" necessary and

40

appropriate "requires at least some attention to cost," not simply the potential benefit to the species. *Michigan v. EPA*, 576 U.S. 743, 752 (2015). It would hardly be appropriate, for example, to "spend billions to save one more fish or plankton." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 232–33 (2009) (Breyer, J., concurring in part and dissenting in part). The Committee's failure "to provide even [a] minimal level of analysis" of why the cost of the measures imposed by the order are commensurate with the purported benefit to the listed species in the Gulf of America renders "its action … arbitrary and capricious." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

That the Committee was acting following a subsection (j) finding is no excuse. Subsection (j) is not a carte blanche for the Committee to mandate unnecessary mitigation measures without attention to cost. Once the Secretary of War made the national security exemption, of course, the plain text of subsection 7(j) compelled the Committee to issue an ESA exemption: The Committee "shall grant an exemption" 16 U.S.C. § 1536(j). That is a "nondiscretionary statutory mandate[]." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 665 (2007). The Committee was therefore "*bound* by the" Secretary of War's finding that an exemption was necessary. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 25 (2020). Equally plainly, however, subsection (j) does not command the Committee to order any business-crush-

ing mitigation measures the Secretary of War asserts are appropriate to protect a listed species. The phrase "shall grant an exemption" does not also mean "shall order mitigation." Such a reading makes no sense of the text or the scheme. The Secretary of War has both the statutory authority and the expertise to determine when ESA obligations interfere with national security. *See Winter v. NRDC*, 555 U.S. 7, 24 (2008). The Secretary of War, however, has neither the authority nor the expertise to determine what mitigation measures are cost justified. The statute assigns that role exclusively to the Committee, not the Secretary of War. 16 U.S.C. § 1536(h)(1)(B).

To be sure, once the Secretary of War makes the required finding under subsection (j), the Committee *need not* consider ordering mitigation measures under subsection (h). As the Committee concluded and AEA agrees: "The Order need not specify any such mitigation and enhancement measures here because the application and other related requirements do not apply." 91 Fed. Reg. at 16,966, JA[R.5]. The Committee is therefore not "legally *required*" to impose mitigation measures. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004). Whether to order mitigation measures "remained squarely within the discretion of" the Committee. *Regents*, 591 U.S. at 28. But instead of exercising its reasoned discretion, the Committee "treated the [Secretary of War's] conclusion regarding the" mitigation measures "as suffi-

cient to" impose them, "without explanation." *Id.* at 28. That violates the APA. *Id.* at 33.

When the Committee chooses to exercise its discretion and imposes mitigation burdens on industry through a binding order, it must follow the reasoned decisionmaking requirements of the APA and explain why its order satisfies the statutory criteria. Such a situation "involves the sort of routine dispute that federal courts regularly review: An agency issues an order affecting the rights of a private party, and the private party objects that the agency did not properly justify its determination under a standard set forth in the statute." *Weyerhaeuser Co. v. FWS*, 586 U.S. 9, 23–24 (2018). Accordingly, APA review in these circumstances is appropriate.

The Committee's failure to justify the mitigation measures with a reasoned explanation is manifest. The Committee's entire written explanation for imposing the mitigation measures reads as follows: "Because the covered agency action includes robust avoidance or minimization measures, those measures shall continue to be implemented under this Order." 91 Fed. Reg. at 16,966, JA[R.5]. "Robust," a conclusory adjective, does not explain why these measures are "reasonable" and "necessary and appropriate to minimize the adverse effects of the agency action upon" the species. 16 U.S.C. § 1536(h)(1)(B). That the measures are "robust"–or in other words, burdensome—says nothing about "the disadvantages" of the miti-

gation measures or the cost to industry subject to those burdens. *Michigan*, 576 U.S. at 753. That "single conclusory sentence … is no substitute for a 'reasonable and reasonably explained' decision." *Tex. Corn Producers v. EPA*, 141 F.4th 687, 707 (5th Cir. 2025).

The Secretary of War's national security findings cannot substitute for the Committee's duty to exercise reasoned statutory judgment. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954). But in any event, the Secretary of War's findings are similarly perfunctory and unreasoned. The Secretary of War's findings simply assert, in a conclusory, Matryoshka doll fashion, that the protections are "appropriate" because other federal agencies such as NMFS have previously claimed that they are "necessary." Secretary of War Letter, Attachment, Nat'l Security Findings ¶ 102, JA[R.46]. But reciting the words of a statutory standard such as "appropriate" or "necessary" is no reasoned explanation for *why* mitigation measures satisfy the statutory standard. *Tex. Corn Producers*, 141 F.4th at 707.

For similar reasons, that the Department of Interior and NMFS have previously *claimed* that the mitigation measures are necessary is no substitute for a Committee explanation. After all, the agencies have been known to order unwarranted mitigation measures "as means in search of an end: justifying additional restrictions on offshore drilling in order to achieve a settlement with environmental group plain-

tiffs." *Louisiana*, 817 F. Supp. 3d at 404. And regardless, the Committee applies a fundamentally different statutory standard under the exemption provisions than NMFS under section 7(a)(2). Its statutory remit under the exemption process is not to insure no likely jeopardy to a listed species "whatever the cost," *TVA*, 437 U.S. at 184, but to make an all-things-considered judgment about the advantages and disadvantages of mitigation. 16 U.S.C. § 1536(h)(1)(B). The very point of the Committee exemption process is to consider not just risks to a species but also cost, in order to avoid "destroying the usefulness of even the most important federal project in our country" whenever NMFS finds "that a continuation of the project would threaten the survival or critical habitat of a newly discovered species of water spider or amoeba." *TVA*, 437 U.S. at 203–04 (Powell, J., dissenting). In short, the scientific judgment of NMFS cannot substitute for the statutory, policy-driven judgment of the Committee.

None of this means, of course, that the Department of Interior is *prohibited* from continuing to implement lawful and necessary mitigation measures to protect listed species. That Department may continue to do so, and AEA's members don't oppose reasonable, cost-conscious restrictions on oil and gas activities in the Gulf. Relief here means only that the Department of Interior need not implement mitigation measures for the next 45 years under the compulsion of an unreasoned, arbitrary

order, and may instead exercise its independent judgment.

## IV. THE COMMITTEE'S ERROR IS PREJUDICIAL

Under the APA, a reviewing court must take "due account … of the rule of prejudicial error." 5 U.S.C. § 706; *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 587–88 (2025). "Taking 'due account' of a rule is not literally the same as applying that rule lock, stock, and barrel. The most natural interpretation of the APA's language is thus that reviewing courts should adapt the 'rule of prejudicial error' applicable in ordinary civil litigation (also known as the harmless-error rule) to the administrative-law context, which, of course, includes the remand rule." *Wages & White Lion Invs., LLC*, 604 U.S. at 588.

The error here is not harmless. A remand is necessary because this Court has "no way of knowing how the [Committee] would have made this discretionary judgment had it" focused on the statutory requirements, considered cost to industry, and provided an explanation. *Me. Lobstermen's Ass'n*, 70 F.4th at 601. Further, there are reasons to doubt the Committee would agree that the mitigation measures are justified in light of their costs. NMFS's conclusions and mitigation measures often "rest[] upon uncertain assumptions," and the Department and the Service have historically taken a precautionary approach to avoid litigious conservation groups— such as initially happened here. *Id.* at 601. For example, the mitigation measures re-

quired by the 2025 biological opinion, and hence the Committee's order, include very burdensome, precautionary requirements to protect listed species from any remote chance of harm during pile driving, decommissioning, or site clearing activities, all of which impose large costs. Arena Decl. ¶¶ 12–36.

To the extent the Committee's order compels compliance with the 2025 "reasonable and prudent" alternative for the Rice's whale, including the plan to impose technology-based requirements, a district court in this circuit has already held that this measure is based on speculation, not evidence of likely jeopardy. *Louisiana*, 817 F. Supp. 3d at 404. The Committee's terse order doesn't specify whether it meant to include this "reasonable and prudent alternative" when compelling compliance with "the avoidance or minimization measures described in NMFS's 2025 biological opinion." 91 Fed. Reg. at 16,967, JA[R.6].[7] But assuming it does, on remand the Committee would likely agree that this plan is unnecessary. After all, the Secretary of Interior, which chairs the Committee, has repeatedly "concluded that additional protections for the Rice's whales are unnecessary outside of their 'core' habitat in the eastern Gulf." *Louisiana*, 86 F.4th at 667.

---

[7] In context, AEA believes that the best reading of "avoidance or minimization measures" is that it does not include the 2025 reasonable and prudent alternative, but only the mitigation measures agreed to by the Department of Interior, embodied in the attachments to the biological opinion. The Committee can clarify the scope of the order in its response brief.

In any event, the Rice's whale vessel mitigation requirements embodied in Attachment 4 to the biological opinion, limited to the Rice's whale known habitat in the northeastern Gulf, are also unduly burdensome. 2025 BiOp, Attachment 4, JA[R.1685–88]. Prohibiting *all* oil and gas travel at nighttime or in low visibility conditions by vessels of any size throughout a large portion of the eastern Gulf, even at speeds below 10 knots per hour, a speed that makes harm to the Rice's whale extremely unlikely, is unwarranted to avoid likely jeopardy, let alone cost justified. Similarly, mandating daytime travel below 10 knots per hour regardless of whether whales are spotted, when Rice's whales are very unlikely to be near the surface during daytime, is unwarranted.

In any event, the point is this: trying to guess how the Committee would analyze these mitigation burdens "would propel the court into the domain which Congress has set aside exclusively for the administrative agency," *Me. Lobstermen's Ass'n*, 70 F.4th at 601 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)), and would "swallow the remand rule." *Wages & White Lion Invs.*, 604 U.S. at 589. Taking due account of the rule of prejudicial error, the Committee's failure to explain is prejudicial.

V.    THE PROPER REMEDY IS TO SEVER THE ORDER OR REMAND WITHOUT
      VACATUR

"Vacatur is the default remedy for violations under § 706(2)." *Texas v. United*

*States*, 126 F.4th 392, 418 (5th Cir. 2025). But the Court must perform a "severability analysis." *Id.* at 419. Severability depends upon the intent of the Committee, and whether the Committee's exemption could function sensibly without the order requiring mitigation. *See id.* at 420; *see also NRDC v. Wheeler*, 955 F.3d 68, 81 (D.C. Cir. 2020).

A Committee exemption decision following a subsection (j) finding is severable from the Committee's discretionary decision to order mitigation. By making the required finding under subsection (j), the Secretary of War has *compelled* an exemption decision "in any event"—with or without ordering adequate mitigation. *See* Secretary of War Letter, Attachment, Nat'l Security Findings ¶ 102, JA[R.46]. The exemption is not only lawful, but required by law. The Committee agreed that while it was required to issue an exemption, it was not required to order mitigation. 91 Fed. Reg. at 16,966, JA[R.5]. The Committee appears to have compelled compliance with the mitigation measures out of an abundance of caution, in case "the requirement" to consider mitigation "applied." *Id.*, JA[R.5]. The Committee did not intend (and indeed, has no discretion to lawfully intend) that if the discretionary mitigation order falls, so too must the mandatory exemption.

The ESA and the underlying regulations further confirm that an order compelling mitigation measures is severable from the exemption decision. The statute

contemplates a separate written order when requiring mitigation, 16 U.S.C. § 1536(h)(1)(B), (*l*)(1), and the regulations differentiate the Committee's "final determinations" about an exemption, which must be documented in a "written decision," from the Committee order "specifying required mitigation and enhancement measures." 50 C.F.R. § 453.03(b). And there is no question that the Committee's exemption decision here can operate perfectly sensibly without the order compelling mitigation measures. The mitigation order is therefore severable.

If the Court concludes that the order is not severable, however, it should order remand without vacatur. Remand without vacatur is appropriate when there is "a serious possibility that the agency will be able to correct the [action]'s defects on remand and ... vacating the challenged action would produce disruptive consequences." *Texas*, 126 F.4th at 418 (cleaned up). This case meets both conditions. The Committee's "failure to explain" therefore "does not require vacatur." *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000).

First, AEA does not dispute that there is some "serious possibility," *Texas*, 126 F.4th at 418, that the Committee could adequately "add explanations to the record when it reconsiders the problem on remand," satisfying its APA obligations. *Me. Lobstermen's Ass'n*, 70 F.4th at 602. A failure to explain is in no way "fatal to the" order. *Id.* at 601. And on this limited record, the mitigation measures are not so man-

ifestly indefensible on their face as to preclude the possibility of a satisfactory justification. The Committee "may well be able to justify its decision." *Cent. & S. W. Servs.*, 220 F.3d at 692.

Second, "vacating the challenged action would produce disruptive consequences." *Texas*, 126 F.4th at 418 (cleaned up). "Vacating the [exemption] would create significant uncertainty" for entities that rely upon the exemption, *Me. Lobstermen's Ass'n*, 70 F.4th at 601, including "other members of the regulated community," *Cent. & S. W. Servs.*, 220 F.3d at 692. Vacatur would allow anti-industry conservation groups to renew ESA challenges that aim to shut down the Gulf of America's oil and gas program. The Secretary of War has concluded that litigation uncertainty arising from such suits threatens national security, a judgment that this Court is not equipped to second guess. *See Winter*, 555 U.S. at 24. A threat to national security easily clears the second requirement for remand without vacatur.

Vacating the exemption decision would also be profoundly inequitable to AEA and other remaining parties. The only entities that have an interest in vacating the exemption decision are conservation groups, which have dismissed their petitions for review with prejudice. Dkts. 90, 92. Vacating the exemption would give these parties a windfall, while making AEA *worse off* on net for seeking judicial review and prevailing. Such a wooden approach to remedies would create terrible incentives by

discouraging meritorious litigation and encouraging arbitrary agency action. "In hearing a petition for review, a court of appeals may exercise equitable powers in its choice of a remedy …." *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 590 (5th Cir. 1981). The Court should exercise its equitable discretion here, not punish AEA with a remedy that doesn't fit the legal violation at issue and that no remaining party requests.

Finally, if this Court decides to remand the case without vacatur to the Committee, the Court should exercise its discretion to retain jurisdiction to ensure compliance with its remand order. *See Tex. Ass'n of Mfrs. v. CPSC*, 989 F.3d 368, 390 (5th Cir. 2021).

## <u>CONCLUSION</u>

This Court should grant AEA's petition, declare the order requiring mitigation measures severable from the exemption decision, and vacate the order. In the alternative, the Court should remand without vacatur and retain jurisdiction to enforce its mandate.

July 15, 2026

Respectfully submitted,

<u>/s/ James R. Conde</u>
Michael Buschbacher
James R. Conde
  *Counsel of Record*
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
  Suite 900
Washington, DC 20006
(202) 955-0620
jconde@boydengray.com

*Counsel for Petitioner*
*American Energy Association*

# CERTIFICATE OF SERVICE

I hereby certify that all counsel of record who have consented to electronic service are being served today with a copy of this document via the Court's CM/ECF. All parties in this case are represented by counsel consenting to electronic service.

July 15, 2026

Respectfully submitted,

/s/ James R. Conde
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
 Suite 900
Washington, DC 20006
(202) 955-0620

*Counsel for Petitioner*
*American Energy Association*

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Fifth Circuit Rule 32.2 because it contains 11,101 words, excluding the portions exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) and Fifth Circuit Rule 32.1 because it has been prepared in a proportionally spaced typeface using Microsoft Word in Equity A and 14-point font.

July 15, 2026

Respectfully submitted,

/s/ James R. Conde
BOYDEN GRAY PLLC
800 Connecticut Ave. NW,
 Suite 900
Washington, DC 20006
(202) 955-0620

*Counsel for Petitioner*
*American Energy Association*