No. 26-60240

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

AMERICAN ENERGY ASSOCIATION,
*Petitioner*,

v.

DOUG BURGUM, Secretary of the Interior, in his official capacities as Chair and Member of the Endangered Species Committee; BROOKE ROLLINS, Secretary of Agriculture, in her official capacity as a Member of the Endangered Species Committee; DANIEL DRISCOLL, Secretary of the Army, in his official capacity as a Member of the Endangered Species Committee; PIERRE YARED, Acting Chair of the Council of Economic Advisors, in his official capacity as a Member of the Endangered Species Committee; LEE ZELDIN, Administrator of the Environmental Protection Agency, in his official capacity as a Member of the Endangered Species Committee; NEIL JACOBS, Administrator of the National Oceanic and Atmospheric Administration, in his official capacity as a Member of the Endangered Species Committee; Pete Hegseth, Secretary U.S. Department of Defense,
*Respondents*.

---

On Petition for Review of an Order of the Endangered Species Committee

---

# FEDERAL RESPONDENTS' ANSWERING BRIEF

---


ADAM R.F. GUSTAFSON
*Principal Deputy Assist. Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT J. LUNDMAN
CHRISTOPHER ANDERSON
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-1971
christopher.anderson3@usdoj.gov

Of counsel:

DONDRAE N. MAIDEN
*Associate Solicitor*
JOHN D. RUDOLPH
*Assistant Solicitor*
Division of Parks and Wildlife
Office of the Solicitor
U.S. Department of the Interior

## CERTIFICATE OF INTERESTED PERSONS

Under the fourth sentence of Fifth Circuit Rule 28.2.1, Respondents, as governmental parties, need not furnish a certificate of interested persons.

s/ *Christopher Anderson*
CHRISTOPHER ANDERSON
Counsel for Federal Respondents

## STATEMENT REGARDING ORAL ARGUMENT

The Endangered Species Committee respectfully requests oral argument in this case. The Endangered Species Act's exemption provisions have been rarely invoked, and there is little case law interpreting them. Further, this case presents questions of first impression because the order under review is the first instance of the Committee granting an exemption from the Act's requirements based on a national security finding by the Secretary of War. Given the novelty and importance of the issues, the Committee believes that oral argument may assist the Court in the resolution of the case.

# TABLE OF CONTENTS


Certificate of Interested Persons ........ i

Statement Regarding Oral Argument ........ ii

Table of Contents ........ iii

Table of Authorities ........ v

Introduction ........ 1

Jurisdictional Statement ........ 2

Issues Presented ........ 2

Statement of the Case ........ 3

A. Statutory and regulatory background ........ 3

1. The ESA's requirements for federal agency actions ........ 3

2. The Endangered Species Committee and exemptions from the ESA's requirements ........ 5

B. Factual background ........ 7

1. ESA consultations on oil and gas activities in the Gulf of America ........ 7

2. The Committee's Decision and Order ........ 10

C. Procedural history ........ 12

Summary of Argument ........ 14

Standard of Review ........ 17

Argument ........ 18

I. The Court has jurisdiction, and venue is proper. ........ 18

A. Committee decisions granting or denying exemptions may be reviewed only in the courts of appeals. ........ 18

B. Venue is proper in this Court. ........ 23

II. The Exemption Order is not arbitrary. ........ 24

A. Section 7(j) requires the Committee to implement the Secretary's National Security Finding, but it does not empower the Committee to do more. .......... 24

B. The Secretary of War's finding is not reviewable and is adequately supported in any event. .......... 31

1. The ESA commits national security findings to the Secretary of War's discretion. .......... 31

2. Even if the National Security Finding were reviewable, it is not arbitrary. .......... 34

III. If the Committee erred, remand without vacatur is the appropriate remedy. .......... 37

Conclusion .......... 39

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Chamber of Com. v. SEC*,
88 F.4th 1115 (5th Cir. 2023) .......... 37

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) .......... 32

*Claybrook v. Slater*,
111 F.3d 904 (D.C. Cir. 1997) .......... 33

*Eagle-Picher Indus., Inc. v. EPA*,
759 F.2d 905 (D.C. Cir. 1985) .......... 22

*Federal Deposit Insurance Corp. v. Bank of Coushatta*,
930 F.2d 1122 (5th Cir. 1991) .......... 33

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 32

*Hinck v. United States*,
550 U.S. 501 (2007) .......... 23

*Hunt v. Washington State Apple Advertising Commission*,
432 U.S. 333 (1977) .......... 18

*In re Endangered Species Committee*,
___ 3d ___, 2026 WL 1659722 (J.P.M.L. June 5, 2026) .......... 13

*JTB Tools & Oilfield Services, L.L.C. v. United States*,
831 F.3d 597 (5th Cir. 2016) .......... 18

*Khalid v. Transportation Security Administration*,
172 F.4th 866 (D.C. Cir. 2026) .......... 18, 34

*Maine Lobstermen's Ass'n v. NMFS*,
70 F.4th 582 (D.C. Cir. 2023) .......... 25

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 30, 31

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ........................................ 39

*Motor Vehicle Manufacturers Ass'n v.*
*State Farm Mutual Automobile Insurance Co.*,
463 U.S. 29 (1983) ........................................ 17

*National Ass'n of Manufacturers v. Department of Defense*,
583 U.S. 109 (2018) ........................................ 18

*Neumann's Pharmacy, L.L.C. v. Drug Enforcement Administration*,
167 F.4th 320 (5th Cir. 2026) ........................................ 35

*NLRB v. SW General, Inc.*,
580 U.S. 288 (2017) ........................................ 21

*North Dakota ex rel. Board of University & School Lands v.*
*Yeutter*,
914 F.2d 1031 (8th Cir. 1990) ........................................ 33

*Ring Precision, Inc. v. Jones*,
722 F.3d 711 (5th Cir. 2013) ........................................ 17

*Seven County Infrastructure Coalition v. Eagle County*,
605 U.S. 168 (2025) ........................................ 35

*Sierra Club v. NMFS*,
797 F. Supp. 3d 440 (D. Md. 2024) ........................................ 8, 9

*Sierra Club v. NMFS*,
2024 WL 6817999 (D. Md. Oct. 21, 2024) ........................................ 9, 10

*Wagner v. Federal Election Commission*,
717 F.3d 1007 (D.C. Cir. 2013) ........................................ 19

*Webster v. Doe*,
486 U.S. 592 (1988) ........................................ 31, 32, 33

**Statutes**

5 U.S.C. § 701(a)(2) ........................................ 31

5 U.S.C. § 704 ........................................ 22

5 U.S.C. § 706(2)(A) ........................................ 17

15 U.S.C. § 1532(19) .......... 3
16 U.S.C. § 1533(c) .......... 3
16 U.S.C. § 1533(d) .......... 3
16 U.S.C. § 1536(a)(2) .......... 4, 20, 25
16 U.S.C. § 1536(b)(3)(A) .......... 4
16 U.S.C. § 1536(b)(4) .......... 5
16 U.S.C. § 1536(e)(2) .......... 26
16 U.S.C. § 1536(g) .......... 6, 7
16 U.S.C. § 1536(g)(1) .......... 6
16 U.S.C. § 1536(h)(1) .......... 7, 8
16 U.S.C. § 1536(h)(1)(B) .......... 29, 30
16 U.S.C. § 1536(j) .......... 24, 25, 32, 36
16 U.S.C. § 1536(n) .......... passim
16 U.S.C. § 1536(*o*)(1) .......... 24
16 U.S.C. § 1536(*o*)(2) .......... 5, 6
16 U.S.C. § 1538(a)(1)(C) .......... 3
28 U.S.C. § 2112(a) .......... 13, 23
U.S.C. § 1536(n) .......... 23
U.S.C. § 3036(e)(1) .......... 32

**<u>Regulations</u>**

50 C.F.R. § 453.03(b) .......... 12
50 C.F.R. § 402.02 .......... 4
50 C.F.R. § 402.13 .......... 4
50 C.F.R. § 402.14(h)(1) .......... 4
50 C.F.R. § 402.14(h)(2) .......... 4

## INTRODUCTION

Congress recognized in the Endangered Species Act (ESA) that the Act's protections must sometimes give way to national security concerns. It therefore directed the Endangered Species Committee to grant an exemption from the ESA's requirements if the Secretary of War finds that an exemption is necessary for reasons of national security. The ESA grants the Committee no discretion in that regard. If the Secretary of War requests an exemption, the Committee must grant it. And the ESA does not authorize the Committee to do more or less—the Committee cannot add to or subtract from the actions encompassed by the Secretary of War's national security finding.

The Committee did exactly what the statute required in this case. The Secretary of War found that national security required an exemption for Gulf of America oil and gas activities, which the Secretary defined to include certain established mitigation and protection measures intended to reduce the impacts of oil and gas activities on endangered and threatened species. The Committee met and unanimously granted an exemption for the action as defined by the Secretary, including the mitigation measures.

Petitioner American Energy Association (AEA) says the Committee acted arbitrarily by failing to consider whether the mitigation measures were truly necessary, but it points to no authority that would allow the Committee

to second-guess the Secretary's national security finding or to exempt a broader swath of activity than the Secretary found necessary for reasons of national security. AEA suggests that the Committee erred in relying on the Secretary's finding because the finding itself was arbitrary, but the Secretary's finding is not subject to judicial review and even if it were, it is well supported. The petition for review should be denied.

## JURISDICTIONAL STATEMENT

On April 3, 2026, the Committee issued a Decision and Order under ESA section 7(h) exempting Gulf of America Oil and Gas Activities from the requirements of the ESA. 91 Fed. Reg. 16966. AEA filed a timely petition for review of the Decision and Order in this Court on April 13, 2026. *See* 16 U.S.C. § 1536(n). As explained further below, pp. 18–24, this Court has original jurisdiction to review the Decision and Order pursuant to section 7(n) of the ESA, and venue is proper in this Court. *Id.*

## ISSUES PRESENTED

1. Whether the ESA confers original jurisdiction on the courts of appeals over AEA's petition for review of the Committee's Decision and Order, and whether venue is proper in this Court.

2. Whether the Committee acted reasonably by granting an exemption for the action defined in the Secretary of War's national security finding

when the defined action included certain mitigation and protection measures.

3. If the Court determines that the Committee erred, whether remand without vacatur is the appropriate remedy.

## STATEMENT OF THE CASE

### A. Statutory and regulatory background

#### 1. The ESA's requirements for federal agency actions

The Endangered Species Act directs the Secretary of the Interior and the Secretary of Commerce to maintain a list of species classified as "endangered" or "threatened." 16 U.S.C. § 1533(c). Listed species are entitled to the protections of the Act. *See id.* §§ 1533(d); 1536(a); 1538. Among other protections, the ESA prohibits the "taking" of endangered species of fish or wildlife, 16 U.S.C. § 1538(a)(1)(C), and the prohibition on take may be extended to threatened species by rule, 16 U.S.C. § 1533(d). "Take" is defined broadly; it means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 15 U.S.C. § 1532(19).

Section 7 of the ESA requires each federal agency to "insure that any action authorized, funded or carried out by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification" of listed species' critical habitat. 16 U.S.C. § 1536(a)(2). To carry out that mandate, the federal agency must consult with the Fish and Wildlife Service (FWS) or the National Marine Fisheries Service (NMFS), as appropriate, whenever a proposed action "may affect" listed species or their critical habitat. *Id.* § 1536(a)(2)–(3). The agency that is authorizing, funding, or carrying out an action is commonly called the "action agency," while FWS and NMFS are called the "consulting agencies."

Consultation can be either informal or formal. 50 C.F.R. § 402.13–.14. Formal consultation culminates in the issuance of a "biological opinion" (BiOp), in which the consulting agency examines the proposed action's anticipated effects and opines on whether the action is likely to jeopardize the listed species' continued existence or adversely modify their critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(1). If the consulting agency issues an opinion that the proposed action would jeopardize the continued existence of listed species, the BiOp must identify "reasonable and prudent alternatives" to the proposed action that would avoid jeopardy (if any are available). 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

Even when the proposed action is not likely to jeopardize a species or adversely modify its critical habitat, it may still cause "incidental take." 50

C.F.R. § 402.02 (defining "incidental take" as "takings that result from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency or applicant"). In such cases, the consulting agency issues an Incidental Take Statement specifying the extent of anticipated take, identifying "reasonable and prudent measures" to minimize the take, and setting forth terms and conditions for implementation of the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4). Compliance with the Incidental Take Statement provides a safe harbor from civil and criminal liability for incidental take of the affected species. 16 U.S.C. § 1536(*o*)(2).

### 2. The Endangered Species Committee and exemptions from the ESA's requirements

Congress recognized that there are circumstances in which agency actions should be exempt from the ESA's requirements and created the Endangered Species Committee with authority to exempt agency actions from section 7's requirements. *See id.* § 1536(e), (h). The Committee consists of six permanent members: the Secretary of the Interior (who serves as chair), the Secretary of Agriculture, the Secretary of the Army, the Chairman of the Council of Economic Advisors, the Administrator of the Environmental Protection Agency, and the Administrator of the National Oceanic and Atmospheric Administration. *Id.* § 1536(e)(3)(A)–(F). In certain circumstances, the

President appoints one additional person to the Committee from each affected State. *Id.* § 1536(e)(3)(G).

If the consulting agency issues a BiOp finding that an agency action is likely to jeopardize the continued existence of a listed species, the action agency, the governor of a state in which an action would occur, or a permit or license applicant may apply to the Committee for an exemption from section 7's requirements. *See* 16 U.S.C. § 1536(g)(1). An application triggers a process that involves a Federal Register notice summarizing the application, an administrative hearing, a written report, and, ultimately, a Committee decision that makes specific findings. 16 U.S.C. § 1536(g), (h).

The Secretary of War may also initiate an exemption by making a finding that it is "necessary" to exempt an "agency action" "for reasons of national security." *Id.* § 1536(j). When the Secretary of War makes such a finding, "the Committee shall grant an exemption." *Id.* Further, a "notwithstanding" clause provides that the Committee shall grant the exemption "[n]otwithstanding any other provision" of the ESA. *Id.* That clause means that the procedures prescribed in section 7(g) and the findings required by section 7(h) are inapplicable when the Committee grants an exemption in response to a national security finding under section 7(j).

An exemption relieves the action agency from the obligation to "insure" that the action "is not likely to jeopardize the continued existence" of any listed species or adversely modify listed species' critical habitat, as well as any further obligation to consult with FWS or NMFS regarding that action. *Id.* § 1536(a)(2). Further, "any activity which is necessary to carry out" an exempted action "shall not be considered to be a taking of any [listed species]." *Id.* § 1536(*o*)(1).

The Committee's final determination on an exemption constitutes final agency action under the Administrative Procedure Act (APA). 16 U.S.C. § 1536(h)(1). Jurisdiction to review the decision lies in the U.S. Court of Appeals for any circuit in which the agency action is being or will be carried out. *Id.* § 1536(n).

### B. Factual background

#### 1. ESA consultations on oil and gas activities in the Gulf of America

Federal agencies have consulted with NMFS regarding oil and gas activities in the Gulf of America since the late 1970s, initially on a lease-sale-by-lease-sale basis. NMFS, *Endangered Species Act Section 7 Biological and Conference Opinion* 7 (May 20, 2025) (2025 BiOp), JA[R.972]. In the 2000s, NMFS began consulting with action agencies on certain activities

programmatically, though individual lease sale consultations continued in parallel. *See id.*, JA[R.972].

In 2010, NMFS and the two agencies within the Department of the Interior (Interior) that oversee offshore oil and gas activities agreed to pursue a single programmatic ESA consultation for oil and gas activities in the Gulf of America.[1] *See* 2025 BiOp at 6, JA[R.971]. That consultation covers all of Interior's approvals for oil and gas activities on the Outer Continental Shelf, including all lease sales through 2029, pre-lease activities, and decommissioning. *Id.*, JA[R.971]. After years of interagency review, NMFS issued a final programmatic BiOp in March 2020. *Id.* at 8–9, JA[R.973–74].

Environmental advocacy organizations challenged the 2020 BiOp in the District of Maryland. *Sierra Club v. NMFS*, 797 F. Supp. 3d 440 (D. Md. 2024). That court held that the 2020 BiOp was arbitrary and capricious because it inadequately assessed oil spill risks, *id.* at 465, and its analysis of

---

[1] From 2010 to 2026, the Department of the Interior's outer continental shelf oil and gas program was administered by two bureaus within Interior: the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE). On July 10, 2026, the Secretary of the Interior issued an order merging BOEM and BSEE into a single bureau, the Marine Minerals Administration. Order 3451, available at https://www.doi.gov/document-library/secretary-order/so-3451-establishment-marine-minerals-administration. The transition from to BOEM and BSEE to the Marine Minerals Administration is ongoing. For convenience, this brief refers to approvals by Interior, which includes all relevant bureaus.

adverse effects on Rice's whale and the Gulf sturgeon was flawed, *id*. at 472. The court also found the BiOp's incidental take statement to be unlawful. *Id*. at 493. The court held that Fourth Circuit precedent required that the BiOp and incidental take statement be vacated *Id*. at 494. Recognizing the disruption that vacatur would cause, however, the court stayed vacatur to allow NMFS to address the court's concerns. *Id*. at 496–97 (staying vacatur until December 20, 2024), *amended by Sierra Club v. NMFS*, 2024 WL 6817999 (D. Md. Oct. 21, 2024) (extending the stay of vacatur to May 21, 2025).

Following the District of Maryland judgment, Interior submitted to NMFS a new biological assessment regarding Gulf of America oil and gas activities in December 2024. Bureau of Ocean Energy Mgmt. & Bureau of Safety & Env't Enforcement, *Focused Biological Assessment to Support Endangered Species Act Reinitiated Consultation on the Gulf of [America] Oil and Gas Program* (Dec. 22, 2024), https://perma.cc/M3VS-FQNT (2024 BA). NMFS then issued its current biological opinion for oil and gas activities in the Gulf of America in May 2025. 2025 BiOp, JA[R.942]. The same environmental advocacy organizations immediately sought vacatur of the 2025 BiOp in the District of Maryland as insufficient under that court's prior

opinion. *Sierra Club v. NMFS*, No. 8:25-cv-1627, ECF No. 1 at 27 (D. Md. May 20, 2025).[2]

Separately, FWS issued its own biological opinion on Interior's Gulf of America oil and gas program in April 2018. EC0745. Interior later reinitiated consultation to consider new information. Fish & Wildlife Service, Reinitiated Consultation Decision at 1, JA[R.928]. In March 2025, FWS confirmed that the new information did not change the conclusions in its 2018 biological opinion. *Id.* at 10, JA[R.937].

### 2. The Committee's Decision and Order

On March 13, 2026, the Secretary of War notified the Secretary of the Interior that he found it necessary for reasons of national security to exempt from the ESA's requirements Gulf of America oil and gas activities, which he defined as "the proposed action reviewed in the [NMFS] 2025 biological opinion and the [FWS] 2018 and 2025 consultation decisions." Secretary of War, Memorandum for Record Re: National Security Findings 1 (Mar. 13, 2026) (National Security Finding), JA[R.34]. That action includes "all oil and gas exploration and development activities" associated with Interior's "Outer Continental Shelf Oil and Gas Program." *Id.*, JA[R.34]. The Secretary of War

[2] While that litigation was ongoing, the Committee issued its Decision and Order. The district court then dismissed the challenge to the 2025 BiOp as moot. *Sierra Club v. NMFS*, No. 8:25-cv-1627, ECF No. 112 (June 24, 2026).

found that the production of oil and natural gas from the outer continental shelf is necessary "to support military operations and readiness," *id.* ¶ 12, JA[R.35], and that "halting or diminishing oil and gas production in the Gulf" would "harm our national security," *id.* ¶ 60, JA[R.41]. The Secretary observed that Gulf oil and gas activities depend on the NMFS and FWS BiOps to ensure ESA compliance and that those "opinions and their incidental take statements are a linchpin for Gulf oil and gas operations." *Id.* ¶ 29, JA[R.37]. The Secretary further found that ongoing ESA litigation has the potential to disrupt Gulf oil and gas activities by leading to vacatur of the BiOps, *id.* ¶¶ 41–45, JA[R.39], and that litigation outcomes short of vacatur could also disrupt Gulf oil and gas operations, *id.* ¶¶ 47–49, JA[R.39–40]. The Secretary determined that ongoing ESA litigation over Gulf oil and gas activities poses unacceptable risks to national security, *id.* ¶ 85, JA[R.44], and that an ESA exemption for those activities is therefore necessary, *id.* ¶¶ 89–93, JA[R.44–45].

The Secretary of War's letter transmitting the National Security Finding requested that the Secretary of the Interior, in his capacity as Chairman of the Committee, convene a Committee meeting as soon as practicable. Ltr. from P. Hegseth to D. Burgum (Mar. 13, 2026) at 2, JA[R.32]. Later that day, the Secretary of the Interior filed with the Office of the Federal Register a

notice announcing that the Committee would meet on March 31, 2026, regarding an ESA exemption for Gulf of America oil and gas activities. *See* Endangered Species Committee Meeting Announcement, 91 Fed. Reg. 12672 (Mar. 16, 2026), JA[R.1].

On March 31, 2026, the Committee convened and unanimously approved a Decision and Order granting an exemption for Gulf of America oil and gas activities, as defined in the National Security Finding. (Exemption Order). JA[R.5–6]. The Committee then issued the Exemption Order by publishing it in the Federal Register on April 3, 2026. Exemption Order at 16966–67, JA[R.5–6]; *see also* 50 C.F.R. § 453.03(b).

### C. Procedural history

A total of five timely petitions for review of the Exemption Order were filed in the courts of appeals. AEA filed its petition in this Court on April 13, 2026. Various environmental advocacy groups filed three petitions for review in the D.C. Circuit.[3] And an independent offshore oil and natural gas producer filed a petition for review in the Eleventh Circuit.[4]

---

[3] *Nat. Res. Def. Council, Inc. v. Burgum* (D.C. Cir. No. 26-1079, filed Apr. 3, 2026), *Defs. of Wildlife v. Burgum* (D.C. Cir. No. 26-1085, filed Apr. 14, 2026), and *Nat'l Wildlife Fed'n v. Burgum* (D.C. Cir. No. 26-1088, filed Apr. 15, 2026).

[4] *W&T Offshore, Inc. v. Sec'y, U.S. Dep't of the Interior* (11th Cir. No 26-11211, filed Apr. 13, 2026).

Because AEA's petition and one of the D.C. Circuit petitions were filed and served within ten days of issuance of the Exemption Order, the Committee notified the Judicial Panel on Multidistrict Litigation (JPML) that petitions for review of the Exemption Order were pending in multiple circuits. *See* 16 U.S.C. § 1536(n) (directing the Committee to file the administrative record "as provided in section 2112 of Title 28"); 28 U.S.C. § 2112(a) (providing mandatory procedures for the consolidation of petitions for review filed in multiple circuits). The JPML then conducted a random assignment procedure and ordered that the administrative record be filed in this Court and that the petitions be consolidated here. *In re Endangered Species Comm.*, MCP No. 202, ECF No. 3 (J.P.M.L. Apr. 17, 2026). The D.C. Circuit then transferred the petitions pending in that court to this Court, which consolidated them with AEA's petition. Dkt. No. 10. The Eleventh Circuit petition was voluntarily dismissed before being transferred to this Court.

The environmental petitioners filed motions before the JPML to set aside the consolidation order and to return the D.C. Circuit petitions to that court, but the Panel denied the motions. *In re Endangered Species Comm.*, ___ F. Supp. 3d ___, 2026 WL 1659722 (J.P.M.L. June 5, 2026).

The environmental petitioners then moved to stay proceedings in this Court pending the outcome of separate challenges to the Exemption Order

filed in the District Court for the District of Columbia.[5] After the Court denied those motions, Dkt. No. 56, the environmental petitioners moved to dismiss their petitions with prejudice, Dkt. Nos. 87, 91. AEA's petition is the sole remaining petition for review of the Exemption Order.

## SUMMARY OF ARGUMENT

1. This Court has jurisdiction over AEA's petition. ESA section 7(n) provides for direct review in the courts of appeal "of any decision of the Endangered Species Committee under subsection (h)." The Committee explicitly stated that it was issuing the Exemption Order under subsection (h), and subsection (h) is the only provision in the ESA that authorizes the Committee to grant exemptions. Before dismissing their petitions, the environmental advocacy petitioners argued that this Court lacks jurisdiction because the Committee granted the exemption in response to a national security finding made under section 7(j). Those arguments are wrong because the Committee

[5] Three cases challenging the Exemption Order are pending in the District Court for the District of Columbia. *Ctr. for Biological Diversity v. Burgum* (D.D.C. No. 1:26-cv-940, filed Mar. 18, 2026); *Nat. Res. Def. Council, Inc. v. Burgum* (D.D.C. No. 1:26-cv-1116, filed Apr. 1, 2026); *Healthy Gulf v. Burgum* (D.D.C. No. 1:26-cv-1118, filed Apr. 2, 2026). The Committee has moved to dismiss those petitions for lack of jurisdiction because the ESA provides for review of Committee exemption decisions exclusively in the courts of appeals. Those motions to dismiss have been fully briefed and are awaiting further action by the district court.

issued the exemption under section 7(h). Venue is also appropriate in this Court because the agency action exempted—Gulf of America oil and gas activities—will be carried out, in part, in this Circuit.

2. The Committee did not err by granting an exemption for Gulf of America oil and gas activities, as defined in the National Security Finding. ESA section 7(j) required the Committee to grant the exemption the Secretary of War found to be necessary for reasons of national security, but it did not authorize the Committee to approve a broader exemption. The Committee therefore could not grant an exemption for activities that do not fall within the National Security Finding's definition of the "action," including the specified mitigation measures. Because the Committee lacked discretion regarding the scope of the exemption, there was no need for the Committee to consider whether the mitigation measures were necessary and appropriate under the standards of the ESA. In any case, the Exemption Order does not require AEA or its members to comply with the mitigation measures. It merely grants an exemption for Gulf of America oil and gas activities that incorporate those measures.

AEA argues that the Secretary of War acted arbitrarily by including the mitigation measures in the definition of the action to be exempted, but the Secretary's National Security Finding is not subject to judicial review because

the ESA commits to the Secretary of War's discretion the determination of whether exemptions are necessary for national security reasons.

Even if the National Security Finding were subject to review, the Finding's definition of the action is well supported. The ESA requires the Secretary of War to determine only whether an exemption is necessary for reasons of national security. The Secretary is not required to determine whether any mitigation measures incorporated into the action by the action agency are necessary and appropriate under the ESA. The National Security Finding is directed primarily at ensuring that oil and gas production in the Gulf is not subject to ongoing litigation risk, and the Secretary of War did not find that the regulatory status quo—in which Gulf of America oil and gas activities are required to comply with the mitigation measures—is contrary to the Nation's security interests. It was therefore reasonable for him to define the action to be exempted as the action proposed by Interior, including the mitigation measures.

3. If the Committee erred by not evaluating whether the mitigation measures were necessary and appropriate, the proper remedy is to remand the Exemption Order to the Committee without vacatur. All parties agree that some form of exemption is required by the National Security Finding, and vacatur of the Order would undermine the national security interests

identified in the Finding. The Committee would also likely be able to justify the Exemption Order on remand, even if the Committee determined that the mitigation measures should be modified.

The Court should not, however, "sever" and vacate the mitigation measures, as AEA urges. The Committee granted the exemption requested by the Secretary of War; it did not order that the mitigation measures be implemented. Thus, there is no mitigation portion of the Committee's order to sever. The appropriate remedy when agency action is held to be arbitrary and capricious is for the Court to remand the action for the agency to consider in the first instance how its action should be modified.

## STANDARD OF REVIEW

Committee decisions granting or denying exemptions are reviewed under the standards of the APA. 16 U.S.C. § 1536(n). Accordingly, the Committee's Exemption Decision may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Review under that standard is 'narrow,'" and a court may not "'substitute [its] judgment for that of the agency.'" *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013) (quoting *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Because "courts have limited competence in the area of national security," judicial

review of "factual determinations in this context is highly deferential." *Khalid v. Transp. Sec. Admin.*, 172 F.4th 866, 874 (D.C. Cir. 2026) (quotation and internal alterations omitted).

## ARGUMENT

### I. The Court has jurisdiction, and venue is proper.

#### A. Committee decisions granting or denying exemptions may be reviewed only in the courts of appeals.

The Committee agrees that this Court has jurisdiction over AEA's petition.[6] The ESA unambiguously provides that "any person … may obtain judicial review … of any decision of the Endangered Species Committee under subsection (h), in the United States Court[s] of Appeals." 16 U.S.C. § 1536(n). A statute providing that a plaintiff "may" obtain judicial review in the courts of appeals vests jurisdiction exclusively in the courts of appeals. *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 583 U.S. 109, 114, 117 (2018) (holding that a statute providing that review "may be had" in the courts of appeals vested jurisdiction "directly and exclusively in the federal courts of appeals"); *JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 599 (5th Cir. 2016) (holding that a statute providing that any person "may" petition for

---

[6] The Committee also agrees that AEA has Article III standing to bring this petition on behalf of its members under *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

review of a standard "on its face[] vests the federal courts of appeals with exclusive jurisdiction"); *Wagner v. Fed. Election Comm'n*, 717 F.3d 1007, 1012 & n.5 (D.C. Cir. 2013) (citing six examples of statutes with similar language and explaining the background principle that courts interpret jurisdictional statutes using "may" "to confer exclusive jurisdiction" in the courts of appeals).

Had the Committee issued its Decision and Order through the ordinary exemption process outlined in section 7(g), there would be no question that exclusive jurisdiction to review the Committee's decision lies in the courts of appeals. As AEA notes, however, the environmental advocacy petitioners argued (before dismissing their petitions) that section 7(n)'s review provision is inapplicable in this case because the Committee acted following a national security finding by the Secretary of War under section 7(j). That argument is incorrect.

First, the Committee expressly issued the Exemption Order "pursuant to section 7(h)." Exemption Order at 16966, JA[R.5]; *see also id.* (expressly stating elsewhere that the exemption was made under subsection (h)). Even if the Committee erred in determining that subsection (h) was the appropriate authority under which to issue the exemption (it did not), that is the authority the Committee invoked. The Exemption Order is therefore a decision

of the Committee "under subsection (h)," which may be reviewed only in the courts of appeals. 16 U.S.C. § 1536(n).

Second, the only statutory provision authorizing the Committee to grant an exemption is subsection (h). Thus, *all* Committee decisions granting or denying exemptions—regardless of the process by which the Committee reaches those decisions—are decisions under subsection (h). The structure of section 7 makes that conclusion inescapable. Throughout section 7 Congress used the term "under subsection (h)" or "pursuant to subsection (h)" to describe exemption decisions issued by the Committee. *See* 16 U.S.C. § 1536(a)(2), (e)(2), (g)(1), (*l*)(1), (m), (n), (*o*)(1). Paragraphs (a)(2) and (*o*)(1) most clearly demonstrate that all exemptions are exemptions "under subsection (h)." Paragraph (a)(2) is the provision that relieves exempted actions from the ESA's consultation requirements, and paragraph (*o*)(1) is the provision that makes the ESA's take prohibition inapplicable to exempted actions. Those provisions must apply to all exemptions granted by the Committee, or the exemptions would have no meaning. Thus, when Congress referred to decisions "under subsection (h)," it was referring to all exemption decisions.

Third, subsection (j) cannot be the authority under which the exemption was issued. That subsection is focused on the Secretary of War's national

security finding. It does not contain any language that independently authorizes the granting of an exemption. Instead, it instructs the *Committee* to grant an exemption, and the Committee's authority to grant exemptions is found in subsection (h). Although subsection (j) requires the Committee to grant an exemption "notwithstanding any other provision of [the ESA]," the "notwithstanding" clause does not alter the source of the Committee's authority to issue exemptions—subsection (h). It only overrides those provisions of the ESA that conflict with the Committee's duty under subsection (j) to grant an exemption. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 301 (2017) (observing that a "notwithstanding" clause determines which statutory provision applies in the event of a conflict).

Fourth, as AEA points out, Br. 35, it would make no sense for Congress to require petitions for review of exemptions granted following the ordinary exemption process to be filed in the courts of appeals within ninety days, but to allow challenges to exemptions necessary for reasons of national security to be challenged up to six years later in the district courts.

If it is reviewable at all (it is not, below pp. 31–34), jurisdiction to review the Secretary of War's finding that an exemption is necessary for reasons of national security also lies exclusively in the courts of appeals. Section 7(n) incorporates by reference the judicial review provisions of the APA. 16

U.S.C. § 1536(n). The APA, in turn, provides that "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. Thus, under APA section 704, Plaintiff's challenges to procedural and intermediate agency action—including the Secretary of War's national security exemption—may be raised only on a petition for review of the final agency action. *See Peoples Nat'l Bank v. Off. of the Comptroller of the Currency*, 362 F,3d 333, 337 (5th Cir. 2004) (procedural challenge to pending proceedings is not subject to immediate judicial review in the district court but must, instead, be raised on petition for review in the courts of appeals).

Again, the structure of section 7 confirms that commonsense conclusion. When Congress provides for exclusive review of an action in the courts of appeals, as it has done with section 7(n), it does so to provide for speedy resolution and finality, and to avoid duplicative and potentially conflicting review. *See Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 911 (D.C. Cir. 1985) (observing that Congress sets time limits on petitions for review to "impose statutory finality on agency orders, a choice [the courts] may not second-guess"). Consistent with that intent, Congress usually applies rigorous limitations periods to petitions for review, and a plaintiff cannot "effortlessly evade" circuit review and the attendant limitations periods by raising

general APA claims in the district courts. *Hinck v. United States*, 550 U.S. 501, 507 (2007) (quotation omitted). It would make no sense for Congress to require that challenges to a Committee order granting an exemption be brought within ninety days, if the underlying national security finding could continue to be challenged in district court years after the Committee's order implementing that finding became unreviewable.

Reinforcing that conclusion, Congress provided in section 7(n) that petitions for review of Committee exemption decisions must be consolidated in a single court. *See* 16 U.S.C. § 1536(n); 28 U.S.C. § 2112(a). It would be incongruous to require that all challenges to the Committee's decision be heard before a single court of appeals, but to permit challenges to a finding by the Secretary of War that an exemption is necessary for reasons of national security to be heard in multiple district courts.

### B. Venue is proper in this Court.

Venue is also proper in this Court. The ESA provides that judicial review of Committee exemption decisions may be sought in "(1) any circuit wherein the agency action concerned will be, or is being, carried out, or (2) in any case in which the agency action will be, or is being, carried out outside of any circuit, the District of Columbia." 16 U.S.C. § 1536(n).

The activities covered by the Exemption Order include "all oil and gas exploration, development, and production activities associated with the [Department of the Interior's] Outer Continental Shelf Oil and Gas Program." Exemption Order at 16966, JA[R.5]. Interior authorizes oil and gas activities on the outer continental shelf. Those action are not "carried out" solely on the outer continental shelf, however. For example, the outer continental shelf can be accessed only by aircraft or vessels, which travel from the mainland, through state territorial waters, and to the shelf. The Committee's decision exempts such vessel traffic from the ESA's take prohibition because vessel transportation is "necessary to carry out" activities on the outer continental shelf. 16 U.S.C. § 1536(*o*)(1). Thus, the exempted actions "will be, or [are] being, carried out," partly onshore and in territorial waters of states within this circuit. *See* 16 U.S.C. § 1536(n). Venue to review the Committee's decision is therefore appropriate in this Court.

## II. The Exemption Order is not arbitrary.

### A. Section 7(j) requires the Committee to implement the Secretary's National Security Finding, but it does not empower the Committee to do more.

Section 7(j) is clear. If the Secretary of War "finds" that an exemption "is necessary for reasons of national security," the Committee "shall grant an exemption" "[n]otwithstanding any other provision of [the ESA]." 16 U.S.C.

§ 1536(j). That provision obligates the Committee to grant the requested exemption and empowers it to do so without observing the procedural steps outlined in subsection (g) or making the findings required by subsection (h). But when the Committee acts on a national security finding, subsection (j)'s notwithstanding clause does not authorize the Committee to do more and grant an exemption broader (or narrower) than the exemption the Secretary of War found to be necessary.

The relevant unit of analysis for section 7 is the agency "action." An agency "action" must not be "likely to jeopardize the continued existence" of a listed species, and agencies must consult with NMFS or FWS on the effects of "prospective agency action." 16 U.S.C. § 1536(a)(2), (3). The Committee is authorized to grant exemptions for "action[s]," *id.* § 1536(e)(2), (*l*)(1), and the Secretary of War may determine whether it is necessary to exempt "any agency action" "for reasons of national security," *id.* § 1536(j). "Actions" are developed by the action agencies (in this case, Interior) and, when relevant, the applicants for agency approvals. *See id.* § 1536(a)(3). Though NMFS and FWS may advise action agencies on the development of actions, the statutory duty of NMFS and FWS is to evaluate the effects of the actions proposed by action agencies on listed species. *See Me. Lobstermen's Ass'n v. NMFS*, 70 F.4th 582, 588 (D.C. Cir. 2023). Similarly, the Committee's role is to

determine whether an exemption should be granted for the action presented to it by the exemption applicant or the Secretary of War. *See* 16 U.S.C. § 1536(e)(2), (j). The Committee's role generally is not to redefine the agency action under consideration, and the Committee lacks any statutory authority to do so when the Secretary of War submits a National Security Finding. When formulating actions, action agencies may consider potential effects on listed species and may incorporate measures into the proposed action to limit adverse effects on those species. *See id.* § 1536(a)(1), (2).

In this case, the Secretary of War found an exemption to be necessary for "the proposed action reviewed in the [NMFS] 2025 biological opinion and the [FWS] 2018 and 2025 consultation decisions." National Security Finding at 1, JA[R.34]. That proposed action was developed by Interior to meet the needs of its Gulf of America oil and gas program and incorporates certain mitigation and protection measures intended to limit adverse impacts on listed species.[7] 2025 BiOp at 96–102, JA[R.1061–1067] (describing the measures); 2024 BA at 64–65 (Dec. 22, 2024), https://perma.cc/M3VS-

[7] The Committee clarifies that the action defined in the National Security Finding is the "the *proposed action*" reviewed in the consultation decisions. National Security Finding at 1, JA[R.34] (emphasis added). It therefore includes only the mitigation measures specified in Interior's proposal as described in the biological assessment and does not include the "reasonable and prudent alternative" identified in the 2025 BiOp. *See* Br. 47 & n.7.

FQNT (discussing the enforceable mitigation measures incorporated into Interior's approvals for Gulf oil and gas activities). The National Security Finding evaluated the need to exempt the action proposed by Interior, and the Finding expressly acknowledged that the action included the mitigation measures. National Security Finding at 1, 13, JA[R.34, 36]. The Secretary of War found that an exemption was necessary for the action, but he did not find that continued observance of those mitigation measures would be inconsistent with national security requirements. In response to the National Security Finding, the Committee did exactly what was required by the ESA: it granted an exemption for the action defined in the Finding, which includes the mitigation measures.

AEA thus misunderstands the nature of the Committee's action when it says that the Committee "mandate[d]" the mitigation and protection measures. Br. 41. The Committee did not mandate or otherwise "impose," Br. 4, the mitigation measures. It simply granted the exemption found to be necessary by the Secretary of War. Indeed, the Committee could do no more in response to the National Security Finding. Subsection (j) mandates that the Committee "shall" grant an exemption "notwithstanding any other provision of the ESA," and the Committee therefore has no discretion to grant an exemption that is different from the exemption requested by the Secretary of

War in the National Security Finding. It lacks any authority to add additional mitigation measures or eliminate mitigation measures requested in the National Security Finding.

AEA quotes out of context a statement in the Exemption Order that the mitigation measures "shall continue to be implemented" to argue that the Committee required compliance with the mitigation measures. Br. 41 (quoting the Exemption Order at 1, JA[R.5]). But the Committee's statement merely observes that the action to be exempted, as defined in the National Security Finding, includes the mitigation measures and that the Exemption Order therefore does not relieve affected parties of the duty to observe them. That statement does not constitute an independent order of the Committee that the mitigation measures be implemented.

AEA acknowledges that whether to authorize future oil and gas activities and whether to require regulated parties to comply with any mitigation measures under any future authorization are decisions for Interior as the action agency. Br. 45. Interior exercised that authority when it developed the proposed action and initiated consultation with NMFS and FWS. If AEA believes that Interior's choice of mitigation measures is unduly burdensome, the proper course would be for AEA to seek relief from Interior, not the Committee. And nothing in the Committee's order would preclude Interior from

issuing approvals for activities that do not include the mitigation measures, provided that Interior complies with the ESA. Thus, contrary to AEA's assertion, Br. 45, the Exemption Order does not necessarily require that all oil and gas activities carried out in the Gulf of America for the next forty-five years observe the mitigation and protection measures included in the definition of the exempted action.

Because the Committee did not impose any mitigation measures, it was not required to make findings under section 7(h)(1)(B), which ordinarily requires the Committee, when granting an exemption, to establish "reasonable mitigation and enhancement measures" that the Committee finds to be "necessary and appropriate to minimize the adverse effects of the agency action." 16 U.S.C. § 1536(h)(1)(B). Indeed, the Committee explained in the Exemption Order that it was *not* required to consider whether to impose mitigation and enhancement measures under section 7(h)(1)(B)—and that it would *not* do so—because subsection (j)'s notwithstanding clause makes section 7(h)(1)(B) inapplicable when the Committee grants an exemption based on a national security finding. Exemption Order at 1, JA[R.5]. True, the Committee also observed that if section 7(h)(1)(B) did apply, it would be satisfied because the action defined in the National Security Finding includes the mitigation measures. *Id.*, JA[R.5]. But that observation merely reflected the

Committee's view that the measures included in the definition of the action would be sufficient to satisfy section 7(h)(1)(B). It was not a finding that those measures would be required by section 7(h)(1)(B), nor was it an order issued under the Committee's authority that those measures be observed.

Because the Committee neither determined that the mitigation measures included in the definition of the action were necessary for the exemption to be granted nor ordered that those measures be implemented, it was not required to find that those measures are "necessary and appropriate." *Contra* Br. 40. Nor was there any reason for the Committee to consider the cost of those measures, given the Committee's lack of discretion. *Contra* Br. 40–41. AEA's argument that the order is arbitrary because it fails to make such findings therefore fails.

If, however, the Court disagrees and concludes that the Committee did have discretion to determine whether the mitigation measures were "necessary and appropriate," 16 U.S.C. § 1536(h)(1)(B), then the Committee would need to consider cost and feasibility, consistent with the Supreme Court's holding in *Michigan v. EPA*, 576 U.S. 743, 752 (2015); AEA Br. 40–41. In *Michigan*, the Court held that EPA was required to consider cost when determining whether a regulation under the Clean Air Act was "appropriate and necessary" because "it is unreasonable to read an instruction to an

administrative agency to determine whether 'regulation is appropriate and necessary' as an invitation to ignore cost." *Id.* at 753.

### B. The Secretary of War's finding is not reviewable and is adequately supported in any event.

#### 1. The ESA commits national security findings to the Secretary of War's discretion.

Perhaps recognizing that the Committee's authority was limited to granting the exemption found to be necessary by the Secretary of War, AEA argues that it was arbitrary for the Committee to rely on the National Security Finding because the Finding itself is "perfunctory and unreasoned" with respect to the mitigation measures. Br. 44. In effect, AEA asks the Court to set aside the National Security Finding insofar as it defines the action to be exempted to include the mitigation measures. The Court cannot to do so, however, because the Secretary of War's national security findings are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).

Section 7(n) of the ESA provides that the Court reviews exemption decisions under the APA. 16 U.S.C. § 1536(n). The APA, in turn, provides that judicial review is unavailable "to the extent that … agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). As the Supreme Court explained in *Webster v. Doe*, 486 U.S. 592 (1988), action is committed to agency discretion by law when the relevant "statutes are drawn in such broad

terms that in a given case there is no law to apply," *id.* at 599 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). ESA section 7(j) is such a statute.

Like the statute at issue in *Webster*, section 7(j) provides "no meaningful standard against which to judge the [Secretary's] exercise of discretion." *Id.* at 600 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). It says only that the Committee shall grant an exemption, "if the Secretary of [War] finds that such exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j). It does not define "national security" or provide any guideposts for when an exemption may be "necessary." That language is like the National Security Act, at issue in *Webster*, which authorized the Director of the Central Intelligence Agency to terminate an employee whenever he "deem[ed]" it "necessary or advisable in the interests of the United States." 50 U.S.C. § 3036(e)(1) (formerly codified at 50 U.S.C. § 403(c)). "[R]easons of national security," like "in the interests of the United States," is too broad and amorphous to be a standard "on which a reviewing court could properly assess" the propriety of the Secretary's National Security Finding. *Webster*, 486 U.S. at 600.

Also as in *Webster*, the language of section 7(j) "fairly exudes deference" to the Secretary. *Id.* In that case, the Supreme Court found it significant

that the statute allowed termination "whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States' (emphasis added), not simply when the dismissal *is* necessary or advisable to those interests." 486 U.S. at 600 (quoting 50 U.S.C. § 3036(e)(1)). Similarly, section 7(j) requires the Committee to grant an exemption whenever the Secretary "finds" one to be required for reasons of national security, rather than when an exemption "is" required. This Court and other courts of appeals have found similar language to indicate that Congress has committed a decision to the agency's discretion. *See*, *e.g.*, *Fed. Deposit Ins. Corp. v. Bank of Coushatta*, 930 F.2d 1122, 1129 (5th Cir. 1991) (interpreting the use of the word "deem" in a statute to commit decisions to agency discretion); *Claybrook v. Slater*, 111 F.3d 904, 09 (D.C. Cir. 1997) (holding that a statute authorizing an agency representative to adjourn a meeting whenever "he determines it to be in the public interest" committed the decision to agency discretion); *North Dakota ex rel. Bd. of Univ. & Sch. Lands v. Yeutter*, 914 F.2d 1031, 1035 (8th Cir. 1990) (holding that the phrase "unless ... the Secretary determines" in a statute supported the conclusion that the action was committed to agency discretion).

Because the ESA commits the determination of whether exemptions are necessary for reasons of national security to the Secretary of War's

discretion, the National Security Finding is not subject to review, and the Court may not set aside the Exemption Order because the Committee granted the exemption found necessary in the National Security Finding.

### 2. Even if the National Security Finding were reviewable, it is not arbitrary.

Even if the National Security Finding were not committed to the Secretary of War's discretion by law, it was well supported and easily survives review under the arbitrary and capricious standard, which is applied with heightened deference to the Secretary's findings on matters of national security. *See Khalid*, 172 F.4th at 874.

The Secretary reasonably explained that an exemption for Gulf of America oil and gas activities is necessary for reasons of national security to ensure continued production of oil and gas from the Gulf and to end the ongoing threat to that production posed by ESA litigation. The Secretary found that the availability of steady supplies of oil and gas from the Gulf is essential to defense readiness and military operations, and that disruption of those supplies "would benefit our adversaries and hurt our allies." National Security Finding at ¶ 13, JA[R.35]. The Secretary also found that ongoing production of oil and gas from the Gulf relies on the NMFS and FWS biological opinions and associated incidental take statements (described above, pp. 8–10). *Id.* at ¶¶ 29–30, JA[R.37]. The Secretary explained that those biological

opinions and incidental take statements have been challenged extensively in litigation and that if a court were to vacate the biological opinions, it would disrupt supplies of Gulf oil and gas with unacceptable national security consequences. *Id.* at ¶¶ 41–52, JA[R.39–40]. Accordingly, the Secretary found it necessary to exempt Gulf of America oil and gas activities to eliminate the threat to national security posed by ongoing litigation. *Id.* at ¶¶ 91–92, JA[R.45]. The Secretary did not, however, find that the regulatory status quo prior to the Exemption Decision—in which Interior issued approvals according to the proposed action reviewed in the biological opinions—was inconsistent with the public interest. Accordingly, the Secretary defined the action to be exempted as "the proposed action reviewed" in the "NMFS 2025 biological opinion and the FWS 2018 and 2025 consultation decisions." *Id.* at 1, JA[R.34]. As the Secretary recognized, that action "includes those mitigation and protection measures … identified as necessary when developing the proposed action." *Id.* at ¶ 102, JA[R.46]. Those findings are both "reasonable" and "reasonably explained," and should therefore be upheld. *See Neumann's Pharmacy, L.L.C. v. Drug Enf't Admin.*, 167 F.4th 320, 327 (5th Cir. 2026) (quoting *Seven County Infrastructure Coalition v. Eagle County*, 605 U.S. 168, 180 (2025)).

In making the National Security Finding, the Secretary was required to determine only whether an exemption for the action under review was necessary "for reasons of national security." 16 U.S.C. § 1536(j). He was not required to determine, for example, whether the mitigation measures included in Interior's proposed action were necessary and appropriate within the meaning of the ESA. Nor did subsection (j) require him to determine that the mitigation measures were "cost justified." *Contra* Br. 42. It was thus reasonable for the Secretary to take the action proposed by the Department of the Interior and analyzed by NMFS and FWS as he found it and to determine whether it was necessary to exempt *that* action without going further and evaluating whether the action itself should be modified. And it was particularly appropriate for him not to do so because those issues are beyond the Secretary's expertise, as AEA points out. Br. 42. It was, however, well within the Secretary's expertise and discretion to determine whether the action proposed by Interior and evaluated by NMFS and FWS was consistent with the needs of national security. The Secretary reasonably determined that it is, and AEA offers no argument that the Secretary's national security determinations are arbitrary.

If the court concludes that it has jurisdiction to review the National Security Finding, that finding should be upheld along with the Exemption Order that relied upon it.

## III. If the Committee erred, remand without vacatur is the appropriate remedy.

If the Court finds that the Committee erred, it should remand, but not vacate, the Exemption Order.[8] Although vacatur is the "default" remedy in this circuit when agency action is found to be arbitrary and capricious, the Court may remand an action without vacatur if there is a "serious possibility that the agency will be able to correct the [action's] defects on remand" and "vacating the challenged action would produce disruptive consequences." *Chamber of Com. v. SEC*, 88 F.4th 1115, 1118 (5th Cir. 2023) (quotations omitted).

As AEA observes, vacating the Exemption Order would have serious disruptive consequences. Although the compliance of Gulf of America Oil and Gas Activities with the ESA would continue to be satisfied through the 2025 BiOp, that BiOp was subject to legal challenge prior to the Exemption

[8] The Committee agrees that if it erred in determining that it lacked authority to evaluate independently whether the mitigation measures included in the Secretary of War's definition of the action to be exempted are necessary, that error would not be harmless.

Order and would likely be challenged again. The threat to oil and gas supplies from the Gulf posed by such litigation uncertainty is one of the primary grounds on which the Secretary of War based the National Security Finding. *Id.* at ¶¶ 29–42, JA[R.37–40]. Vacatur would thus reinstate the very conditions that the Secretary found to be inconsistent with the Nation's security. Vacatur would also harm AEA's members by subjecting them to additional regulatory uncertainty and deprive them of the benefits of a successful challenge to the Exemption Order. Br. 51–52.

At the same time, there is a strong possibility that the Committee would be able to substantiate the Exemption Order on remand. First, there is no dispute that the Committee acted appropriately in granting an exemption in response to the National Security Finding. The only question is the proper scope of the exemption. Second, although the Committee has not previously considered what mitigation measures may be necessary and appropriate in conjunction with the exemption, there is no reason to doubt that the Committee will be able to reasonably explain its decision regarding such measures, even if the Committee were to conclude the measures should be modified. Moreover, the Committee has demonstrated that it is able to move quickly in response to the National Security Finding. Just eighteen days passed between the Secretary's notification to the Committee of the National

Security Finding, and the Committee's action on the Exemption Order. While it may take the Committee somewhat longer to address the appropriate scope of mitigation measures, the Committee's past actions indicate that it will conclude any remand with appropriate dispatch. Vacatur of the Exemption Order is therefore unnecessary.

Finally, if the Court somehow determines that the Exemption is not adequately supported and that vacatur of the mitigation measures is warranted to some extent, the Court should at most order partial vacatur by vacating only the mitigation measures. Petitioner fails to challenge any portion of the Exemption other than the mitigation measures, which means there is no possible basis for vacating anything other than the mitigation measures and any remedy should be limited to them. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010) (court should issue "less drastic remedy," such as "partial vacatur," if "sufficient to redress [the] injury"). Regardless, all of this is beside the point. As explained above, the Committee's Exemption should be upheld.

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

*s/ Christopher Anderson*
ADAM R.F. GUSTAFSON
*Principal Deputy Assist. Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
ROBERT J. LUNDMAN
CHRISTOPHER ANDERSON
*Attorneys*
Energy and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-1971
christopher.anderson3@usdoj.gov

Of counsel:

DONDRAE N. MAIDEN
*Associate Solicitor*
JOHN D. RUDOLPH
*Assistant Solicitor*
Division of Parks and Wildlife
Office of the Solicitor
U.S. Department of the Interior

September 4, 2026
90-13-9-18168

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and 5th Cir. R. 32.2 becaprinteruse it contains 8,652 words, excluding the parts exempted under Federal Rule of Appellate Procedure 32(f) and 5th Cir. R. 32.2.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Georgia font) using Microsoft Word.

s/ *Christopher Anderson*
CHRISTOPHER ANDERSON
Counsel for the Federal Respondents