Case No. 26-60240

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

AMERICAN ENERGY ASSOCIATION,
*Petitioner*,

v.

DOUG BURGUM, SECRETARY OF THE INTERIOR, IN HIS OFFICIAL CAPACITIES AS CHAIR AND MEMBER OF THE ENDANGERED SPECIES COMMITTEE; BROOKE ROLLINS, SECRETARY OF AGRICULTURE, IN HER OFFICIAL CAPACITY AS A MEMBER OF THE ENDANGERED SPECIES COMMITTEE; DANIEL DRISCOLL, SECRETARY OF THE ARMY, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ENDANGERED SPECIES COMMITTEE; PIERRE YARED, ACTING CHAIR OF THE COUNCIL OF ECONOMIC ADVISORS, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ENDANGERED SPECIES COMMITTEE; LEE ZELDIN, ADMINISTRATOR OF THE ENVIRONMENTAL PROTECTION AGENCY, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ENDANGERED SPECIES COMMITTEE; NEIL JACOBS, ADMINISTRATOR OF THE NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, IN HIS OFFICIAL CAPACITY AS A MEMBER OF THE ENDANGERED SPECIES COMMITTEE; PETE HEGSETH, SECRETARY U.S. DEPARTMENT OF DEFENSE,
*Respondents*,

AMERICAN PETROLEUM INSTITUTE,
*Intervenor-Respondent*.

On Petition for Review of an Order of the Endangered Species Committee

# AMERICAN PETROLEUM INSTITUTE'S ANSWERING BRIEF

Jason T. Morgan
Ryan P. Steen
Tiffany Wang
STOEL RIVES LLP
600 University Street, Suite 3400
Seattle, Washington 98101
T: (206) 624-0900
jason.morgan@stoel.com
ryan.steen@stoel.com
tiffany.wang@stoel.com
*Counsel for Intervenor-Respondent American Petroleum Institute*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of the case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

1. Petitioners

   American Energy Association

2. Attorneys for Petitioners

   James Conde, Boyden Gray, P.L.L.C.

3. Respondents

   Doug Burgum, Secretary of the Interior, in his official capacities as Chair and Member of the Endangered Species Committee

   Brooke Rollins, Secretary of Agriculture, in her official capacity as a Member of the Endangered Species Committee

   Daniel Driscoll, Secretary of the Army, in his official capacity as a Member of the Endangered Species Committee

   Pierre Yared, Acting Chair of the Council of Economic Advisors, in his official capacity as a Member of the Endangered Species Committee

   Lee Zeldin, Administrator of the Environmental Protection Agency, in his official capacity as a Member of the Endangered Species Committee

   Neil Jacobs, Administrator of the National Oceanic and Atmospheric Administration, in his official capacity as a Member of the Endangered Species Committee

   Pete Hegseth, Secretary, U.S. Department of Defense

4. Attorneys for Respondents

Christopher Anderson

Robert Nolan Stander

5. Intervenor-Respondent

American Petroleum Institute ("API")

6. Attorneys for Intervenor-Respondent

Ryan P. Steen, Stoel Rives LLP

Jason T. Morgan, Stoel Rives LLP

Tiffany Wang, Stoel Rives LLP

**Federal Rule of Appellate Procedure 26.1:**

API discloses as follows:

API is a 501(c)(6) organization that has no parent corporation, and there is no publicly held corporation that owns ten percent (10%) or more of API.

*/s/ Jason T. Morgan*
Jason T. Morgan
*Counsel for Intervenor-Respondent*
*American Petroleum Institute*

# STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Fifth Circuit Rule 28.2.3, API believes that oral argument would be useful and is warranted because this case raises important issues of national security and involves the first-ever use of the national security exemption authorized in section 7(j) of the Endangered Species Act, 16 U.S.C. § 1536(j).

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ..... i
STATEMENT REGARDING ORAL ARGUMENT ..... iii
TABLE OF AUTHORITIES ..... v
I. INTRODUCTION ..... 1
II. STATEMENT OF THE CASE ..... 6
III. SUMMARY OF ARGUMENT ..... 6
IV. ARGUMENT ..... 9
A. The Court Has Jurisdiction Over AEA's Petition. ..... 9
B. The Committee Complied with the ESA and the Petition Should Be Denied. ..... 14
1. The Committee Lacks Discretion to Add Mitigation to a National Security Exemption. ..... 14
2. The Committee Did Not Add Mitigation Measures to the Agency Action Identified by the Secretary of War. ..... 17
3. AEA May Not Challenge the Secretary of War's Findings or the Scope of the Secretary of War's Request for an Exemption. ..... 19
4. Remand Is Not Required Because Any Error by the Committee Was Harmless. ..... 24
C. Vacatur Is Not Warranted. ..... 26
V. CONCLUSION ..... 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
934 F.3d 649 (D.C. Cir. 2019)....27

*Bennett v. Spear*,
520 U.S. 154 (1997)....1

*BNSF Ry. Co. v. United States*,
775 F.3d 743 (5th Cir. 2015)....12

*Cal. Cmtys. Against Toxics v. U.S. EPA*,
688 F.3d 989 (9th Cir. 2012)....28

*Cent. & S. W. Servs., Inc. v. U.S. EPA*,
220 F.3d 683 (5th Cir. 2000)....27, 28

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026)....17

*Chamber of Com. of United States v. U.S. Secs. & Exch. Comm'n*,
85 F.4th 760 (5th Cir. 2023)....29

*City of Arlington, Tex. v. F.C.C.*,
668 F.3d 229 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013)....24

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988)....13, 21, 22

*Fla. Power & Light Co. v. Costle*,
650 F.2d 579 (5th Cir. 1981)....26

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025)....24

*Lincoln v. Vigil*,
508 U.S. 182 (1993)....21

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)....4

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Louisiana v. Nat'l Marine Fisheries Serv.*,
817 F. Supp. 3d 390 (W.D. La. 2026) ....................20, 26

*Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023)....................1, 3, 13, 25

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
551 U.S. 644 (2007)....................15, 16

*Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*,
580 U.S. 288 (2017)....................15

*PNC Bank, Nat'l Ass'n v. 2013 Travis Oak Creek, L.P.*,
136 F.4th 568 (5th Cir. 2025) ....................14

*Sierra Club v. Nat'l Marine Fisheries Serv.*,
No. CV DLB-25-1627, ECF No. 112 (D. Md. June 24, 2026) ....................12

*SXSW, L.L.C. v. Fed. Ins. Co.*,
83 F.4th 405 (5th Cir. 2023) ....................10

*Tennessee Valley Authority v. Hill*,
437 U.S. 153 (1978)....................2, 3, 13, 22

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
989 F.3d 368 (5th Cir. 2021) ....................30

*Tex. Tech Physicians Assocs. v. U.S. Dep't of Health & Hum. Servs.*,
917 F.3d 837 (5th Cir. 2019) ....................25

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....................27

*United States v. Zubaydah*,
595 U.S. 195 (2022)....................21

*Water Keeper All. v. U.S. Dep't of Def.*,
271 F.3d 21 (1st Cir. 2001)....................13

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Webster v. Doe*,
486 U.S. 592 (1988) ..... 22

*White v. Black*,
190 F.3d 366 (5th Cir. 1999) ..... 12

**Statutes**

5 U.S.C. § 701(a)(2) ..... 7, 20

10 U.S.C. § 113 ..... 13

16 U.S.C. § 1536(a)(2) ..... 1, 11

16 U.S.C. § 1536(h) ..... 3, 10

16 U.S.C. § 1536(h)(1)(A) ..... 10

16 U.S.C. § 1536(h)(1)(B) ..... passim

16 U.S.C. § 1536(j) ..... passim

16 U.S.C. § 1536(l)(1) ..... 16

16 U.S.C. § 1536(n) ..... 6, 9, 10

16 U.S.C. § 1536(o)(1) ..... 11

**Constitutional Provisions**

U.S. Const., Art. III ..... 9

**Other Authorities**

124 Cong. Rec. S11128 (daily ed. July 19, 1978) ..... 23

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Endangered Species Authorization: Hearings Before the Subcomm. on Fisheries and Wildlife Conservation & the Env't of the H. Comm. on Merch. Marine & Fisheries*, 95th Cong. 74 (1978) (Serial No. 95-39) .......... 13

J.B. Ruhl, *The Endangered Species Act's Fall from Grace in the Supreme Ct.* Harv. Env't. L. Rev. 487, 489 (2012) .......... 2

James Phillips, *Threats to U.S. Energy Security: The Challenge of Arab Oil*, Heritage Found. Backgrounder No. 95, at 1-2, 20 (Aug. 13, 1979) .......... 4

# I. INTRODUCTION

Since 2020, environmental activists have increasingly weaponized the Endangered Species Act ("ESA") to try to halt, delay, and impede oil and gas operations in the Gulf of America ("Gulf"). Their tool of choice is section 7(a)(2) of the ESA, which requires federal permitting agencies to "consult" with federal wildlife agencies to ensure that proposed activities are "not likely to jeopardize" ESA-listed species "us[ing] the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). The consultation concludes with a "biological opinion" from the wildlife agency on whether the activity at issue is likely to jeopardize a species, and, if necessary, the steps needed to avoid that result. *Me. Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 595-96 (D.C. Cir. 2023). Without a valid biological opinion, an agency's permitting program is paralyzed—it may proceed only "at its own peril" under the threat of "substantial civil and criminal penalties." *Bennett v. Spear*, 520 U.S. 154, 170 (1997).

Paralysis is the goal of the groups targeting Gulf oil and gas activities. *See, e.g.*, *No oil and gas drilling off U.S. Coasts*, NRDC, https://action.nrdc.org/letter/4573-ocs-5-year-plan-112125 (last visited Aug. 10, 2026). Under the threat of litigation, they prod the wildlife agencies—the National Marine Fisheries Service ("NMFS") and the Fish and Wildlife Service ("FWS")—to base their biological opinions on speculative, pessimistic, and worst-case

assumptions to exaggerate the risks posed by Gulf activities. Then, if the activities are nevertheless allowed to proceed, they sue the agencies and ask the court to vacate the biological opinions, which the plaintiffs know will impede and halt activities. And when the agencies produce new decisions after remand, the plaintiffs renew their challenges, arguing for more speculative analysis and, of course, vacatur. This cycle of litigation and the ever-present threat of court-ordered shutdown creates a cloud of uncertainty, impedes orderly oil and gas leasing, permitting, exploration, and development in the Gulf, and compromises national energy security. *See* Secretary of War, Memorandum for Record re: National Security Findings (Mar. 13, 2026) ("National Security Finding"), JA[R.39-44].

Fortunately, Congress amended the ESA in 1978 to give the Secretary of War a means to address threats to the Nation's security. Congress was compelled to do so by the Supreme Court's issuance of an opinion earlier that year—*Tennessee Valley Authority v. Hill* ("*TVA v. Hill*")—that approved an injunction request by environmental activists to halt construction of a federal hydropower dam. 437 U.S. 153 (1978). The Court opined that section 7 of the ESA, as adopted in 1973, "admit[ted] of no exception" and ostensibly required federal agencies to eliminate any risk of jeopardy to ESA-listed species "whatever the cost." *Id*. at 173, 184. That "decision was ridiculed by many and brought sweeping condemnations in Congress." J.B. Ruhl, *The Endangered Species Act's Fall from*

*Grace in the Supreme Ct.*, 36 Harv. Env't. L. Rev. 487, 489 (2012) (footnote omitted).

Congress acted swiftly to supersede *TVA v. Hill*. *See Me. Lobstermen's Ass'n*, 70 F.4th at 596. Among other changes, Congress created the Endangered Species Committee (the "Committee") and empowered the Committee to grant exemptions from the ESA after considering economic costs and available mitigation measures. 16 U.S.C. § 1536(h) (section 7(h)). And, regardless of economics or available mitigation, Congress provided a blanket exemption in section 7(j) for national security: "[n]otwithstanding any other provision of this chapter, the Committee *shall grant* an exemption for *any agency action* if the Secretary of [War] finds that such exemption is necessary *for reasons of national security*." *Id.* § 1536(j) (emphases added).

On March 13, 2026, Secretary Hegseth found it was necessary for reasons of national security to exempt the federal oil and gas program in the Gulf from the requirements of the ESA. National Security Finding, JA[R.31-46]. To support that conclusion, he made detailed factual findings explaining how ESA litigation, and the consequential threat of vacatur and shutdown of Gulf oil and gas activities, threatened the Nation's security. *Id.*, JA[R.34-46]. The Secretary explained that vacatur would "strip liability protections from agencies and operators," including API's members, "exposing them to civil and criminal penalties," and that the

constant threat of vacatur introduces regulatory uncertainty and instability that will "disrupt oil operations that require advanced planning, which, in turn, curtail oil and gas development." *Id*., JA[R.39-40].[1] On March 31, 2026, the Committee convened, as required by the ESA, and granted the exemption as requested by Secretary Hegseth. JA[R.5-6] (the "Exemption Order" or "Order").

No one in this case disputes the validity of Secretary Hegseth's national security finding or that it legally justifies an exemption. Nor would it be credible to do so. Energy security issues dominated the Congressional landscape of the 1970s, as foreign nations used embargoes as an "oil weapon" against the United States to achieve political and military objectives. James Phillips, *Threats to U.S. Energy Security: The Challenge of Arab Oil*, Heritage Found. Backgrounder No. 95, at 1-2, 20 (Aug. 13, 1979);[2] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (every statute has "a single, best meaning" that is "fixed at the time of enactment" (citation omitted)). Those concerns resonate today, as the 2025 National Security Strategy of the United States identifies energy independence as a

[1] API's interests in the exemption at issue in this case are further described in the Declaration of Holly A. Hopkins, Dkt. 24-2.

[2] Available at https://static.heritage.org/1979/pdf/bg95.pdf?_gl=1*z91ht8*_gcl_au*NzE5ODUwOTE1LjE3ODM0NDAwNjc.*_ga*MTIzOTY2MjYxMi4xNzgzNDQwMDY4*_ga_W14BT6YQ87*czE3ODM0NDAwNjckbzEkZzAkdDE3ODM0NDAwNjckajYwJGwwJGgw.

"top strategic priority." National Security Finding, JA[R.36]; JA[R.2330, 2332] ("Energy security is national security. One cannot exist without the other.").

Petitioner American Energy Alliance ("AEA") contends instead that the Committee should have explained *why* it chose to include certain mitigation measures as part of its Exemption Order. AEA is wrong. The Committee did not *choose* to include those mitigation measures. Those measures were part of the "agency action" Secretary Hegseth identified as requiring the exemption. The Committee's Order includes those measures because that is what the Secretary requested.

Indeed, the Committee could not have added mitigation measures to the "action" identified by Secretary Hegseth even if it wanted to do so. Although the Committee may consider and prescribe mitigation when granting an exemption for reasons *other* than national security, the Committee has no such discretion for an exemption based on national security—such exemptions "shall" be granted "[n]otwithstanding any other provision of this chapter." 16 U.S.C. § 1536(j). The statute can bear no other interpretation. *If* the Committee has the power to *condition* a national security exemption (as AEA claims), then Committee has the power to effectively deny an exemption, as the Committee could impose onerous measures that burden an activity the Secretary of War identifies as essential to national security. That is plainly not what Congress envisioned, which is why it

stripped the Committee of any discretion in its response to a request for a national security exemption.

In short, the Committee did not "exercise its discretion to impose" mitigation measures because it has no such discretion, and, as a necessary corollary, no obligation to provide the explanation AEA seeks. Nor, as AEA also argues, can the *Secretary of War's* finding be second-guessed by this Court. Accordingly, AEA's petition for review should be denied.

## II. STATEMENT OF THE CASE

API accepts the Committee's Statement of the Case. Committee Brief ("Br.") at 3-14.[3]

## III. SUMMARY OF ARGUMENT

This Court has jurisdiction over the Committee's Order. The ESA requires direct review in the court of appeals of the Committee's exemption orders issued "under subsection (h)." 16 U.S.C. § 1536(n). A national security exemption is issued under ESA section 7(h) and, accordingly, the Committee expressly issued its Exemption Order for national security "under section 7(h)." Exemption Order, JA[R.5].

[3] Citations to the Committee's and AEA's briefs refer to bottom of page numbers. Citations to pleadings and other court filed documents refer to the ECF generated page number.

On the merits, AEA's argument that the Committee was required to explain why it imposed mitigation measures is fundamentally flawed. The Committee did not impose mitigation measures, and could not do so. A national security exemption "shall" be granted "[n]otwithstanding" any other provision of the ESA. 16 U.S.C. § 1536(j). This command precludes the Committee from imposing mitigation measures. The mitigation measures included in the Order were not added by the Committee—they were merely part of the proposed agency action identified by the Secretary of War as necessitating a national security exemption. The Committee has no power to add or subtract from the scope of the Secretary of War's request and properly refrained from doing so here.

As part of its challenge to the Committee's Order, AEA attempts to collaterally attack *the Secretary of War's* actions under section 7(j)—specifically, the Secretary of War's framing of the "agency action" to be exempted to include mitigation measures. This collateral attack fails because the Secretary of War's finding is not subject to judicial review. No review is available under the Administrative Procedure Act ("APA") if the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). National security decisions, like the one made by the Secretary of War here, are traditionally regarded as committed to agency discretion by law. Adding to that is the fact that the ESA provides no law to apply—*i.e.*, no criteria, guidance, or other standard for a court to evaluate the

Secretary of War's national security "finding" under section 7(j). AEA's challenge to the Committee's Order is necessarily limited to the decision of the Committee, and does not extend to the Secretary of War's unreviewable findings.

Regardless, even if the Committee had authority to add or remove mitigation measures, its failure to provide the additional explanation demanded by AEA is harmless error. The mitigation measures at issue were developed by the Bureau of Ocean Energy and Management and the Bureau of Safety and Environmental Enforcement (collectively the "Bureaus")[4] as part of the Gulf oil and gas program and have been implemented for several years. The Committee explained that the general obligation to impose "necessary and appropriate" mitigation under 16 U.S.C. § 1536(h)(1)(B) did not apply to a national security exemption request, but, even if it did, the existing mitigation measures satisfied that obligation. Remand is unnecessary when the agency provides a valid alternative explanation.

Lastly, to the extent the Court finds any prejudicial error in the Exemption Order, vacatur is inappropriate and unwarranted. No party requested vacatur, and it would be inequitable to grant relief broader than requested. More importantly, it would be inequitable, to say the least, to vacate an action the Secretary of War

[4] On July 10, 2026, the Bureaus were consolidated into the Marine Minerals Administration. *See* Secretary's Order No. 3451, *Establishment of the Marine Minerals Administration*, U.S. Dep't of the Interior (July 10, 2026). For clarity this brief uses the agency names in place when the decisions were made.

determined was "necessary for reasons of national security" (National Security Finding, JA[R.31]) based on the mere failure to provide a sufficient explanation for imposing mitigation measures that have been in place for years.

## IV. ARGUMENT

### A. The Court Has Jurisdiction Over AEA's Petition.

API agrees with AEA and the Committee that the Court has jurisdiction over AEA's petition.[5] Section 7(n) of the ESA vests jurisdiction directly in the court of appeals for "*any decision* of the … Committee under subsection (h)." 16 U.S.C. § 1536(n) (emphasis added). The Committee expressly issued the exemption "under section 7(h)." Exemption Order, JA[R.5]. The Committee further stated that judicial review of its action is available "exclusively in the U.S. Courts of Appeals for the Fifth or Eleventh Circuits." *Id.* at JA[R.6]. There should be no dispute that the Court has jurisdiction over this case.

Nonetheless, as AEA points out, the Natural Resource Defense Counsel ("NRDC"), formerly a Petitioner in this case, asserted that this Court lacks jurisdiction. *See* NRDC Pet. for Review at 3, Dkt. No. 10-1 (explaining that "judicial review . . . is proper[] *not* in the courts of appeals pursuant to 16 U.S.C. § 1536(n), but rather in the district court pursuant to the Administrative Procedure Act"). NRDC abandoned its case here with prejudice, but is currently arguing in

[5] API also agrees that AEA has demonstrated Article III standing to challenge the Committee's exemption order.

the D.C. District Court that this Court lacks jurisdiction because national security exemptions are supposedly not issued "under" section 7(h). *Nat. Res. Def. Council v. Burgum*, No. 1:26-cv-01116-RC (D.D.C.), ECF No. 32 at 39-41. Likewise, Healthy Gulf (also formerly a Petitioner in this case) claims that a national security exemption is "not a decision under Section 7(h)" and, thus, that this Court lacks jurisdiction under 16 U.S.C. § 1536(n). *Healthy Gulf v. Burgum*, No. 1:26-cv-01118 (D.D.C.), ECF No. 28 at 9. Because the issue of jurisdiction has been raised and the Court has an obligation to address its own jurisdiction, API addresses those jurisdictional arguments below. *SXSW, L.L.C. v. Fed. Ins. Co.*, 83 F.4th 405, 407 (5th Cir. 2023).

The Committee's Order is squarely an exemption issued "under" Section 7(h). Section 7(h) provides the sole authority for the Committee to grant an exemption. 16 U.S.C. § 1536(h). It provides both the general criteria for the Committee to apply when deciding "whether or not to grant an exemption" (*id*. § 1536(h)(1)(A)) and the process for imposing additional mitigation measures (*id*. § 1536(h)(1)(B)). Section 7(j) does not provide *separate* authority for granting an exemption but rather dictates the *outcome* of the Committee's decision under section 7(h) when the Secretary of War requests a national security exemption: "[n]otwithstanding any other provision of this chapter, the Committee *shall grant* an exemption for any agency action if the Secretary of [War] finds that such

exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j) (emphasis added). Section 7(j) therefore divests the Committee of discretion to balance factors under section 7(h)(1)(A) or to impose mitigation under section 7(h)(1)(B) for *national security* exemption requests, and mandates that the Committee "shall grant" the exemption upon request by the Secretary of War.

NRDC's and Healthy Gulf's arguments would render the national security exemption completely meaningless. The express purpose of an ESA exemption is to excuse the exempted agency action from two core ESA mandates: (1) the ESA's *consultation* requirement to avoid jeopardizing ESA-listed species (section 1536(a)(2)); and (2) the ESA's *prohibition on taking* endangered species (section 1536(o)(1)). But the consultation requirement applies "unless [the] agency has been granted an exemption for such action by the Committee **pursuant to subsection (h)** of this section." 16 U.S.C. § 1536(a)(2) (emphasis added). And the exemption from the taking prohibition only applies to an "action for which an exemption is granted **under subsection (h)**." *Id.* § 1536(o)(1) (emphasis added).

If a national security exemption is not issued "under subsection (h)," or "pursuant to subsection (h)," as NRDC and Healthy Gulf argue, then, under the express statutory terms, it does not provide an "exemption" from either the consultation requirement or the takings prohibition. Under that interpretation, even with the Secretary of War's exemption in place, oil and gas activities in the Gulf

would still be subject to both the consultation requirement (leading to biological opinions that will result in litigation threatening Gulf oil and gas activities) and the taking prohibition. Such an empty exemption would have accomplished *nothing* and the pre-exemption status quo would have remained fully intact. The Maryland District Court already held that cannot be so, in dismissing a lawsuit challenging a 2025 biological opinion for Gulf oil and gas activities as moot *because of the issuance of the exemption*. *See Sierra Club v. Nat'l Marine Fisheries Serv.*, No. CV DLB-25-1627, ECF No. 112 (D. Md. June 24, 2026).[6] Courts do not interpret statutes in a way that renders them meaningless. *White v. Black*, 190 F.3d 366, 368 (5th Cir. 1999) ("the court should give words their ordinary meaning and should not render as meaningless the language of the statute"); *BNSF Ry. Co. v. United States*, 775 F.3d 743, 754 (5th Cir. 2015) (refusing to accept interpretation that would render "exceptions" in statute "meaningless").

Gutting the national security exemption, as NRDC and Healthy Gulf hope to achieve, would be especially inappropriate here, given the legislative context. In 1978, Congress amended the ESA as an immediate rebuke to the Supreme Court's interpretation earlier that year that the ESA "reveals a conscious decision by

[6] Similar motions to dismiss on mootness grounds are pending before the D.C. District Court in a lawsuit challenging the U.S. Fish and Wildlife Service's consultation decisions for Gulf oil and gas activities. *See Ctr. for Biological Diversity v. Haaland*, No. 1:24-cv-00990-DLF (D.D.C.).

Congress to give endangered species priority over the 'primary missions' of federal agencies" and protects species "whatever the cost." *TVA v. Hill*, 437 U.S. at 184-85; *see Me. Lobstermen's Ass'n*, 70 F.4th at 595-96 (explaining that 1978 amendments reset standards in response to *TVA v. Hill*). The Secretary of War's primary mission is to provide for the defense of the Nation. 10 U.S.C. § 113. When enacting sections 7(h) and 7(j) in 1978, Congress ensured that mission would not be compromised by the ESA because "the paramount concern of the Nation is the defense and security of the United States of America." *See Endangered Species Authorization: Hearings Before the Subcomm. on Fisheries and Wildlife Conservation & the Env't of the H. Comm. on Merch. Marine & Fisheries*, 95th Cong. 74 (1978) (Serial No. 95-39). Even the original bill's primary sponsor conceded that he was "certainly not going to sacrifice the preservation of the United States for a bald eagle." *Id*. (statement of Dingell). Matters related to national security should receive more weight—not less—than other agency actions. *See Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("Thus, unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Water Keeper All. v. U.S. Dep't of Def.*, 271 F.3d 21, 34 (1st Cir. 2001) ("the harm asserted by the Navy implicates national security and therefore deserves greater weight than the economic harm").

Thus, the only plausible reading of the statute is that a national security exemption by the Committee is issued under *section 7(h)*, which is subject to the exclusive review in the court of appeals under section 7(n). The Court should confirm that it has jurisdiction here. *PNC Bank, Nat'l Ass'n v. 2013 Travis Oak Creek, L.P.*, 136 F.4th 568, 572 (5th Cir. 2025) ("we have an independent obligation to assess our own jurisdiction, notwithstanding the parties' agreement").

## B. The Committee Complied with the ESA and the Petition Should Be Denied.

AEA claims that the Committee failed to satisfy its obligation under the APA to provide a "reasoned explanation" for its decision to impose mitigation measures in its Exemption Order. AEA Br. at 40-45 (quotations omitted). AEA's arguments misread the scope of the Committee's authority and the Exemption Order and should be rejected.

### 1. The Committee Lacks Discretion to Add Mitigation to a National Security Exemption.

AEA's argument flops at the outset because it erroneously presumes that the Committee has the authority to impose mitigation when granting a national security exemption. AEA Br. at 40-43 (discussing the Committee's "discretion" to "impose[] mitigation burdens on industry"). The Committee has no such authority: "Notwithstanding any other provision of this chapter, the Committee *shall grant* an exemption for *any agency action* if the Secretary of [War] finds that such

exemption is necessary for reasons of national security." 16 U.S.C. § 1536(j) (emphases added). This provision grants no discretion to the Committee and, instead, as admitted by AEA, is intended to "'override' legal hurdles that ordinarily constrain a Committee's subsection (h) exemption." AEA Br. at 32.

Nevertheless, AEA pins its argument on the Committee's general authority in section 7(h) to impose measures that are "'reasonable'" and "'necessary and appropriate to minimize the adverse effects of the agency action upon'" the species. AEA Br. at 40 (quoting 16 U.S.C. § 1536(h)(1)(B)). But that mitigation authority is just one of the "other provision[s] of this chapter" that are overridden by the "notwithstanding" clause of section 7(j). 16 U.S.C. §1536(j). "The ordinary meaning of 'notwithstanding' is 'in spite of,' or 'without prevention or obstruction from or by.'" *Nat'l Lab. Rels. Bd. v. SW Gen., Inc.*, 580 U.S. 288, 301 (2017) (citation omitted).

Nor is such authority to impose mitigation on a national security exemption reasonably implied in the statute. When a governing statute states that an agency "shall grant" an approval once certain specified statutory criteria are met, as section 7(j) does here, the agency generally lacks the discretionary authority to impose additional conditions, mitigation measures, or factors beyond those explicitly enumerated by Congress. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 663 (2007). That is because a statutory requirement that the

agency "shall" grant an approval "if the specified criteria are met" operates "as a ceiling as well as a floor" on the agency's discretion. *Id*.

Allowing the Committee to impose conditions of its choice on a national security exemption would swallow the exemption. Section 7(j) is obviously intended to give the Secretary of War the last word on matters involving national security. But AEA's interpretation would give the Committee broad discretion to, as part of its approval, establish "reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned." 16 U.S.C. § 1536(h)(1)(B); *id*. § 1536(l)(1) (mitigation measures identified in section 7(h) implemented through order under section 7(l)). In so doing, the Committee could impede and burden the very activity the Secretary of War found necessary to exempt to protect the Nation's security.

Congress intended no such thing, which is why it mandated that the Committee "shall grant" the exemption requested by the Secretary of War "[n]otwithstanding" *any* other provision of the ESA. 16 U.S.C. § 1536(j). That plain language precludes the Committee from imposing mitigation measures under section 7(h)(1). The Committee had no obligation to explain why it complied with the plain language of the statute in granting the exemption precisely as requested

by the Secretary of War. *See Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1239 (D.C. Cir. 2026) (no explanation required where agency complied with plain reading of the statute).

### 2. The Committee Did Not Add Mitigation Measures to the Agency Action Identified by the Secretary of War.

The second flaw in AEA's claim is that it wrongly assumes the Committee *added* mitigation to the Secretary of War's exemption request. As explained above, the Committee could not do so. And the record shows that the Committee did not do so.

The "agency action" at issue here is identified by the Secretary of War in his letter to the Secretary of Interior as "the *proposed action reviewed* in NMFS's 2025 biological opinion and in FWS's 2018 and 2025 consultation decisions." National Security Finding, JA[R.31] (emphasis added). The "action reviewed" in the NMFS 2025 biological opinion and FWS's 2018 and 2025 consultation decisions, as described by the Secretary of War, "covers all oil and gas exploration and development activities associated with [the Bureaus] Outer Continental Shelf Oil and Gas Program." *Id*. This action also included, according to the Secretary of War, certain mitigation measures because "the underlying agency action includes those mitigation and protection measures that [the Bureaus] identified as necessary when developing the proposed action that is the subject of this determination." National Security Finding, JA[R.31-32]. In other words, the "agency action" that

the Secretary of War found necessitated an exemption for national security reasons expressly *included* certain mitigation measures.

The Committee properly recognized that the Secretary of War's request defined the "agency action" such that "[t]he Gulf of America Oil and Gas Activities include both the oil and gas exploration, development, and production activities, as well as the avoidance or minimization measures that are described in the agency action analyzed in the NMFS's 2025 biological opinion and in FWS's 2018 and 2025 consultation decisions." Exemption Order, JA[R.5]. And the Committee then properly granted the exemption just as the Secretary of War requested: "This exemption applies to the full scope of the Gulf of America Oil and Gas Activities, and for the duration of those actions." *Id*. The Order explains for purposes of clarity that "[b]ecause the covered agency action includes robust avoidance or minimization measures, those measures shall continue to be implemented under this Order." *Id*.

AEA mischaracterizes that last sentence as an exercise of discretion by the Committee to impose mitigation. But the sentence simply reflects the fact that the Committee properly granted the exemption for the agency action (as mitigated) just as requested by the Secretary of War. The Committee's Order itself states that the mitigation provisions of section 7(h) "do not apply" when an exemption is necessary for national security. Exemption Order, JA[R.5] ("The Order need not

specify any such mitigation and enhancement measures here because the application and other related requirements do not apply.”).

Accordingly, AEA’s claim that the Committee failed to provide a “reasoned explanation” for supposedly imposing mitigation necessarily fails as a matter of law. The Committee had no discretion to impose mitigation and expressly disavowed that authority. To the extent an explanation was required, the Committee provided it by explaining that the mitigation provisions of section 7(h) “do not apply” and that the “mitigation measures” AEA complains of were already “included in the Secretary of War’s findings.” Exemption Order, JA[R.5].

#### 3. AEA May Not Challenge the Secretary of War’s Findings or the Scope of the Secretary of War’s Request for an Exemption.

AEA alternatively claims that the *Secretary of War* (not the Committee) should have provided an explanation as to why the mitigation included in the defined agency action was necessary or appropriate. The Secretary of War *could* have chosen to define the “agency action” more narrowly and sought an exemption only for the oil and gas activities proposed by the Bureaus (and not also the mitigation that was part of the proposed action). And perhaps the Secretary of War *should* have done so given, as AEA correctly points out, much of the mitigation imposed is both costly and arguably unnecessary. AEA Br. at 18, 48.

AEA is also right to complain that the Bureaus baked some of this arguably unnecessary mitigation into the “proposed action” following litigation over the

2020 biological opinion in an effort to appease NMFS and the environmental activists. *See* AEA Br. at 18 (explaining how the Bureaus incorporated the 2020 reasonable and prudent alternative into the 2025 proposed action); AEA Br. at 48 (explaining how 2020 vessel restrictions are unnecessary and burdensome). The most egregious parts of the 2025 biological opinion, and the part that the district court in *Louisiana* found was based entirely on speculation, was NMFS's 2025 reasonable and prudent alternative requiring a futuristic technology plan to avoid hypothetical, never-before-observed whale strikes. *Louisiana v. Nat'l Marine Fisheries Serv.*, 817 F. Supp. 3d 390, 404 (W.D. La. 2026). And while *this* egregious reasonable and prudent alternative is *not* part of the Committee's Order (because it was not part of the Bureaus' proposed action in 2025), some of the measures incorporated into the Committee's Order (including the 2020 vessel restrictions) are based on the same speculative whale strike analysis. AEA Br. at. 14-16. Given that the exemption will last 45 years, there is certainly some inefficiency in requiring industry operators to comply with arguably unnecessary mitigation for decades to come.

Nonetheless, AEA's challenge to the Secretary of War's finding fails as a matter of law because the Secretary's finding is not subject to judicial review under the APA. Judicial review under the APA is not available if "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). An action is

committed to agency discretion by law when either (1) the agency action is of a kind "traditionally regarded as committed to agency discretion," *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); or (2) the relevant statute "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id*. at 191 (citation omitted). Both of these are true here.

*First*, national security decisions are traditionally regarded as committed to agency discretion. *See United States v. Zubaydah*, 595 U.S. 195, 205 (2022) (discussing the "traditional" reluctance to intrude upon matters of national security). Such decisions necessitate an "inherently discretionary judgment call" that "is committed by law to the appropriate agency of the Executive Branch." *Dep't of Navy*, 484 U.S. at 527. "Thus, unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Id*. at 530.

So too here. Congress, in section 7(j), authorized the Secretary of War to make a national security finding that mandates the issuance of an exemption by the Committee. Congress provided no criteria for making those findings, thereby committing that finding to the judgment of the Secretary of War. For this reason alone, the Secretary of War's national security finding under section 7(j) is not reviewable.

*Second*, section 7(j) places no limit on the scope of the Secretary of War's finding—it may apply, quite literally, to "any agency action." 16 U.S.C. § 1536(j). The statutory text also gives the Secretary of War unlimited discretion to determine what "national security" concerns warrant an exemption. *Id.* Thus, section 7(j) "exudes deference" to the Secretary of War and "foreclose[s] the application of any meaningful judicial standard of review." *Webster v. Doe*, 486 U.S. 592, 600 (1988) (termination based on national security concerns not subject to judicial review). A section 7(j) national security finding is "committed by law" to the Secretary of War, and judicial review is unavailable. *See Dep't of Navy*, 484 U.S. at 527.

This reading makes sense in light of the 1978 legislative context. At that time, Congress reset the legal framework to reject the Supreme Court's pronouncement in *TVA v. Hill* that the ESA gives "endangered species priority over the 'primary missions' of federal agencies" and requires the avoidance of "jeopardy" to species at "whatever the cost." *TVA v. Hill*, 437 U.S. at 184-85. One legislator described it this way:

> In the case of TVA against Hill, the Supreme Court concluded that it had been Congress['] intent to provide endangered or threatened wildlife and plants the highest possible degree of protection from Federal actions. All other national goals, the Court said, must fall in the face of a threat to an endangered species.
>
> That interpretation is, in my opinion, patent nonsense, and it is not the interpretation put upon the act by the Congress in passing it. . . . The fact is that however

> desirable it may be to preserve an endangered species, and I for one count it as desirable indeed, there may be considerations of health, well-being, **or national defense**, **which must take precedence.** In some circumstances, there may even be considerations of convenience and comfort which should take precedence. As interpreted by the court, the act at present provides no mechanism for balancing these interests.

124 Cong. Rec. S11128 (daily ed. July 19, 1978) (statement of Sen. Garn) (emphasis added) (Senate consideration and passage of S. 2899, with amendments).

To address those concerns, Congress considered an amendment that would have allowed the Committee to merely "give immediate consideration" to a request from the National Security Council for an exemption for a "critical military installation." *Id.* at S11159 (inclusion in proposed amendment), S11147 (statement of Sen. Scott quoting amended language). But Congress ultimately moved beyond a narrow exemption for the military, opting instead to allow the Secretary of War to find that "any agency action" should be exempted for reasons of "national security" and requiring that the Committee "shall grant" the requested exemption. 16 U.S.C. § 1536(j).

Accordingly, when enacting section 7(j), Congress ensured that national security would not be compromised by the ESA and provided no limits on the Secretary of War's discretion to make such an important finding. Subjecting that

finding to judicial review on the basis of sufficiency of mitigation measures would undermine the free hand Congress intentionally gave to the Secretary of War.

In sum, national security decisions are the kind of action traditionally committed to agency discretion by law, and there is nothing in the text of the ESA or its history suggesting otherwise. AEA is free to challenge the Committee's decision, but its collateral attack on the Secretary of War's actions fails as a matter of law.

#### 4. Remand Is Not Required Because Any Error by the Committee Was Harmless.

As to the Committee's decision, the alleged error asserted by AEA was harmless. *Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 546 (2025) (under the APA, "reviewing courts should adapt the 'rule of prejudicial error' applicable in ordinary civil litigation (also known as the harmless-error rule) to the administrative-law context, which, of course, includes the remand rule"). "An agency's failure to comply with the APA is harmless when the agency's mistake clearly had no bearing on the procedure used or the substance of decision reached." *City of Arlington, Tex. v. F.C.C.*, 668 F.3d 229, 243–44 (5th Cir. 2012), *aff'd*, 569 U.S. 290 (2013) (internal quotations omitted").

Assuming, as AEA argues, that the Committee has discretion to set the "'necessary and appropriate'" mitigation measures under 16 U.S.C. § 1536(h)(1)(B) (*see* AEA Br. at 40), the Committee has already explained how it

would exercise that discretionary authority. After explaining that the mitigation provisions of the ESA "do not apply" to a national security exemption, the Committee's Order states that "even if the requirement applied, it would be satisfied here based on mitigation measures included in the Secretary of War's findings." Exemption Order, JA[R.5-6]. In so doing, the Committee determined that these measures were "necessary and sufficient" to protect endangered species as instructed by 16 U.S.C. § 1536(h)(1)(B). So, it is incorrect that there is "'no way of knowing how the [Committee] would have made this discretionary judgement had it' focused on the statutory requirements" of section 7(h). AEA Br. at 46 (quoting *Me. Lobstermen's Ass'n*, 70 F.4th at 601). The Committee made that perfectly clear, and its alternative explanation renders the error asserted by AEA harmless. *Tex. Tech Physicians Assocs. v. U.S. Dep't of Health & Hum. Servs.*, 917 F.3d 837, 847 (5th Cir. 2019) (separate valid finding by agency that would have supported decision rendered error harmless).

AEA also argues that the Committee could, on remand, provide additional clarity on the scope of the mitigation imposed in the Order, saying that the "Committee's terse order doesn't specify whether it meant to include" NMFS's 2025 reasonable and prudent alternative. AEA Br. at 47. But the Order is clear that the 2025 reasonable and prudent alternative is *not* included. The Order expressly includes only "avoidance or minimization" measures proposed by the Bureaus

(Exemption Order, JA[R.5]), which are identified in Section 3.1.6 of the 2025 biological opinion, including Section 3.1.6.1 ("Effects Avoidance or Minimization Measures for Lease Activity Implementation"), Section 3.1.6.2 ("Effects Avoidance or Minimization Measures for Seismic Surveys"), Section 3.1.6.3 ("Effects Avoidance or Minimization Measures for Marine Debris"), Section 3.1.6.4 ("Effects Avoidance or Minimization Measures for Vessel Operations"), Section 3.1.6.5 ("Vessel Transits within Rice's Whale Area"), Section 3.1.6.6 ("Effects Avoidance or Minimization Measures for Entanglement or Entrapment"), and Section 3.1.6.7 ("Effects Avoidance or Minimization Measures for Pile Driving"). *See* JA[R.1061-64] (NMFS 2025 Biological Opinion). These are known measures that were already being imposed by the Bureaus *before* the 2025 reasonable and prudent alternative was prepared. *Id.*; *Louisiana*, 817 F. Supp. 3d at 395-96. There is no error here, let alone prejudicial error requiring remand.

**C. Vacatur Is Not Warranted.**

Notwithstanding the above, if the Court finds any merit in AEA's claims, API agrees with AEA and the Committee that vacatur is inappropriate and unwarranted. Under the APA, a court "may exercise equitable powers in its choice of a remedy, as long as the court remains within the bounds of statute and does not intrude into the administrative province." *Fla. Power & Light Co. v. Costle*, 650 F.2d 579, 590 (5th Cir. 1981) (citation omitted). It is axiomatic that courts should

not grant relief that is "broader than necessary to provide complete relief to each plaintiff." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). AEA does not seek vacatur and would receive complete relief with either a remand for further explanation or severance of the offending mitigation measures from the Order.[7]

The APA "does not require vacatur," and remand without vacatur is generally appropriate when there is "at least a serious possibility" that the agency can correct its errors and when vacating would be "disruptive," especially to "the regulated community." *Cent. & S. W. Servs., Inc. v. U.S. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (internal quotation marks and citation omitted). Both factors, independently and together, compel remand without vacatur. *See Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 674 (D.C. Cir. 2019) ("A strong showing of one factor may obviate the need to find a similar showing of the other.").

There is a "serious possibility" that the Committee could sustain its decision on remand. Indeed, the Committee already stated that if it had the authority to impose mitigation on a national security exemption under section 7(h), that this obligation was "satisfied" by the "mitigation measures included in the Secretary of War's findings." Exemption Order, JA[R.5-6]. This factor weighs heavily against

[7] As for the choice between remand for further explanation and severance of the offending conditions, API takes no position.

vacatur. *Cent. & S. W. Servs., Inc.*, 220 F.3d at 692 ("EPA's failure to explain why it did not adopt a national variance does not require vacatur.")

Additionally, vacatur would be extraordinarily disruptive. Energy independence, including an "affordable and reliable domestic supply of energy" is a "top strategic priority" in the 2025 National Security Strategy for the United States. National Security Finding, JA[R.36]. In the context of ongoing military operations against Iran impacting global energy supplies, the Secretary of War found that this exemption was necessary because the "United States's ability to extract oil from the Gulf of America is a matter of national security." *Id*. at JA[R.35]. The Secretary of War explained that the "United States relies on domestic oil production to support military operations and readiness," and "[i]f our ability to extract Gulf oil is disrupted, our ability to support military operations and readiness will also be disrupted." *Id*. This will "benefit our adversaries and hurt our allies" including by allowing "countries like Russia and Iran" to "generate more revenue from their own oil exports." *Id*. This would "blunt U.S. sanctions efforts and bolster these countries' economies and geopolitical standing." *Id*. Vacatur of the exemption would revive these serious threats. *See Cal. Cmtys. Against Toxics v. U.S. EPA*, 688 F.3d 989, 993-94 (9th Cir. 2012) (refusing to vacate agency rule because "vacatur would pave the road to legal challenges to Sentinel's construction that could well delay a much needed power plant" and "the region might not have

enough power next summer, resulting in blackouts," and explaining that "if saving a snail warrants judicial restraint, … so does saving the power supply" (internal citation omitted)).

Vacatur would also be detrimental to API's members. Litigation over biological opinions "injects uncertainty and instability into Gulf development," and "[r]egulatory uncertainty and instability … disrupt oil operations that require advanced planning, which, in turn, curtail oil and gas development." National Security Finding, JA[R.40]. API's members "invest billions of dollars" in oil and gas development to meet the nation's energy needs, and need "[r]egulatory certainty and stability" to make those kinds of investments. *Id*. The Exemption Order was intended to provide regulatory certainty and stability. *Id*. Vacatur of the Exemption Order would create uncertainty and instability, and immediately restart the "trend … toward more litigation" under the ESA. *Id*. For this reason too, vacatur of the Exemption Order is unwarranted.

Finally, API agrees with AEA that if the court grants remand, it should retain jurisdiction to ensure that the remedy is carried out promptly. *See Chamber of Com. of United States v. U.S. Secs. & Exch. Comm'n*, 85 F.4th 760, 780 (5th Cir. 2023) (remanding without vacatur and with "direction to the SEC to correct the defects in the rule within 30 days of this opinion," and retaining jurisdiction "to consider the decision that is made on remand"); *Tex. Ass'n of Mfrs. v. U.S.*

*Consumer Prod. Safety Comm'n*, 989 F.3d 368, 390 (5th Cir. 2021) (retaining jurisdiction over remand, without vacatur, to commission "to resolve the defects in its rule"). Retention of jurisdiction over the remand will also streamline venue disputes that may arise in new challenges that environmental activists assert against a decision by the Committee following a remand.

## V. CONCLUSION

For the foregoing reasons, AEA's petition should be denied. If, alternatively, the Court finds any merit in AEA's petition, the Court should refrain from vacating the Committee's Exemption Order, and retain jurisdiction during any period of remand.

Dated: September 11, 2026.

*/s/ Jason T. Morgan*
JASON T. MORGAN, WA. Bar No. 38346
jason.morgan@stoel.com
RYAN P. STEEN, WA Bar No. 39922
ryan.steen@stoel.com
TIFFANY WANG, WA. Bar No. 57367
tiffany.wang@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3400
Seattle, Washington 98101
T: (206) 624-0900
F: (206) 386-7500

*Counsel for Intervenor-Respondent*
*American Petroleum Institute*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 11, 2026, an electronic copy of the foregoing AMERICAN PETROLEUM INSTITUTE'S ANSWERING BRIEF was filed with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system, and that service on all parties will be accomplished by the appellate CM/ECF system.

*/s/ Jason T. Morgan*
Jason T. Morgan
STOEL RIVES LLP
600 University Street, Suite 3400
Seattle, Washington 98101
T: (206) 624-0900
F: (206) 386-7500
jason.morgan@stoel.com

## CERTIFICATE OF COMPLIANCE

The undersigned counsel certifies that this motion:

(i) complies with the type-volume limit of Fed. R. App. P. 27(d)(2)(A) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Fifth Circuit Rule 32.2, this document contains 6,854 words; and

(ii) complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6) because the document has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman.

Dated: September 11, 2026.

*/s/ Jason T. Morgan*
Jason T. Morgan